**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

ANGELA ENGLE HORNE,

     Plaintiff,

v.                                                                                      Civil Action No. 3:16cv92

WTVR, LLC, d/b/a CBS 6,

     Defendant.

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### Preliminary Statement

Plaintiff seeks a recovery in defamation based on a broadcast about a newsworthy event where every statement in the broadcast is absolutely true. Plaintiff asserts that WTVR, LLC, d/b/a CBS 6 ("WTVR") is responsible for alleged inferences flowing from the true fact that the School Board terminated Plaintiff because of her felony conviction. Whatever inferences flow from the fact that the school board terminated Plaintiff because of the felony conviction are not the responsibility of WTVR.

Virginia law categorically prohibits any school system from hiring an employee who has been convicted of a felony. Va. Code § 22.1-296.1 (2011); Butler v. Fairfax Cty. Sch. Bd., ___ Va. ___, 780 S.E.2d 277 (2015) (applying Section 22.1-296.1). Plaintiff, a convicted felon, was employed by and worked at the Central School Board Office in Prince George County. Plaintiff was terminated, as she had to be, when the School Board learned of her felony conviction.

The fact that a school system hired and then terminated a convicted felon in violation of Virginia law was newsworthy. The viewer who reached out to WTVR concerned about a local school system hiring a convicted felon had a reason for being concerned. WTVR did not name the Plaintiff but accurately reported that the school system had terminated an unnamed convicted

felon.  The broadcast also reported, however, that because this was a personnel matter, the law

prevented the school system from providing details about the hiring and termination.  The

reporter specifically stated that "the school superintendent cannot legally talk about personnel

matters."  Because the superintendent said the law prohibited him from providing details about

Plaintiff, the reporter addressed questions "to the school system about how they keep this from

happening."

> Plaintiff's claim as stated in paragraph 1 of her Complaint is as follows:
>
> On February 13, 2015, CBS6 aired a two-minute, 21 second story entitled:
> "Sources:  Convicted felon worked at school board office in Central Va."  The
> unmistakable message from the story was that an applicant to the Prince George
> County School System had lied about her prior felony conviction and was fired
> only after the conviction was discovered as a result of a criminal background
> check process.

To the extent Plaintiff's termination created any "unmistakable message," which is

denied, WTVR cannot be held liable for any inferences created by accurately reporting

statements made by government employees relating to a matter of public concern.  In order to

maintain the necessary "breathing space" for discussion of public affairs, the First Amendment

shields citizens and the media from liability from accurately reporting governmental actions and

statements.  Moreover, because punishing truthful speech is antithetical to the First Amendment,

a plaintiff asserting a cause of action for defamation by implication must also allege sufficient

facts to pass the "plausibility" standard under Bell Atlantic Corp. v. Twombly, 550 U.S. 544

(2007)  and Ashcroft v. Iqbal, 556 U.S. 662 (2009) to show that the speaker intended to create

the defamatory implication.  Plaintiff cannot possibly meet that standard based on WTVR's

airing the school system's generic explanation of how the hiring process works.

I-1393871.3

## Statement of Facts

Paragraph 42 of the Complaint references the complete video of WTVR's news story.  A CD containing the entire news story is being sent to the Clerk's Office for inclusion in the file and a complete transcript made from the CD is attached hereto as **Exhibit 1**.

The broadcast begins by noting, "a CBS 6 viewer reached out to us concerned about a felon working for a local school system."  The viewer's concern was justified, and WTVR responded by questioning the superintendent of the school system.  The broadcast correctly notes that the law prevents the superintendent from providing information related to the terminated employee saying, "while the school system cannot legally talk about personnel matters, he did talk to me about the hiring practice."  The only other reference to the specific individual is the reporter's statement, "Candace, sources tell us the person who was hired to work in the school board office is no longer employed."

The broadcast makes it plain that the superintendent is not talking about this specific incident, but rather "about the hiring practice, and it starts with this book … Virginia School Law."  The superintendent discusses on air the general policies and practices related to how school personnel are hired.  A member of the public then comments that the background check should be completed earlier.  At the end of the story, the reporter notes that it is a Class 1 misdemeanor to make false representations about criminal convictions.

All WTVR could do based on what the superintendent said was to explain the procedure for hiring school system employees so that the public would be aware of how the process worked.  There is no allegation that WTVR was aware of the facts relating to the hiring and firing of Plaintiff, and WTVR was specifically told and relayed to its viewers that it could not legally obtain that information.  In short, the broadcast identified an important public issue, specifically stated that the school system could not and was not talking about a specific

3

individual, and accurately reported the summary of the hiring process by putting the
superintendent on air.

### The Standard for a Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a
complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009).  The "complaint must
contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its
face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007)).  "The plausibility standard requires a plaintiff to demonstrate more than
'a sheer possibility that a defendant has acted unlawfully.'" Francis, 588 F.3d at 193.  Rather, a
plaintiff must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a
claim entitling him to relief, i.e., the plausibility of entitlement to relief." Id. (quoting Twombly,
550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed
factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to
relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Twombly, 550 U.S. at 555.  The allegations of a complaint "must be
enough to raise a right to relief above the speculative level[.]" Id.  Pleading only the
"possibility" of a violation is not enough; a complaint must present the "plausibility of
'entitle[ment] to relief.'" Id. at 557.  While the Court must presume all "factual allegations in the
complaint to be true and accord[] all reasonable inferences to the non-moving party,"  the Court
is not bound to accept as true "conclusory allegations regarding the legal effect of the facts
alleged." Westmoreland v. Brown, 883 F. Supp. 67, 70 (E.D. Va. 1995) (quoting Labram v.
Havel, 43 F.3d 918, 921 (4th Cir. 1995)).  Indeed, the "presence… of a few conclusory legal
terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in

4

the complaint cannot support a finding of [liability]." <u>Young v. City of Mount Ranier</u>, 238 F.3d 567, 577 (4th Cir. 2001).

In deciding a motion to dismiss under Rule 12(b)(6), the Court may consider not only the facts stated in the complaint, but also any incorporated documents.  <u>See</u> <u>Phillips v. LCI Int'l, Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999).  The Court may also consider documents referred to in the complaint and relied upon by a plaintiff in bringing the action.  <u>Id.</u>  Similarly, when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss, and the Court may consider the same without converting the motion to one for summary judgment.  <u>Gasner v. County of Dinwiddie</u>, 162 F.R.D. 280 (E.D. Va. 1995) (citations omitted); <u>Tessler v. NBC Universal, Inc.</u>, Civ. A. No. 2:08cv234, 2009 U.S. Dist. LEXIS 27345, at *10 (E.D. Va. Mar. 31, 2009) (Jackson, J.), <u>aff'd</u> <u>Tessler v. NBC, Inc.</u>,  364 F. App'x 5 (4th Cir. 2010).

<u>**Argument**</u>

Because a school system had hired a convicted felon in violation of Virginia law, it was appropriate to broadcast information concerning how the hiring process worked and the procedures in place to prevent a convicted felon from being hired in the future.  Any inferences created by the failure of the superintendent to provide information he said the law legally prevented him from providing are not the responsibility of WTVR.

I.      THE BROADCAST IS TRUE AND TRUTH IS AN ABSOLUTE DEFENSE IN DEFAMATION ACTIONS

Virginia law clearly recognizes the constitutional requirement that a plaintiff has the burden to prove falsity in a defamation case.  <u>Gazette, Inc. v. Harris</u>, 229 Va. 1, 15 (1985); <u>Great Coastal Express, Inc. v. Ellington</u>, 230 Va. 142, 151-52 (1985).  In <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 777 (1986), Justice O'Connor, speaking for the <u>Hepps</u> Court,

5

reasoned that if the burden of proving truth were on the defendant, true speech might be punished.  The deterrence of truthful speech which might be occasioned by the presumption of falsity is "antithetical to the First Amendment's protection of true speech on matters of public concern."  Such a rule "could only result in a deterrence of speech which the Constitution makes free."  Id.  True speech about whether a convicted felon has been hired and fired by a school system is within the "speech which the Constitution makes free."  The only thing reported in the broadcast that could possibly relate to Plaintiff was that the person was a convicted felon, that the person had been hired, and that the person had been terminated.  All of these facts were true.  The broadcast specifically stated that the superintendent could not legally provide other details about Plaintiff.  This should end the analysis in regard to this case.

Plaintiff seems to argue that the broadcast was false because the reporter did not determine facts which the superintendent could not legally provide before broadcasting any story.  The argument is these unknown facts were necessary for the broadcast to be true.  There is no law to support this proposition.  The media has the right to publish what the government has provided even if the government has not provided all of the relevant information.  As Judge Payne observed in Ostergren v. McDonnell, No. CIV.A. 3:08CV362, 2008 WL 3895593 (E.D. Va. Aug. 22, 2008):

> As its third and final consideration, the Court expressed concern about the "timidity and self-censorship, which may result from allowing the media to be punished for publishing certain truthful information," id., and thus determined that it was constitutionally impermissible to "force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." Id. at 536.  On that point, the Court explained that "[t]his situation could inhere even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question." Id.

Id. at *9 (citing Florida Star v. B.J.F., 491 U.S. 524 (1989)).

6

There is no requirement that the media learn what the government will not say prior to accurately broadcasting what the government will say.  Indeed, such a requirement would create substantial obstacles for the media who acts as a surrogate for the public in investigating and reporting on governmental improprieties, particularly where the government refuses to provide all relevant details.  A journalist does not have an obligation to refrain from publishing what the government says until the journalist can determine whether the legal prohibition against discussing personnel matters means the government has not provided all relevant facts.  The superintendent said the law required that he omit facts.  A requirement that the media independently obtain any information omitted by the official spokesperson for the government would chill free speech and severely curtail the ability of the media to report on government activities.

II.    WTVR IS NOT LIABLE FOR ANY INFERENCE CREATED BY A CORRECT
       REPORT OF AN INTERVIEW WITH A GOVERNMENT SPOKESPERSON

Defamation by implication claims are a specific, narrow exception to the prohibition on punishing truthful speech that only arise when a reporter juxtaposes facts to create an undue inference or omits facts to create a false implication.  When an implication arises from the facts, and not from manipulation by the reporter, no liability can be asserted.  For example, reporting that the government has arrested or is investigating an individual arguably creates an inference of misconduct by that person.  Even if the fact that the investigation creates an inference of wrongdoing, the public has a right to know about the fact of the investigation and the media is free to report on the investigation and may do so without attempting to verify whether the individual is actually guilty.  In Jackson v. Paramount Pictures Corp., 80 Cal. Rptr. 2d 1 (Ct. App. 1998), the court held that a generally accurate report of a law enforcement investigation of a celebrity's alleged pedophilia was protected even though the investigation did not confirm the

7

charge.  In <u>Dulcefino v. Randolph</u>, 19 S.W.3d 906, 918 (Tex. App. 2000), the court held,

"[w]hen, as here, a case involves media defendants, the defendants need only prove that third

party allegations reported in a broadcast were, in fact, made and under investigation; they need

not demonstrate the allegations themselves are substantially true."

The media regularly reports on arrests.  The fact that an arrest may create an innuendo

that the arrested person is guilty does not make the report actionable.  As the leading authority on

defamation law has explained:

> One can imagine an argument that reporting an arrest or other official accusation
> of misbehavior implies that the person arrested or accused is in fact guilty of the
> charged misbehavior, requiring the plaintiff only to establish that he or she did not
> misbehave rather than that the accusation was not in fact made in order to make
> out a claim.  The argument is unlikely to prevail, particularly in light of the
> importance of the reporting of public accusatory actions and accusatory
> statements made by public officials.  Indeed, if not protectable, as true, such a
> publication might well find privilege under the "fair report" doctrine.

Robert D. Sack, <u>Sack on Defamation</u> § 3.8, at 3-27 (4th ed. 2010 & Supp. 2015).

The government regularly terminates employees.  As with criminal investigations, the

termination of an employee may create an implication of poor performance.  This does not mean,

however, that the media cannot publish the fact of the termination when it involves a matter of

public concern.  A government spokesperson may well have a specific intent to create a false

impression, but that does not mean that the media can be sued because it truthfully publishes

what it has been told by the government spokesperson.

The public has a right to know that the school district employed a convicted felon in

violation of Virginia law.  If reporting this fact creates the inference that the felon did not reveal

the felony, that is not the responsibility of the journalist.  There are only two explanations for a

felon being hired – someone at the school system was either unaware of the law or violated it or

the employee did not tell the school system of the felony.  Plaintiff argues that the station could

not broadcast what the superintendent said without determining additional unknown facts, even

though the superintendent was legally prevented from providing this information.  There is no

support for this claim.

III.    AN ACCURATE REPORT OF THE SUPERINTENDENT'S COMMENTS IS
        PROTECTED UNDER THE FAIR COMMENT PRIVILEGE RECOGNIZED BY
        VIRGINIA LAW

        Virginia has long recognized the importance of both citizens and the media being free to

comment on matters of public concern.  In James v. Haymes, 163 Va. 873 (1935), the Supreme

Court of Virginia recognized this important right and explained the important public policies

underlying the right:

> The privilege or right of a citizen to comment on matters of public concern is
> based upon a sound public policy, *i.e.*, the public should be informed of the
> character, qualifications, actions, and conduct of public officers and candidates
> for public offices, and other matters of public nature, such as the erection of
> public buildings and the construction of highways.  The comment or criticism in
> such cases may reflect upon the plaintiff in his public actions or conduct; indeed,
> he would not complain unless they tended in some degree to defame or ridicule
> him.  Sound public policy requires that immunity should be granted to
> newspapers and other citizens in the discussion of public affairs and where the
> comment or stricture is based upon established facts, an action does not lie unless
> there is proof of actual malice, or the language used so exceeds reasonable limits
> that malice may be inferred therefrom.

Id. at 878.

        In Story v. Norfolk-Portsmouth Newspapers, Inc., 202 Va. 588 (1961), the Supreme

Court of Virginia applied the privilege to a letter to the editor, holding that the law of Virginia

immunizes a publisher who fairly and accurately describes or summarizes official or

governmental actions, statements or reports.  Another court describes the fair report privilege as

follows:

> In Virginia, the fair report doctrine applies to press accounts of such official
> proceedings as court records and governmental actions.  A publisher is immune
> from liability for articles that accurately describe or summarize the contents of an
> official statement or report.

I-1393871.3

Ramey v. Kingsport Publ'g Corp., 905 F. Supp. 355, 358 (W.D. Va. 1995) (citations omitted).

In Ramey, the court applied the privilege to a reasonable inference from an affidavit the sheriff filed in order to obtain a search warrant for the plaintiff's premises.  The court outlined its rationale as follows:

> In Virginia, the fair report doctrine applies to press accounts of such official proceedings as court records and governmental actions.  *Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249, 254 (4th Cir. 1988) (applying Virginia law); *Alexandria Gazette Corp.,* 198 Va. at 159-160, 93 S.E.2d at 279 (1956).  A publisher is immune from liability for articles that accurately describe or summarize the contents of an official statement or report.  *Alexandria Gazette Corp.,* 198 Va. at 159-60, 163, 93 S.E.2d at 279, 281-82.  The statements in the February 27, 28 and 29 articles that Ramey was suspected of helping to deliver the baby, and that he may have done so, are reasonable inferences from the affidavit that the sheriff filed in order to obtain the search warrant for Ramey's apartment.  That affidavit taken as a whole contemplated the discovery in Ramey's apartment of evidence of an illegal abortion, and set forth evidence tending to support the inference that Ramey may have assisted in such an abortion.  Specifically, the affidavit sought "[i]nstruments used to facilitate an abortion," and cited as material facts constituting probable cause Ramey's admission that he was present in Holbrook's apartment at some point, that Ramey was aware of Holbrook's pregnancy, that "sensitive and affectionate communications" between the two had been discovered in Holbrook's apartment, and that Ramey's roommate had medical training.  The inference that Ramey and Campbell were suspected of assisting in the delivery of the baby is quite clear, and was plainly "substantially correct."  *Alexandria Gazette Corp.,* 198 Va. at 159-60, 93 S.E.2d at 279.  These statements are thus within the scope of Virginia's fair report privilege.  The court grants summary judgment to the defendant with respect to the February 27 article, and with respect to the statements in the February 28 and 29 articles that Ramey was suspected of, and may have, participated in the delivery of the baby.

Id. at 358-59.

While this issue frequently arises in reporting on criminal matters, the privilege applies in any context in which the media accurately publishes information provided by the government on a matter of public concern.  The privilege has been applied to letters from government officials and remarks of public officials.  In Reuber v. Food Chemical News, Inc., 925 F.2d 703 (4th Cir. 1991), the court applied the fair report privilege to a leaked letter reprimanding a public figure

employed by a contractor of the National Cancer Institute for his actions in connection with a matter of public concern.  This privilege has also been applied to unofficial public remarks of a member of Congress.  Chapin v. Knight-Ridder, Inc., 993 F.2d 1087 (4th Cir. 1993).

In commenting on the fair comment privilege in regard to reports on judicial records, the Supreme Court of Virginia has observed:

> Privilege in reporting a judicial record is not measured by the legal sufficiency of the charges made in the judicial pleadings or the truth of those charges.  The privilege consists of making a fair and substantially true account of the particular proceeding or record.

Alexandria Gazette Corp. v. West, 198 Va. 154, 160 (1956).  The Virginia rule is consistent with general law:

> The consensus rule has allowed the media to reasonably rely on authoritative police sources, spokespersons, and records without any independent verification or corroboration of the factual verity of the information conveyed.  Thus, defendant has been permitted to rely on the sheriff, the chief of police, an official press release list disseminated by the public relations director of the state police, an official "police blotter" report, a press release from the police department taken from an official "incident report," and an INS source disseminating information pursuant to agency policy.  However, the rule has not been limited to such official sources and other cases have allowed the media to reasonably rely on informal police communications or statements.

David A. Elder, Defamation:  A Lawyer's Guide, § 3:20, at 3-72 (2011) (citations omitted); see also Goss v. Houston Cmty. Newspapers, 252 S.W.3d 652, 656 (Tex. App. 2008) ("Goss argues that the privilege does not apply here because by relying solely on the press release instead of conducting an independent investigation, the story was biased and inaccurate because it omitted important facts, such as the prescription for his medication and that he was never charged with drag racing.  However, in reporting on this police action, appellees had no duty to investigate."); Lami v. Pulitzer Publ'g Co., 723 S.W.2d 458, 460-61 (Mo. Ct. App. 1986) (dismissing a claim based on an inaccurate report of an arrest and stating, "[a]s noted above, defendant's obligation was to publish a fair and accurate account of the record.  There was no concomitant duty to

11

investigate the truth or the falsity of the information contained in the record."); <u>McDonald v.</u>

<u>Raycom TV Broad., Inc.</u>, 665 F. Supp. 2d 688, 690-91 (S.D. Miss. 2009) (dismissing a

defamation claim where the defendant had published the picture of an innocent man with the

same name of a suspect and stating, "[n]umerous cases recognize the principle that information

released by the police, including reports and records, is generally considered to be a report of an

official action subject to the fair report privilege…   This has been routinely held to include

reports based on police press releases"); <u>LaComb v. Jacksonville Daily News Co.</u>, 543 S.E.2d

219, 221 (N.C. Ct. App. 2001) (affirming the dismissal of a defamation claim where the story

was a substantially accurate account of information contained in an arrest warrant,

notwithstanding that the most serious charges were later dismissed); <u>Robart v. Post-Standard</u>,

425 N.Y.S.2d 891, 892 (App. Div. 1980) (dismissing a defamation case based on an incorrect

report that the plaintiff had been arrested when, in fact, she had only been given a ticket where

the information had been provided by the police public information officer), <u>aff'd</u>, 418 N.E.2d

664 (N.Y. 1981).

In <u>Zaminski v. Jennings</u>, 6 Media L. Rep. (BNA) 1788 (Md. Ct. Spec. App. 1980), the

court held that a newspaper's publication based on statements by a police officer who had

previously provided reliable and accurate information was privileged as a report of an official

proceeding.  The court observed:

> The story was written by John Jennings, appellee, staff reporter for the News
> American.  In writing the story, Jennings had relied upon statements by Sergeant
> Windsor Kessler who had participated in the raid.  Kessler had previously
> supplied Jennings with reliable information which had been accurate in each
> instance.  The other appellees were Mark Collins, publisher, and the Hearst
> Corporation, owner of the News American.

<u>Id.</u> at 1788.

The court's rationale for its ruling was set forth as follows:

A newspaper enjoys a common law qualified privilege to publish reports of arrests and charges on which arrests are made, as well as other matters involving violation of the law. *Koren v. Capital-Gazette*, 22 Md. App. 576, 325 A.2d 140, *cert. denied*, 273 Md. 721 (1974). In that case we said:

> "Even if the underlying arrest or the underlying criminal charges turn out to be ill-founded, it is well settled that in Maryland a newspaper enjoys a qualified privilege to publish reports of arrests and charges on which arrests are made, as well as other matters involving violation of the law. *Evening News Co. v. Bowie*, 154 Md. 604, 141 A. 416 (1928); *Piracci v. Hearst Corp.*, 263 F. Supp. 511 (D. Md. 1966) (construing Maryland law).

Id. at 1789.

In Medico v. Time, Inc., 509 F. Supp. 268 (E.D. Pa. 1980), aff'd, 643 F.2d 134 (3d Cir. 1981), the court held that the publication of an article based on Federal Bureau of Investigation documents was privileged even though those documents had not been released to the press or public. The court held that the fact that the report was not public did not negate the privilege:

> Consequently, I conclude that the mere fact that a government report has not been made public does not make it less of "a report of an official action or proceeding" than any other ex parte report of a governmental agency for purposes of the section 611 privilege to republish a defamation.

Id. at 279.

In Kenney v. Scripps Howard Broadcasting Co., 259 F.3d 922 (8th Cir. 2001), the court dealt with whether the qualified fair reporting privilege shielded a television station from a defamation action brought by a grandmother identified as a possible suspect in the abduction of her grandchild. The missing person's report indicated that the police believed the grandchild was abducted by a parent or relative, and the report explained that the child's mother believed the child was last seen with the grandmother. Despite the fact the grandmother had nothing to do with the abduction, the court granted summary judgment for the television station, stating:

> Reports of legislative, judicial or executive proceedings and the statements made therein, are subject to a qualified privilege. *Spradlin's Market, Inc. v. Springfield*

> *Newspapers, Inc.*, 398 S.W.2d 859, 864 (Mo. 1966).  The fair report privilege,
> adopted by the Missouri Court of Appeals in *Shafer v. Lamar Publishing Co.*, 621
> S.W.2d 709, 711 (Mo.App.1981), is set out in Restatement (Second) of Torts
> § 611 (1976):  "The publication of defamatory matter concerning another in a
> report of an official action or proceeding or of a meeting open to the public that
> deals with a matter of public concern is privileged if the report is accurate and
> complete or a fair abridgment of the occurrences reported."  The question of the
> existence of a qualified privilege is a question of law for the court and is
> particularly appropriate for resolution on a motion for summary judgment.
> *Erickson v. Pulitzer Pub. Co.*, 797 S.W.2d 853, 857 (Mo.App.1990).

Id. at 923-24.  As long as the report was a fair and accurate abridgement of the missing person's

report, it was privileged.  The court said, "The Missouri Court of Appeals has held that police

reports are reports of an official action subject to the fair report privilege.  *Erickson v. Pulitzer

Publ'g Co.*, 797 S.W.2d 853, 857 (Mo. App. 1990); *Biermann v. Pulitzer Publ'g Co.*, 627

S.W.2d 87, 88 (Mo. Ct. App. 1981)."  Id. at 924.

In Mathis v Philadelphia Newspapers, Inc., 455 F. Supp. 406 (E.D. Pa. 1978), the media

relied upon an affidavit filed by an FBI agent and published the photograph of the plaintiff who

was in no way involved in a combined kidnapping and attempted bank robbery.  In spite of the

fact that the media utilized the plaintiff's photograph extensively, the court granted summary

judgment based on the common law privilege of fair reporting:

> Without belaboring the point, I conclude that defendants' publications were
> accurate reports of the admittedly inaccurate governmental reports on the arrest
> and arraignment of the Mathis brothers.  Indeed, I do not understand plaintiff to
> suggest otherwise.  The Philadelphia Police Department reported that the
> photograph of plaintiff was a likeness of the John Mathis then in custody, and the
> initial articles in both newspapers accurately reprinted this report, which later
> turned out to be false.  Similarly, the two articles in the Evening Bulletin
> accurately reprinted the obsolete account of plaintiff's age and address, as it was
> reported by the Philadelphia Police Department.  Defendants' accounts cannot be
> deemed inaccurate for purposes of section 611 simply because they did not
> correspond to the events that actually occurred.  *See Sciandra v. Lynett*, 409 Pa.
> 595, 600, 187 A.2d 586 (1962).

Id. at 417.

In Sibley v. Holyoke Transcript-Telegram Publishing Co., 461 N.E.2d 823 (Mass. 1984), the court addressed whether the privilege extended to publications of statements contained in an affidavit presented to obtain a search warrant.  The court ruled, "We hold that the qualified privilege extends to this case, and in view of this determination, we need not reach the issue of negligence in the reporter's research of the affidavit's contents."  Id. at 824.

The court explained its holding in more detail later as follows:

> This court has long recognized a publisher's qualified privilege to report fairly and accurately the subject matter of judicial proceedings.  This qualified privilege is justified "not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself . . . as to the mode in which a public duty is performed." *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884).  As the privilege is not absolute, however, the issue of its applicability must focus upon whether the reported material reflects the subject of a judicial proceeding as well as whether it is fair and accurate. It has been said that the act of filing a paper with the court, without more, is not a "judicial proceeding." *Cowley v. Pulsifer, supra.*  The privilege extends only "to matters which really have been made the subject of judicial action." *Lundin v. Post Publishing Co.*, 217 Mass. 213, 216, 104 N.E. 480 (1914).  Ordinarily this determination is within the province of the jury. *Parker v. Republican Co.*, 181 Mass. 392, 395, 63 N.E. 931 (1902).  However, because the early cases clearly contemplated "judicial proceedings" as being transactions in open court, the dividing line between "judicial proceedings" and other court functions not within the privilege is a matter of some uncertainty. This court has previously held that a fair and accurate report of a clerk's issuance of an arrest warrant upon a sworn complaint falls within the privilege. *Thompson v .Globe Newspaper Co.*, 279 Mass. 176, 186-187, 181 N.E. 249 (1932).

Id. at 825-26.

In El Amin v. Miami Herald Publishing Co., 9 Media L. Rep. (BNA) 1079 (Fla. Cir. Ct. 1983), the court held that reliance upon information supplied by the police was privileged:

> Those who report information from official sources to the public are also accorded a privilege for that republication:
>
>> [I]t would, indeed, be anomalous if the maker of a defamatory statement were privileged but a news agency which merely published a true account of the statement could be subject to liability.

* * *

> If freedom of public debate is to be meaningful, the dissemination of such debate must also be privileged to insure that it is heard by all.  Thus, as *New York Times* and other cases have seemingly recognized, the republisher is entitled to at least the same protection as the original speaker.
>
> *Grafton v. ABC*, 7 Med. L. Rptr. 1134 (Ohio Ct. App. 1890), (quoting Comment, 64 Colum.L.Rev. 1102 (1964) (Emphasis supplied.)  *See, also, Hatjioannou v. The Tribune Company, supra.*

News articles reporting information received from police agencies have been repeatedly held privileged.  *Medico v. Time, Inc.*, 643 F.2d 134 [6 Med.L.Rptr. 1968, 2529] (3d Cir. 1981); *Mathis v. Philadelphia Newspapers, Inc.,* 455 F. Supp. 406 [4 Med.L.Rptr. 1449] (E.D. Pa. 1978); *Zaminski v. Jennings*, 6 Med.L.Rptr. 1788 (Md. Ct. App. 1980); *O'Neal v. Tribune Company,* 176 So.2d 535 (Fla. 2 DCA 1965).  If reports of officially disseminated information are substantially and materially accurate, the fact that the reported information itself later turns out to be erroneous is no basis for imposing liability.  The test of accuracy for purposes of the privilege requires that the publications be compared not with the events that actually transpired, but with the information that was reported from official sources.  *Mathis v. Philadelphia Newspapers, Inc.*, 455 F. Supp. 406, 415-417 (E.D. Pa. 1978); *Hatjioannou v. The Tribune Company, supra.*

Id. at 1081.

In Vaillancourt v. Media General Operations Inc., 36 Media L. Rep. (BNA) 1543 (Fla.

Cir. Ct. 2007), another Florida court applied the same privilege:

> Under Florida law, media defendants in defamation lawsuits are entitled to several privileges, including the fair report or official action privilege.  Under that privilege, defendants cannot be held liable for fairly and accurately reporting information derived from official sources, whether the source is a government report or a government official.  *Stewart v. Sun Sentinel Co.,* 695 So.2d 360, 362 [25 Med.L.Rptr. 1763] (Fla. 4th DCA 1997); *Woodard v. Sunbeam Television Corp.,* 616 So.2d 501, 502-03 [21 Med.L.Rptr. 1286] (Fla. 3d DCA 1993).  Consequently, if a media defendant's report of information obtained from an official source is substantially and materially accurate, regardless of whether the underlying allegations from the official source are true, the newspaper cannot be held liable.  *Stewart*, 695 So.2d at 362; *Woodard*, 616 So.2d at 502-03.  The test of accuracy for purposes of the privilege requires that the report be compared not

16

with the events that actually transpired, but with the information that was reported from official sources.

Id. at 1544.

There is no duty to investigate to determine the accuracy of an official report.  In Lewis

v. McGraw-Hill Broadcasting Co., 832 P.2d 1118 (Colo. Ct. App. 1992), the court stated:

> Based on the foregoing, we hold that when, as here, members of the media have an objective basis to rely on the accuracy of an official report which relates to a matter of public concern or which involves a public figure, then publication need not be delayed in order to investigate its accuracy or to obtain corroboration from all possible sources.  *Seible v. Denver Post, Corp., supra; Bowers v. Loveland Publishing Co., supra; Fink v. Combined Communications, Corp.,* 679 P.2d 1108 (Colo. App. 1984) ("a reporter, without a 'high degree of awareness of their probable falsity' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution").  To impose liability in such a case, as here, would create unrealistic burdens on the news media.

Id. at 1124.

The privilege applies even if the superintendent knew the information he was providing

created a false impression.  In Uranga v. Federated Publications, Inc., No. 25162, 2000 WL

1056095 (Idaho Ct. App. Aug. 2, 2000), vacated, No. 27118, 2001 WL 693891 (Idaho 2001) the

court dealt with the issue of the falsity of information provided by the police as follows:

> In our view, however, the underlying policy expressed in *Cox Broadcasting* and its progeny calls for a rejection of Uranga's contention that the press may be subject to liability for accurately reporting the untruthful content of court records. A rule that the press must independently verify all allegations found in a court record before publishing the information would create the sort of chilling effect on press coverage that the United States Supreme Court has consistently admonished against.  The press's role to keep the public apprised of the court system's operations includes notifying the public of criminal charges made against members of the community.  By following the accused through the criminal process, the press offers the general public a window into the justice system, a window from which the community can track the law enforcement, prosecutorial and judicial operations, through the ultimate disposition of the charges.  If only *truthful* information were protected, the press would risk liability for reporting that a person had been accused of a crime, as the truth of the accusation would not be known until after trial.

Id. at *5.

In Uranga, the court observed that the newspaper was protected from liability even if all of the elements of the common law tort in Idaho had been satisfied:

> The issue presented by the Statesman's summary judgment motion was not whether Uranga could sustain his burden to prove the elements of one or more of these common law causes of action but whether, even assuming that he could sustain his burden of proof under state law, the Statesman is nonetheless immune from liability by operation of the First Amendment, which is applied to the states through the Fourteenth Amendment.

Id. at *2.  The court held that the newspaper was entitled to summary judgment because the publication was protected by the Constitution.

On appeal, the Idaho Supreme Court upheld the lower court's verdict, stating:

> The instant case is not sufficiently distinguishable from *Cox Broadcasting*.  The First and Fourteenth Amendments do not permit the *Statesman* to be held liable in damages for accurately publishing a document contained in a court record open to the public.  Changing the cause of action from invasion of privacy to infliction of emotional distress does not circumvent the constitutional protection of the publication.  *See Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1193 n. 2 (9th Cir. 1989).

> In *Cox Broadcasting*, the Supreme Court stated, "In this instance as in others reliance must rest upon the judgment of those who decide what to publish or broadcast."  420 U.S. at 496, 95 S.Ct. 1029.  As James Madison said, "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press."  4 Elliot's Debates on the Federal Constitution 571 (1876 ed.).

Uranga v. Federated Publ'ns, Inc., 67 P.3d 29, 35-36 (Idaho 2003).

IV.    THERE IS NO ALLEGATION THAT WTVR INTENDED TO ESTABLISH AN INNUENDO IT KNEW TO BE FALSE

Pendleton v. Newsome, ___ Va. ___, 772 S.E.2d 759 (2015), illustrates the distinction between the liability of governmental spokespeople for leaving out details that created a false impression while the media had the absolute right to publish those false statements without liability.  That case involved, as does this case, comments from a school system.  That case

18

involved the tragic death of a child.  The statements from the school system implied that the

mother bore some responsibility for the death in spite of the fact that the spokespeople knew the

contrary.  The Supreme Court of Virginia held that in that situation, the spokespeople could be

held accountable.  While rejecting the argument that the words themselves must show that the

author intends or endorses the defamatory inference, the Supreme Court recognized there was a

need to prove an intent to create the defamatory inference.  The court said:

> Such a holding would immunize one who intentionally defames another by a
> careful choice of words to ensure that they state no falsehoods if read out of
> context but convey a defamatory innuendo in the circumstances in which they
> were uttered.  Motive, intent, scheme, plan or design are issues of fact that may be
> proved by circumstantial evidence as well as by direct evidence.  *See Banovitch v.
> Commonwealth*, 196 Va. 210, 216, 83 S.E.2d 369, 373 (1954) ("The specific
> intent may, like any other fact, be shown by circumstances.")

Id. at 764-65.  In order to prevail, plaintiffs would have to prove, "that the statements, even if

facially true, were designed and intended by the defendants to imply that the plaintiff was

responsible for the death of her child."  Id.  at 765.

The Court did not suggest that the news media bore any responsibility for publishing the

statements made by defendants.  The Court specifically observed:

> In the present case, published news reports, attached as exhibits to the
> complaint, indicate that in the days immediately following the child's death, the
> case had been widely publicized.  News accounts had identified the plaintiff by
> name as the mother at the center of the case.  In this context, it is clear that any
> defamatory implication proceeding from the defendants' statements was aimed
> directly at her and at no other person.

Id. at 763-64.  By noting that responsible news organizations had identified the plaintiff in the

context of accusations that made her appear to bear responsibility for her child's death, the court

was not suggesting that the media could be sued for doing its job.

In Chapin v. Knight-Ridder, Inc., 993 F.2d 1087 (4th Cir. 1993), a case arising under

Virginia law, the Fourth Circuit applied these principles in dismissing a variety of defamation by

implications claims made against a news organization's reports about a matter of public concern. The plaintiffs in <u>Chapin</u> ran several nonprofit organizations, one of which allowed the public to send gift packages to soldiers in the Middle East (one for $15 or two for $25).  <u>Id.</u> at 1091.  The promotional materials indicated that the retail value of the items in the packages was $14.40.  <u>Id.</u> Although the program flourished, the Philadelphia Inquirer published a story that questioned the legitimacy of the program, noting a "hefty mark-up" of about 50% and "wondered aloud 'where the rest of the money goes.'"  <u>Id.</u>  The article also asked, "Who will benefit more?," the soldiers or the plaintiffs.  The article reported on other charities run by the plaintiffs that resulted in strained financial situations, misleading promotions, and the questionable inclusion of highly-situated "friends" of the program (e.g., generals), who were unaware of its existence.  <u>Id.</u> at 1094-95.

The court rejected the plaintiffs' claims based on the pointed questions raised by the article.  In rejecting the plaintiffs' claim based on the question of "Who will benefit more?," the court held that, "[t]his question cannot be reasonably read to imply the assertion of the false and defamatory fact – pocket-lining – of which plaintiffs complain.  The question simply provokes public scrutiny of the plaintiffs' activities."  <u>Id.</u> at 1094.  The court similarly rejected the plaintiffs' claim that the sentence, "it is not clear where the rest of the money goes" created false and defamatory implications.  The court's explanation with respect to this claim, perhaps more than anywhere else in the opinion, makes the key distinction between actionable and non-actionable claims:

> Plaintiffs complain about the sentence "it is not clear where the rest of the money goes."  We do not know how this statement could be false.  [The reporter] did not know; [the plaintiff] would not tell him; [the reporter] invited the public to ask.  This invitation, rather than a libel, is the paradigm of a properly functioning press.  Again, plaintiffs argue that the question implies the answer: [the plaintiff] is a dishonest man who pockets the difference.   That answer was certainly within the

20

wide range of possibilities, which is precisely why we need and must permit a free press to ask the question.

Id. at 1095-96.

In the context of this case, it was entirely appropriate to ask questions concerning how a convicted felon could be hired by a school system in violation of Virginia law.  No one is liable for reporting the government's answers to appropriate questions.

## Conclusion

The broadcast is true.  To the extent any implications were created, they were created by the facts and not by any action of WTVR.  The broadcast is protected by the fair comment privilege.  There is no evidence that WTVR or any of its agents, servants or employees was negligent.  This action has no basis at law and should be dismissed.

Dated:  March 16, 2016                         Respectfully submitted,


                                               /s/_____
                                               Conrad M. Shumadine
                                               (VSB No. 4325)
                                               Brett A. Spain
                                               (VSB No. 44567)
                                               Counsel for WTVR, LLC, d/b/a CBS 6
                                               WILLCOX & SAVAGE, P.C.
                                               440 Monticello Avenue, Suite 2200
                                               Norfolk, Virginia  23510
                                               Telephone: (757) 628-5500
                                               Facsimile: (757) 628-5569
                                               cshumadine@wilsav.com
                                               bspain@wilsav.com

I-1393871.3

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of March, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

Richard F. Hawkins, III
(VSB No. 40666)
Counsel for Plaintiff
The Hawkins Law Firm PC
2222 Monument Avenue
Richmond, Virginia 23220
Telephone:  804/308-3040
Facsimile:  804/308-3113
rhawkins@thehawkinslawfirm.net

/s/
Conrad M. Shumadine (VSB No. 4325)
Brett A. Spain (VSB No. 44567)
Counsel for WTVR, LLC, d/b/a CBS 6
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia  23510
Telephone: (757) 628-5500
Facsimile: (757) 628-5569
cshumadine@wilsav.com
bspain@wilsav.com

I-1393871.3