IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

ANGELA ENGLE HORNE,

    Plaintiff,

v.                                                                Civil Action No. 3:16cv92

WTVR, LLC, d/b/a CBS 6,

    Defendant.

## MEMORANDUM IN SUPPORT OF MOTION TO DECLARE PLAINTIFF A PUBLIC OFFICIAL AND/OR A LIMITED-PURPOSE PUBLIC FIGURE

### Preliminary Statement

This case involves a claim for defamation brought by Angela Engle Horne ("Ms. Horne") against WTVR based on a broadcast concerning the hiring practices of the Prince George County School System (the "School System") addressing how the School System could avoid hiring a felon in violation of Virginia law. Virginia law requires an applicant for any position with the School System as a condition precedent to obtaining employment to certify that the applicant has never been convicted of a felony. Section 22.1-296.1 of the Code of Virginia. Ms. Horne was hired by the School System to be Director of Budget and Finance in spite of having a felony conviction which made it impossible for her to provide the required certification.

While the broadcast was generated by the fact that the Prince George County School Board (the "School Board") had hired a felon, it was not about Ms. Horne, it did not mention her name and did not contain any information about her position or the facts relating to her hiring or firing and, in fact, made it plain that this information could not be obtained because of the legal protection provided to personnel records. Ms. Horne claims she was defamed because the broadcast correctly reported that Virginia law makes a false certification of no felony convictions

a class 1 misdemeanor. While WTVR asserts that the broadcast was not "of and concerning" Ms. Horne, that its reporter was in no way negligent in relying on information provided by the official spokesperson for the School System and that the broadcast is protected by the Fair Comment Privilege, it is clear that Ms. Horne was both a public official and limited-purpose public figure for the publication of the broadcast.

## Argument

The standard of proof in defamation actions depends on the public or private status of the plaintiff. As a general rule, private plaintiffs may recover based merely on a showing by a preponderance of the evidence that the defendant made a false and defamatory statement negligently. A "public official" or "public figure," on the other hand, must prove by clear and convincing evidence that the defendant made the statement with constitutional "actual malice."

The United States Supreme Court first recognized the distinction between public and private plaintiffs, and the differing standards of proof that apply to each, in the landmark decision New York Times v. Sullivan, 376 U.S. 254 (1964). Explaining the need for open and robust debate and discussion of public issues, the Court stated:

> The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F. Supp. 362, 372 (D.C. S. D. N.Y. 1943). Mr. Justice Brandeis, in his concurring opinion in *Whitney v. California*, 274 U.S. 357, 375-376, gave the principle its classic formulation:
>
> "Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as

2

> applied through public discussion, they eschewed silence coerced by law — the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."
>
> Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

Id. at 270. In order to provide the necessary "breathing space" for public criticism of the government and its employees, the Court held that "public officials" may recover for defamatory statements only upon proof that the defendant published the alleged defamatory statements with constitutional "actual malice."

Whether a plaintiff falls within the category of public officials subject to the actual malice standard is a question of federal constitutional law for the Court. Rosenblatt v. Baer, 383 U.S. 75 (1966), later appeal, 237 A.2d 130 (N.H. 1967). It is the clear that the Director of Budget and Finance for the School System has "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it." Id. at 88. A brief review of the Prince George County Public Schools Position Description Summary Form for the position of Director of Budget and Finance indicates the importance of that position. (Browder Dep. pp. 13-14; Browder Dep. Ex. 3).[1] The Director of Budget and Finance is the highest ranking accounting official in the School System (Browder Dep. p. 14) and, in that capacity, has authority over a budget of between $58 and $59 million (Browder Dep. p. 25) which is approximately half of the budget for Prince George County.

When a school system violates clear Virginia law, this creates a newsworthy controversy. Ms. Horne thus becomes a limited purpose public figure for the purpose of describing the actions

---

[1] Portions of the redacted deposition of Dr. Bobby Browder and Exhibit 3 to his deposition are attached hereto as **Exhibit A**.

3

of the School Board that violated Virginia law. While Ms. Horne may not have known the law, she voluntarily applied for the position, she did not make certification required by the law, and even after becoming aware of the law, she urged that she be retained in violation of the law. The expense incurred in evaluating and deciding to hire Ms. Horne was wasted as were efforts associated with her learning her new responsibilities. None of this should have occurred. For purposes of discussing how the School Board could avoid violating the law, Ms. Horne is thrust into the controversy and is thus a limited-purpose public figure.

I.   PUBLIC STATUS IS A MATTER OF LAW FOR THE COURT TO DECIDE

The determination of a plaintiff's status as a public official or public figure is an issue of law for resolution by the court. Fleming v. Moore, 221 Va. 884 (1981), later appeal sub nom. Gazette, Inc. v. Harris, 229 Va. 1 (1985). In Rosenblatt v. Baer, 383 U.S. 75, 88 (1966) later appeal, 237 A.2d 130 (N.H. 1967), the Supreme Court said, "We remark only that, as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'" In Tavoulareas v. Piro, 817 F.2d 762, 772 (D.C. Cir. 1987), the court said, "Whether (and to what extent) a person is a public figure is a matter of law for the court to decide." In Trotter v. Jack Anderson Enterprises, Inc., 818 F.2d 431, 433 (5th Cir. 1987), the court said, "[w]hether an individual is a public figure is a matter of law for the court to decide." See also Kassel v. Gannett Co., 15 Media L. Rep. (BNA) 1205, 1206 (1st Cir. 1988); White v. Mobile Press Register, Inc., 514 So. 2d 902 (Ala. 1987); J & C. Inc. v. Combined Commc'ns Corp., 14 Media L. Rep. (BNA) 2162, 2164 (Ky. Ct. App. 1987); O'Neil v. Peekskill Faculty Ass'n, 507 N.Y.S.2d 173, 179 (App. Div. 1986). As the Iowa Supreme Court noted, the determination of public official or public figure status "is one of federal constitutional law." Jones v. Palmer Commc'ns, Inc., 440 N.W.2d 884, 894 (Iowa 1989).

## II. A PUBLIC OFFICIAL HAS OR APPEARS TO HAVE SUBSTANTIAL RESPONSIBILITY FOR THE HANDLING OF GOVERNMENT AFFAIRS

In establishing the actual malice standard in New York Times, the Court stated that it would not decide "how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." New York Times, 376 U.S. at 283 n.23. When the Supreme Court addressed the issue two years later in Rosenblatt v. Baer, 383 U.S. 75 (1966), the Court again declined to provide "precise lines" for public official status. Rather, the Court focused on the two motivating forces for creation of the standard in New York Times, stating, "[t]here is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." Id. at 85. Recognizing the importance of open and robust debate and criticism of government generally and public officials specifically, the Court rejected the argument that the designation should only apply to high-ranking officials:

> Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the "public official" designation *applies at the very least to* those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

Id. (emphasis added). The Court held that both factors identified in New York Times are present and the actual malice standard for public officials applies if a plaintiff's "position in government has such apparent[2] importance that the public has an independent interest in the qualifications

---

[2] As this language indicates, it is sufficient that the position in question have either the actual or apparent responsibility for governmental affairs. See also Baumback v. Am. Broad. Cos., 161 F.3d 1 (unpublished table decision), 1998 WL 536358, at *3 (4th Cir. 1998) ("[W]e begin with the general rule that 'the "public official" designation applies at the very least to those among the hierarchy of government employees who *have, or appear to the public to have*, substantial responsibility for or control over the conduct of governmental affairs.' ... Thus our application

5

I-1436349.1

and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees...." Id. at 86.

While Rosenblatt did not provide a clear definition of "public official," courts and commentators agree that the term is broad and expansive. See, e.g., Robert D. Sack, Sack on Defamation § 5.2.1, at 5-6 (4th ed. 2010) ("This much is clear: Although not every public employee is a public official, the term is broad."); id. at 5-7 ("The public official category is by no means limited to upper echelons of government. All important government employees are subject to discussion by the people who employ them and by others who would comment on their behavior."). As explained by Dean Smolla:

> The definition of public officials is not limited to those policy-making roles at the very top of the governmental structure. *Rosenblatt v. Baer* was a case arising from a verdict in favor of a former public recreation area supervisor against a columnist for a local New Hampshire newspaper. The Court in this case indicated that for constitutional purposes the definition of public figure would not be tied to state standards that evolved prior to the *New York Times* cases, but would be an extremely expansive first amendment standard. The Court stated that "the public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." In order to give the public official designation the latitude envisioned by this formulation, the Court held, it is for the trial judge to determine in the first instance whether the proofs show that a plaintiff is a public official. The Court embarked on this course "to lessen the possibility that a jury will use the cloak of the general verdict to punish unpopular ideas or speakers and assure an appellate court the record of findings for review of constitutional decisions."

Rodney A. Smolla, Law of Defamation § 2:101, at 2-175 to 2-176 (2d ed. 1999 & Supp. 2014).

Given this expansive view, courts have held officials at all levels of government to be public officials. The privilege is not reserved simply for those who have been popularly elected or who sit at the very top of the governmental hierarchy, and a plaintiff's relative position is not

---

of the 'public official' designation turns on whether Baumback had substantial responsibility – actual or apparent – for the administration of governmental matters.") (emphasis in original).

dispositive. See Baumback v. Am. Broad. Cos., 161 F.3d 1 (unpublished table decision), 1998 WL 536358 (4th Cir. 1998). In Auvil v. Times Journal Co., 10 Media L. Rep. (BNA) 2302 (E.D. Va. 1984), for example, the United States District Court for the Eastern District of Virginia found a receptionist at a pediatric clinic at Ft. Eustis to be a public official because of the interactions she had with the public. The court noted that she was:

> ... the single person empowered to make appointments in that clinic. Her position requires her to be in constant contact with the public, including many persons who have reason to be fearful and distressed. Her performance in that position is clearly a matter of public concern, and accordingly she should be treated as a public official.

Id. at 2304; see also Dean v. Dearing, 263 Va. 485 (2002) (applying the actual malice standard to a police officer); Sharpe v. Landmark Commc'ns, Inc., At Law No.: CL08-1664, 4 Cir. CL081664 (Va. Cir. Ct. Apr. 6, 2009) (Casefinder) (holding that a public information officer on a Navy ship was a public official); Carroll v. Jones, 74 Va. Cir. 466 (Portsmouth 2008) (holding that a civilian "Director of Contracting" in charge of awarding government contracts was a public official).

Courts outside of Virginia have similarly concluded that plaintiffs with far less important positions than Ms. Horne were public officials for purposes of defamation claims. See, e.g., Peterson v. County of Dakota, Minn., 479 F.3d 555 (8th Cir. 2007) (social worker); Smith v. Danielczyk, 928 A.2d 795 (Md. 2007) (police officer); Beeton v. District of Columbia, 779 A.2d 918 (D.C. 2001) (correctional officer); Davis v. Borskey, 660 So. 2d 17 (La. 1995) (university purchasing agent); Ferguson v. Union City Daily Messenger, Inc., 845 S.W.2d 162 (Tenn. 1992) (county purchasing agent); Kahn v. Bower, 284 Cal. Rptr. 244 (Ct. App. 1991) (social worker); Villarreal v. Harte-Hanks Commc'ns, Inc., 787 S.W.2d 131 (Tex. App. 1990) (welfare agent); Guzzardo v. Adams, 411 So. 2d 1148 (La. Ct. App. 1982) (personnel coordinator); Gray v. Udevitz, 656 F.2d 588 (10th Cir. 1981) (policeman); Hodges v. Okla. Journal Publ'g Co., 617

7

P.2d 191 (Okla. 1980) (license tag agent); Fadell v. Minneapolis Star & Tribune Co., 557 F.2d 107 (7th Cir. 1977) (tax assessor); Grzelak v. Calumet Publ'g Co., 543 F.2d 579 (7th Cir. 1975) (secretary to city public works director); Fopay v. Noveroske, 334 N.E.2d 79 (Ill. App. Ct. 1975) (x-ray technician); Coursey v. Greater Niles Twp. Publ'g Corp., 239 N.E.2d 837 (Ill. 1968) (patrolman); Kruteck v. Schimmel, 278 N.Y.S.2d 25 (App. Div. 1967) (public utility auditor); Press, Inc. v. Verran, 569 S.W.2d 435 (Tenn. 1978) (junior social worker); Clawson v. Longview Publ'g Co., 589 P.2d 1223 (Wash. 1979) (administrator of county motor pool).

### III. THE RESPONSIBILITIES OF THE DIRECTOR OF BUDGET AND FINANCE ARE AND APPEAR TO BE EXTENSIVE

The public has an independent and overriding interest in seeing that public funds are accounted for with accuracy and transparency. The Director of Budget and Finance is the person who has the ultimate responsibility for making this happen, and is thus a public official for the purpose of the New York Times' actual malice test. As Dr. Bobby Browder (the former Superintendent of Schools) noted, the Director of Budget and Finance is routinely invited to School Board meetings and is the person to whom the School Board refers questions concerning financial matters. Dr. Browder testified:

> Q    If anyone has any questions concerning financial records of the school system, who would those questions be directed to?
>
> A    They would be directed to the director of budget and finance.

(Browder Dep. p. 15).

The Prince George County Public Schools Position Description Summary Form says the Director of Budget and Finance is "[t]o manage the financial, budgetary, and purchasing affairs of the School Division in a prudent and effective manner." (Browder Dep. Ex. 3). The responsibilities of the position are listed in 19 subparagraphs. Among the duties are to:

8

I-1436349.1

1. Plan, direct, and coordinate the preparation of the School Division's annual budget

2. Plan, direct, and coordinate general accounting activities for the School Division and serve as a liaison between the School Board and the County's Central Accounting Office for such activities

3. Manage the accounts payable and payroll functions for the School Division

4. Provide periodic and budgetary reports to the School Board, Superintendent, and key staff. . . .

Ms. Horne concedes that the description of the duties of her position are correctly set forth in the Position Description Summary Form. Ms. Horne testified:

Q   Let me show you a document that's been previously marked as Browder Deposition Exhibit No. 3. And can you identify that document?

A.  Position Description Summary Form for Prince George County Public Schools.

Q   And is that an accurate description of the position that you were given?

A   Yes.

Q.  And were all of the job duties that are set forth there correct and a part of the responsibilities you had?

A.  These were duties that I was responsible for, yes.

(Horne Dep. p. 63, line 17 through p. 64, line 4).[3]

The Director of Budget and Finance reports to the Assistant Superintendent for Administration and Personnel, but the Director of Budget and Finance is the top accounting official in the School System. (Browder Dep. p. 14). To the extent financial accountability is important, and it is, that responsibility falls directly on the Director of Budget and Finance. The significance of the position is reinforced by the fact that the selection of this official is made by the School Board itself with the administrative staff assuming only an advisory role.

---

[3] A copy of the redacted deposition of Plaintiff is attached hereto as **Exhibit B.**

I-1436349.1

Dr. Browder described the position as follows:

Q    Okay. Does the director of budget and finance typically interact with the School Board?

A    Yes, they are – the individual is typically present at the meeting. They would be asked questions in relationship to where we are with the finances, grants, etc.

Q    And so the first duty that's set out there is plan, direct, and coordinate the preparation of the school division's annual budget. Do you see that?

A    Uh-huh.

Q    And would you just briefly describe what that encompasses?

A    The budget director is more than involved with me as superintendent in terms of helping prepare the budget information for presentation in terms of the superintendent's budget. And then once that's prepared, it's refined as we would learn from a Board standpoint what funds would be available for the local, the state, and the federal government for purposes of developing the budget and then having it approved for implementation.

Then, once it's approved, that person is the individual that the superintendent and Board would rely upon to ensure that all of the funding strands are funded correctly based upon line item approval.

Q    Okay. And the next item is plan, direct, and coordinate general accounting activities for the school division. I'm going to stop there. Would you describe for the record what that encompasses?

A    They are working with the individual schools in terms of the activities that would take place within each of the schools in terms of the funding streams, making sure that those funds are expended correctly, they are accounted for, and then audited.

(Browder Dep. pp. 16-17).

Virginia law prohibits a school board from expending "in any fiscal year, any sum of money in excess of the fund available for school purposes without the consent of the governing body or bodies appropriating funds to the school board." Section 22.1-91 of the Code of Virginia. It is the responsibility of the Director of Budget and Finance to make certain that revenue expectations are realistic and appropriate and are adjusted to deal with unexpected

circumstances. The correct estimation of revenues and expenditures requires judgment and discretion as well as backbone. The public always wants more from its schools than the schools can provide from the funds allocated, and it is the responsibility of the Director Budget and Finance to advise the School Board when anticipated revenues are insufficient to do all that the School Board wishes to do. In 1994 and 1995, the Virginia Beach School Board had successive deficits of $12 million and $8.6 million, and this resulted in the empaneling of a special grand jury to consider criminal indictments. The responsibility to see that the School Board complies with the law is an important responsibility.

IV. SINCE MS. HORNE WAS HIRED IN VIOLATION OF LAW, SHE IS ALSO A LIMITED-PURPOSE PUBLIC FIGURE FOR A DISCUSSION OF THE FACTS RELATED TO THIS CONTROVERSY

Ms. Horne's hiring in violation of Virginia law creates a controversy, and she is a limited purpose public figure for a discussion of the facts related to this controversy. A limited-purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz v. Robert Welch, Inc., 418 U.S. 323, 361 (1974). Ms. Horne was plainly "drawn into a particular public controversy." When Ms. Horne voluntarily applied for and accepted the position of Director of Budget and Finance in violation of Virginia law, she inevitably voluntarily injected herself into a public controversy. Her actions in attempting to keep her position were voluntary and purposeful. After she learned that her hiring was illegal, she wrote a letter to the School Board asking the School Board to retain her. Asking a public body to violate the law is a purposeful act.

Ms. Horne argues that any discussion of the School Board hiring a felon inevitably implicates her, and if that is correct she is a public figure for the purpose of that discussion. Otherwise, no citizen could discuss the School Board's illegal act without the risk of liability. A

11

private person becomes a limited purpose public figure for the purpose of reporting on the specifics of governmental actions regarding him. "[T]he fact that [Dr. Levin] was a subject of complaints to the Board of Medicine [would not] place him so significantly in the public eye as to make him a 'public figure' except for the limited purpose of reporting on the specifics of the Board's public proceedings." WJLA-TV v. Levin, 264 Va. 140, 164 (2002). If reporting on the School Board's illegal hiring identifies Ms. Horne, she is a limited purpose public figure for the purpose of that reporting.

To determine whether a plaintiff is a private person or a limited-purpose public figure in relation to a particular public controversy, the defendant must prove the following:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 668 (4th Cir. 1982); Foretich v. Capital Cities/ABC, Inc., 37 F.3d at 1541, 1553 (4th Cir. 1994) (noting defendant's burden of proof). The second and third factors are often combined and are the heart of the inquiry: "whether the plaintiff had voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome." Id.

The existence of a public controversy is a threshold determination. See Hatfill v. New York Times Co., 532 F.3d 312, 322 (4th Cir. 2008) (stating that the court "first address[es] the nature of the 'particular public controversy' that gave rise to the alleged defamation"). The Court defines the scope of the controversy through a fair reading of the Article in its entirety. See id. at 323 ("[I]t stands to reason that we should look to the scope of the message conveyed in ... the articles ... [plaintiff] is challenging."). It is clear that the controversy here is the fact of

Ms. Horne's being hired in violation of law. Hiring a convicted felon to supervise the expenditure of $58-59 million in public funds would probably be controversial even if it were not illegal, but in light of the clear illegality, the existence of the controversy is clear. The School Board was not alone in violating the law. Ms. Horne also violated Virginia law when she accepted employment by the School Board without making the necessary certification. Butler v. Fairfax Cty. Sch. Bd., 291 Va. 32, 37 (2015).

Ms. Horne concedes that she was hired in violation of Virginia law and that the public has an interest in learning when the School Board violates the law. Ms. Horne testified as follows:

> Q But you have now learned – I'm not trying to argue with you. If I am, I apologize. But isn't it true that you have now learned that the school system violated the law of Virginia when they hired you?
>
> A That is correct, I have learned that, yes.
>
> Q And that is a matter in which the public has an interest; would you agree with that?
>
> A Yes.
>
> Q And would you agree the school system should not violate the law?
>
> A Yes.
>
> Q And would you also agree that the school system should know the law?
>
> A Yes.

(Horne Dep. p. 45, l. 19 through p. 46, l. 7).

Ms. Horne went on to testify:

> Q Do you agree that Dr. Browder should have complied with the law?
>
> A Yes.
>
> Q And do you agree that the public has an interest in seeing that Dr. Browder complies with the law?

13

        MR. HAWKINS: Objection to the form. You can answer.

        THE WITNESS: Yes.

(Horne Dep. p. 47, ll. 15-22).

The fact that the controversy relating to her illegal hiring was newsworthy was reflected by the fact that on March 5, 2015, the *Prince George Journal* ran a front-page story concerning her hiring and firing. (Horne Dep. p. 52). This story was followed up by a story in the Petersburg *Progress-Index*. (Horne Dep. p. 54).

Ms. Horne acknowledges that she has filed a lawsuit relating to her hiring and firing and agrees that the School Board should have complied with the law. Ms. Horne testified:

> Q    And would you agree the school system should not violate the law?
>
> A    Yes.
>
> Q    And would you also agree that the school system should know the law?
>
> A    Yes.
>
> Q    And the school system – would you agree the school system should have had in the application a certification complying with the law?
>
> A    I have never had to certify, so in any job that I've been you just answer the question so, you know, I don't know about a certification. I have never experienced a certification.
>
> Q    If the statute requires the certification, the school system should put it in the form; don't you agree?
>
> A    That, that I would agree with, yes. Yes.
>
> Q    And it is fair to say that – if you disagree, don't – I'm not trying to put words in your mouth.
>
> A    Okay.
>
> Q    Is it fair to say the school system ought to have their form prepared so that it complies with the law?
>
> A    I would agree with that.

> Q   And now you filed a suit against Dr. Browder; is that correct?
>
> A   That is correct.
>
> Q   And is it your contention that Dr. Browder is responsible for your hiring in violation of law?
>
> A   Yes.
>
> Q   And is it your contention that Dr. Browder acted wrongfully when he didn't tell you the correct law?
>
> A   That is correct.

(Horne Dep. p. 46, l. 2 through p. 47, l. 7).

Ms. Horne's lawsuit alleges that both the School Board and Dr. Browder were guilty of actual and constructive fraud and defamation. The Complaint is attached hereto as **Exhibit C**. The heading of paragraph D of the Complaint is "Dr. Browder defames Horne to try to cover up his own misdeeds." Plaintiff's allegation that her hiring and termination involved actual and constructive fraud and defamation on the part of the Superintendent of Schools and the School Board plainly affirms the existence of a controversy, and the Plaintiff's participation in that controversy was obviously voluntary.

Ms. Horne's illegal hiring resulted in a significant waste of public resources. All of the time spent in evaluating Ms. Horne's references and past experience and in discussing her possible hiring was wasted and unnecessary. All the training provided to Ms. Horne accomplished nothing. Ms. Horne was terminated before she could implement effectively any of the procedures she instituted.

## Conclusion

The Director of Budget and Finance for the Prince George County School System has and appears to have substantial responsibility for or control over the conduct of governmental affairs since the Director of Budget and Finance is the chief financial officer supervising the

expenditure of more than $50 million of public funds. The public has an independent interest in knowing that public funds are carefully monitored and that expenditures and receipts are accurately recorded. When the School Board hired Ms. Horne in violation of Virginia law, it created a controversy which was newsworthy. If the discussion of this controversy implicates Ms. Horne, then she is a limited purpose public figure for the purpose of this discussion since the public has an absolute First Amendment right to discuss and examine illegal actions of public bodies and public officials. Ms. Horne is both a public official and a limited purpose public figure.

Dated: November 22, 2016

Respectfully submitted,

/s/
Conrad M. Shumadine (VSB No. 4325)
Brett A. Spain (VSB No. 44567)
Counsel for WTVR, LLC, d/b/a CBS 6
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
Telephone: (757) 628-5500
Facsimile: (757) 628-5569
cshumadine@wilsav.com
bspain@wilsav.com

I-1436349.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of November, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

>   Richard F. Hawkins, III
>   (VSB No. 40666)
>   Counsel for Plaintiff
>   The Hawkins Law Firm, PC
>   2222 Monument Avenue
>   Richmond, Virginia 23220
>   Telephone: 804/308-3040
>   Facsimile: 804/308-3113
>   rhawkins@thehawkinslawfirm.net

>   /s/
>   Conrad M. Shumadine (VSB No. 4325)
>   Brett A. Spain (VSB No. 44567)
>   Counsel for WTVR, LLC, d/b/a CBS 6
>   WILLCOX & SAVAGE, P.C.
>   440 Monticello Avenue, Suite 2200
>   Norfolk, Virginia 23510
>   Telephone: (757) 628-5500
>   Facsimile: (757) 628-5569
>   cshumadine@wilsav.com
>   bspain@wilsav.com