```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
2                       Richmond Division

3

4

5   Angela Engle Horne,

6                              Plaintiff,

7               versus          3:16 CV 092

8   WTVR, LLC,

9                              Defendant

10

11

12

13

14        Before:  HONORABLE JOHN A. GIBNEY, JR.
              United States District Judge
15                   and a jury

16

17

18

19              April 10, 2017
              Richmond, Virginia
20

21            Pages 1 -5 and 51 - 229

22     (Opening statements, Testimony, Ruling)

23

24            Gilbert F. Halasz, RMR
              Official Court Reporter
25              U. S. Courthouse
              701 East Broad Street
```

```
 1                 Richmond, Virginia 23219
                      (804) 916-2248
 2

 3                     APPEARANCES

 4

 5

 6

 7              Richard Hawkins, III, Esq.
                    For the plaintiff
 8

 9

10              Conrad Shumadine, Esq.
                   Brett Spain, Esq.
11                 For the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                        i n d e x

 3     witness                        page   line

 4     Horne - direct                  79     2
       Horne - cross                   92     1
 5     Horne - redirect               109    18
       Browder - direct               111     2
 6     Browder - cross                125    17
       Browder - redirect             135    13
 7     Wilson - direct                140    24
       Bullock - direct               144     7
 8     Bullock - cross                148    16
       Covil - direct                 153    15
 9     Covil - cross                  194     8
       Covil - redirect               199    10
10     Bergazzi  - direct             205     2
       Barnhouse - direct             212    11
11     Barnhouse - cross              220    21
       Barnhouse - redirect           222    12
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Case number 3:16 CV 92.

2          Angela Engle Horne versus WTVR, LLC.

3          Mr. Richard F. Hawkins, III represents the plaintiff.

4          Mr. Conrad M. Shumadine and Mr. Brett Spain represent

5     the defendant.

6          Are counsel ready to proceed?

7          MR. HAWKINS:  Counsel for plaintiff is ready.

8          MR. SHUMADINE:  We are ready.

9          THE COURT:  All right.

10         Good morning.

11         And good morning, ladies and gentlemen of the jury.

12         My name is John Judge Gibney, and I will be the judge

13    here today.  Some of you I have already met out on the

14    sidewalk in front of the building.

15         Not all of you will be called to serve today, but, we

16    thank all of you for coming because it is important to

17    have all of you here in order to have a fair trial in this

18    case.

19         Let's take attendance and swear the jury.

20         THE CLERK:  As I call your name, please stand, answer

21    "present" and then be seated.

22              (The clerk polled the venire).

23         THE CLERK:  Are there any jurors in the courroom

24    whose name I did not call?

25         Jurors, will you please stand, raise your right hand,

1   and respond by stating "I shall" after the oath is

2   administered.

3                    (Venire sworn on voir dire).

4          (Jury examined, and after peremptory strikes

5                  duly sworn and impaneled)

6

7

8

9

10

11

12

13

14

15                    INTENTIONALLY LEFT BLANK

16

17          VOIR DIRE AND JURY SELECTION OMITTED

18

19          TESTIMONY TRANSCRIPT BEGINS ON PAGE 77

20

21

22

23

24

25

1        THE CLERK:  One juror is not ready.

2        THE COURT:  Okay.

3          (Jury took its place in the jury box)

4      THE COURT:  All right.  There are no a assigned

5  seats, so you can make new friends every time you go out

6  and come back.

7      All right.  We are now ready for opening statements.

8  Again these are not evidence, these are the lawyer's

9  outlines of what they think the case will show.

10      These are also not argument.  These are just

11  statements of what they believe the evidence will be.

12      Mr. Hawkins?

13      MR. HAWKINS:  Yes, Your Honor, can we make sure that

14  the video works?  All right.

15      Good morning.  At least let me, as I said at the

16  opening, my name is Richard Hawkins.  I am the attorney

17  who represents Ms Horne in this case.  As the Judge told

18  you early on, this case is a case about defamation.  I

19  will talk about that in just a minute.

20      Before I get into what it is going to be in our

21  estimation, I thank each one of you for being here.  The

22  Judge indicated our judicial system is important and

23  unique.  I am sure that there is lots of places you would

24  rather be, but we thank you for being here today and with

25  us during the trial and helping us decide this case.  We

1    couldn't solve it among ourselves.  We will ask you to do

2    that for us.

3        This is case about defamation, and defamation is a

4    false statement of facts that injures a person's

5    reputation.  Here for Ms Horne this case is about Friday

6    the 13th, and specifically Friday 13th, 2015.

7        Now, that had been the end of a hard week for Ms

8    Horne.  Earlier in the week she had been terminated from a

9    job she really enjoyed as director of budget and finance

10   at Prince George School System.  She had that job about

11   eight months, and she liked it.  But she lost that job.

12   And she lost that job because she previously had been

13   convicted of a felony.  And she had.  And let's be very

14   clear about this.  We make no bones about it.  This

15   elephant in the room, no secret she was convicted of a

16   felony in the year of 2000.  All right.

17       So we are now here in 2015.  This is 15 years ago,

18   and now this felony resurfaces.  It resurfaced in a way

19   that really frustrated Mrs. Horne, made her upset, and she

20   was upset because she had told the school system that she

21   had previously been convicted of a felony.  They were

22   firing her now because of this felony conviction which she

23   had filled out on an application.  You know, most of us

24   do.  We apply for a new job, we have online applications,

25   you get the computer out and she answered the questions.

1   There was a question about a felony.  And she said, "yes."

2   And did more than that.  She actually talked to the

3   superintendent.  And you are going to hear from the

4   superintendent.  He is going to confirm this.  That she --

5   and she spoke about her prior felony conviction.  She told

6   him, and he said, don't worry, that won't be a problem.

7   Right before she left the job that she had, she told him,

8   she asked him, said, is this going to be a problem?  And

9   he said, no.  And so she took that job.

10      She was proud of that job.  She was doing well.  She

11   put blood, sweat and tears into that job.

12      THE COURT:  All right, let's not argue.  Let's state

13   what the facts are going to be.

14      And, ladies and gentlemen, let me instruct you now,

15   the fact that she -- let's stay at the podium as well.

16      MR. HAWKINS:  Yes, sir.

17      THE COURT:  The fact that she lost her job at the

18   school division is not part of this case.  It doesn't have

19   anything to do with what happened here other than

20   background.  But WTVR is in no way responsible for her

21   losing her job, and she is not allowed to sue them because

22   she lost her job at the Prince George schools.

23      Go ahead.

24      MR. HAWKINS:  Thank you.

25      And we are not.  We are not suing WTVR because she

1   lost her job.  But that happened on a Tuesday, on February

2   10 of 2015.  And some times goes on, and she doesn't speak

3   with anyone else at the school system.  Dr. Browder

4   waited.  The 11th comes and goes.  Hadn't gotten back with

5   anybody.  Wednesday, February 12, it kind of all comes

6   together.  Doesn't speak to anybody in the media.  Doesn't

7   speak to Dr. Browder.  Friday, Friday something odd

8   happens.  She is now on her computer.  She lost her job,

9   she is looking for a new job and searching LinkedIn.  And

10  I am sure you know LinkedIn is a web site you can use to

11  find new jobs or post your professional profile.  And she

12  noticed somebody had checked out her profile.  She had a

13  feature that allowed her to see who used her profile.  And

14  she noticed somebody, Wayne Covil, had looked at her

15  profile.  And so she thought it odd, but noticed he worked

16  for WTVR 6.  WTVR.  And she caught the 5:30 broadcast that

17  day, and sat there with her and her son and her husband,

18  and this is what she saw.

19                    (video clip played)

20       Ladies and gentlemen.  Mr. Horne watched that video

21  with her and her son.  She was shocked.  She watched that

22  video.  Her husband will tell you he knew that video was

23  about her, and her son will tell you that that video was

24  about her.  And it is our contention in this case

25  that that video portrayed her as a liar, and not just a

1    liar, but a criminal liar, somebody who had lied on an

2    application.  And then as a result of that lie had gotten

3    fired.  That is the falsity that happened here.  And as I

4    told you a few moments ago, she disclosed the prior

5    felony.  She told the school system.  And so the

6    suggestion, the implication from that, that she had not

7    done so, and that she had committed a class one

8    misdemeanor was false.

9         She wasn't the only one who thought that that news

10   story was about her.  Her good friend, you will hear from

11   them, good friend, Susan Wilson and good friend Randy

12   Bullock, called her soon after this broadcast.  One of

13   them almost immediately after.  Called and said, are you

14   okay?  Is this all right?  Do you feel okay?  They knew

15   the story was about her.

16        Randy Bullock will testify he was mad.  Saw the story

17   and couldn't believe that they were portraying her this

18   way.  He was really upset.  And he called her to ask if

19   she was upset.  She was.

20        Now, the question that you will be asked to answer as

21   part of this besides whether or not the story is false,

22   the question that you will been having to answer is how

23   this story got put together.  How did Wayne Covil, how did

24   WTVR, how did CBS 6 put together this "important

25   investigation" that was their lead story at their 5:30

1    broadcast.

2        How did they do that?  Did they conduct a detailed

3    and thorough analysis of the issue?  Did they call all the

4    people, check the obvious sources?  The evidence is going

5    to tell you, no, they did not.  The evidence is going to

6    show you that Wayne Covil didn't pursue anything.  All he

7    did was interview Dr. Browder, and he made a phone call

8    that he thought, but couldn't confirm, was Ms Horne's

9    phone number.  He didn't call the school board, he didn't

10   call anybody at the school system other than the

11   superintendent.  And he never spoke with Ms Horne.  The

12   question becomes, was that something he should have done?

13   Was that something that would have made sense?  And the

14   answer is, yes.

15       He actually should have done this.

16       THE COURT:  All right.  This is -- this is argument.

17       MR. HAWKINS:  Understood.

18       THE COURT:  This is your chance to say what the

19   evidence is going to be.

20       MR. HAWKINS:  The evidence will show you when he

21   interviewed Dr. Browder what he did is they used this

22   method called a non denial confirmation.  Dr. Browder you

23   saw in the story said that he could not legally talk about

24   personnel matters.  But Wayne Covil asked him, did you

25   have a felon at the school system?  Did you have a felon

1    who worked there?  And he didn't deny it.  And he will

2    tell you he found that interesting.  And, in fact, the

3    WTVR news director will tell you that a non denial was the

4    same thing as a confirmation.  So even though they

5    couldn't get to the personnel information they said they

6    couldn't talk about, they actually tried to confirm and

7    used the non denial as a confirmation.

8         Now, did Wayne Covil do that with any other question?

9    No.  Did he ask about the application process of Ms Horne

10   to get a denial or non denial?  No, he didn't.  And the

11   evidence will show you that he had reason to think that

12   there were other factors involved.  There were other

13   issues.  There were other people who knew more and could

14   have pointed fingers in the right direction to tell him

15   what he needed to know.

16        And it starts with this e-mail.  He had interviewed

17   Dr. Browder, and then this e-mail comes in.  And this is

18   an e-mail from an anonymous source.

19        Now, the story started with a confidential tip.  It

20   came from somebody who Mr. Covil will tell you is a

21   confidential source, somebody he only knows, and somebody

22   that we do not.  And that started the story.  That is how

23   he got to Dr. Browder.  And then this e-mail comes in.

24   And this e-mail raises a host of questions.  You will see

25   right here, right there.  That is the start.

1     THE COURT:  Wait a minute.  What is it?  You kind of

2     lost me there.

3     MR. HAWKINS:  It's the date.  The date of this e-mail

4     right here.  And the time is 11:48.  The broadcast was

5     done at 5:30.  This is five and a half hours before the

6     broadcast aired.  You will see that this e-mail comes in

7     and it comes in not to WTVR as a whole, but comes in right

8     to Wayne Covil.  So it cames in directly to him.  And it

9     says, source:  Prince George.  So it is very obvious right

10    from the start that this anonymous e-mail is hitting on

11    exactly the topic that he has just interviewed Dr. Browder

12    for.  And then asks a lot of questions.  And points to a

13    lot of things.  It starts with anonymously sent letters to

14    each of the school board members.  And then it says,

15    informing them a convicted felon had been hired by the

16    school board.  Says, I know this because the person lives

17    in Prince George, and I know they are a felon.  It says I

18    also know they worked as director at Prince George County

19    school board office.  My concern is -- and here is the

20    important part of the e-mail -- my concern is how did this

21    happen?  And any state employee must have have been a

22    background check when hired.  How was this overlooked?

23    Who allowed this to happen?  Shouldn't someone take

24    responsibility?  Who at the school board gave the okay to

25    hire a felon?  Then says, Virginia law states school

1    division cannot hire a convicted felon.  This also happens

2    at the same time that the superintendent gets a ten

3    thousand dollar raise.  Is he really doing his job?  This

4    comes in 11:48.

5        Now, does Wayne Covil after he interviewed

6    Dr. Browder, after he has received information a felon has

7    been hired at the school board, after he gets this does he

8    go back to Dr. Browder and say, tell me about members,

9    tell me about the letters that were sent to these school

10   board members.  Does he do that?  No.  Does he ask any

11   member of the school board whether or not that were felons

12   who have been hired or fired?  Or how that happened?  No.

13   Does he answer this question, how was this overlooked?

14   Who at school board gave the okay to hire a felon?  No.

15   He doesn't do any of that.  And he doesn't go back to the

16   superintendent who he has just interviewed and say, is he

17   really doing his job?  He knows there is much more to this

18   story, and he didn't do anything to investigate it.

19   Instead, what he did do is he forwarded this e-mail to the

20   news director.  You will see this is her response.  He

21   says that at 11:55.  You will see this.  Sending right in,

22   11:55.  This wasn't a late response.  She comes back,

23   11:57.

24       THE COURT:  What are you doing?

25       MR. HAWKINS:  Trying to clear it.  Well, there we go.

1    All right.

2         So 11:55 he sends the e-mail.  At 11:57 she writes

3    back.  And she writes back and says, we need to pursue.

4    Wayne, are you reaching out for additional information?

5    Name, for starters.  I don't know what this is.

6         THE COURT:  Okay.  So you know what it says.  Go to

7    something else.

8         MR. HAWKINS:  Indeed, says, Wayne, are you reaching

9    out for additional information?  Does he follow up and

10   reach out for additional information?  Does he pursue?

11   No.  In fact, what we see happens is a little after that

12   you can see they now believe that Angela Horne is the

13   person who is the felon who has been hired and fired.  You

14   see what happens here.  Mike Bergazzi, producer at WTVR,

15   then asks Wayne, ask your source if she may have been

16   convicted of a crime in Tennessee.  Does he do that?  No,

17   he doesn't do any of these things.  He has two specific

18   requests.  He has an anonymous e-mail, and a host of

19   information and host of questions, and he doesn't do

20   anything to follow through.  And at this point he has

21   reason to believe that he had obvious concerns about

22   whether or not what he put out there is correct.

23        THE COURT:  Let's argue later.  Let's discuss the

24   evidence and not argue what inference we should draw about

25   Mr. Covil, all right?

1          MR. HAWKINS:  Yes, sir.

2          The bottom line is, and the evidence will show, is

3    that Wayne Covil published the story that you saw without

4    one shred of evidence, one iota of evidence that Angela

5    Horne had done anything to make a false representation on

6    her employment application with the Prince George school

7    system, and had not done anything to commit a fraud, a

8    class one misdemeanor, in violation of Virginia law.

9          That is what this case is about.  That is why this

10   case is about what happened on Friday 13th.

11         Now, before I sit down, two other points I want to

12   raise with you.

13         WTVR contends that this case is not about Angela

14   Horne.  It says this case is about something else.  And

15   the response to that is that they had a screen shot that

16   has Angela Horne, and they were looking at it.  It is

17   right there.  This is being passed around at WTVR before

18   the news story goes.  They had information that it was

19   about Angela Horne.  And the evidence in this case will

20   show that Angela Horne was the only person working for the

21   Prince George school system who had been fired at a recent

22   time, and fired that week, because she previously had a

23   felony conviction.  She is the only person who fits this.

24         And the evidence will show that her friend and her

25   family immediately understood that this story was about

1   her, and this story was to used on her termination from

2   the Prince George school board.

3       The other thing they will say is the source is about

4   the hiring process.  And that is what they will do.  If

5   that were the case, look at this evidence.  Watch the

6   felon hired and then fired.  Felon hired and then fired.

7   And that is this demonstrative exhibit, just so you can

8   clearly see.  WTVR chose to put those words in there.

9   They chose to lead the story with the felon hired and

10  fired.  The story was about Ms Horne.

11      Now, the last thing I am going to say before I sit

12  down, and I will get a chance to talk to you again, but as

13  you listen to this case, think of the metaphor --

14      THE COURT:  Let's not get into that.  Finish up.

15  Tell them about the metaphor, but not do argument.  Okay?

16      MR. HAWKINS:  Understood.  It's like the ostrich.

17  When you don't want to hear about something that you don't

18  like --

19      THE COURT:  All right.  That is argumentative.

20      MR. HAWKINS:  That is it.

21      THE COURT:  You can't argue your case in opening,

22  ladies and gentlemen.

23      Are you done?

24      MR. HAWKINS:  I am.

25      THE COURT:  Let me say one thing.

1        You can sit down.

2        One of the things that was mentioned, I guess at some

3    stage by either the superintendent or the reporter, is

4    that you can't hire people who have been accused of

5    misdemeanors involving child abuse or child sexual

6    matters.  We are not going to get into at this stage what

7    Mrs. Horne was convicted of.  But it wasn't anything of

8    that ilk.  Wasn't anything of that sort.  Take that

9    demonstrative exhibit out fought of the way.

10        MR. HAWKINS:  Happy to.

11        THE COURT:  Mr. Shumadine, happy to hear from you.

12        MR. SHUMADINE:  May it please The Court, ladies and

13    gentlemen of the jury, I begin by joining Mr. Hawkins.

14    The issue you are going to address today is terribly

15    important because the issue is whether when WTVR prepared

16    this broadcast it had serious doubt as to the truth of

17    what they were saying.  My theme in giving you an opening

18    is to prove to you that no one at WTVR at the time this

19    broadcast was prepared had any doubt of any kind based

20    upon what they were told.  And the broadcast was actually

21    accurate.

22        I began by noting a few facts that are undisputed

23    that the evidence will establish.  First, as you

24    undoubtedly know, Ms Horne's name is not mentioned, her

25    position is not mentioned.  Her felony is not mentioned.

1    The broadcast makes it plain that what is being discussed

2    is the hiring process.

3        The broadcast also makes it plain that WTVR could not

4    obtain any of the information related to Ms Horne because

5    Dr. Browder said it was a personnel matter, and personnel

6    matters are protected by the law.  So there was no way

7    WTVR could find anything out about what was going, what

8    was on her application.  And the -- in fact, we have

9    stipulated, and I am going to read you one of the

10   stipulations.  "The policy of the school board at all

11   relevant times was that personnel records and personnel

12   decisions were confidential.  That policy, we knew about

13   it.  And we knew there was no -- and his, more than knew

14   about it, everyone knew we could not find out any details

15   about the hiring and firing of the felon.

16       But what we will establish is that we believe

17   everything in that broadcast was absolutely true at the

18   time we broadcast it.  And we had a source for everything.

19   And everything in that broadcast is true.

20       Now, let me go over with you what happened in the

21   basic investigation of the story.  This began with a call

22   from Mr. Covil to a source he had known in Prince George

23   for years who told him when Prince George had things occur

24   in the county that should not occur.  So that he could

25   bring them to the attention of his viewer.  That is what a

1    TV station does.  They got a call from this person who

2    said, Wayne, I don't know anything about it, but I

3    understand that a felon has been hired by the school board

4    and fired.  And that -- he gave, I believe he gave a

5    partial name.  And he said, you should check on it.  Wayne

6    immediately said, yes.  At the time, which you will find

7    the evidence will show, Mr. Covil was not aware of the

8    statute.  Didn't know anything about the legal background.

9        But he was aware of the school superintendent.  So

10   the first thing he did was to call the school

11   superintendent.  The school superintendent, as the

12   evidence will show you, is a man named Dr. Bobby Browder.

13   The evidence will show that Dr. Browder had every position

14   virtually in Virginia public education.  He had been an

15   educator for 40 years.  He had been an assistant

16   superintendent and superintendent of the Prince George

17   schools for seven years.  He had talked to Mr. Covil

18   numerous times in the past.  He had always responded with

19   accuracy, and Mr. Covil had a tremendous amount of

20   confidence he would tell him the truth.

21       What Dr. Browder said was, when asked was a felon

22   hired, he immediately said, well, since that is a

23   personnel decision, I can't provide you any of the

24   details.

25       Well, that told Mr. Covil immediately that a felon

1    had been hired and fired, because if a felon had not been

2    hired and fired there would have been no personnel

3    decision, and the superintendent would have told him

4    pretty quickly, Wayne, have you lost your mind?  We

5    wouldn't do that.  So he knew to a certainty based on

6    Dr. Browder's position, look, I can't tell you the

7    details.  He knew that a felon had been hired.  And he

8    said, I can't discuss the details of the hiring because it

9    is a personnel matter.  But I will discuss with you the

10   hiring process.

11        And Wayne went out and said, fine, I will be

12   delighted to discuss the hiring practices.  And Wayne went

13   to Dr. Browder's office, as you saw -- by the way, one

14   thing the evidence is going to show is what Dr. Browder

15   said on the broadcast, which I want you to listen to very

16   carefully when you have heard all of evidence, was

17   essentially what he told Mr. Covil.  The evidence is he

18   came in and he said, I can't discuss the hiring process,

19   but he began and said, I can't discuss the felon --

20   little -- getting nervous.  Excuse me.  But I can discuss

21   the hiring practice.  And he said the hiring practice

22   begins with the statute.

23        Let me pause.  I am going to pull up the statute for

24   you, if I may, as an exhibit, because I would like to show

25   you the statute that he showed Mr. Covil.  We can look at

1    it together.  Let's blow this this statute up so everybody

2    can read it, even I.

3        This was where we started everything.  By the way,

4    just before we read it, he said, this is the law of

5    Virginia.  The laws, been the law in Virginia, the law in

6    Virginia since '96.  And this is where we start all of our

7    hiring decisions.  By the way, not surprising, as

8    Mr. Covil will tell you, he was not surprised by that.  He

9    felt they ought to start with the law.  He knew the

10   superintendent was supposed to be the one that was

11   ministering the law, and this doesn't surprise him at all.

12   But let's read the statute.  I mean, Mr. Covil read with

13   him.  "As a condition of employment for all of its public

14   school employees" -- I pause there because it says

15   "all" -- it goes on -- "full time or part time, permanent

16   or temporary" -- that is pretty clear -- "every school

17   board shall require on its application for employment

18   certification that the applicant has not been convicted of

19   a felony."  That is the law.  That is, by the way the law

20   of Virginia.  That is the law that Mr. Covil was shown by

21   Dr. Browder.  And Dr. Browder said that is the law with

22   which we start the hiring process.

23       Then Dr. Browder went on to say, the second provision

24   was any person making a materially false statement

25   regarding any such offense shall be guilty of a class one

1   misdemeanor, and upon conviction the fact of said

2   conviction shall be grounds to the Board of Education to

3   revoke such person's license to teach.

4       Now, with that background Dr. Browder went on to

5   describe the hiring practice knowing that Mr. Covil was

6   asking him about the hiring practice as it applied in

7   every case.  And Dr. Browder, as you heard, went on to say

8   that they narrow the number of applications.

9       Well, let me pause for a moment and let's make one

10  clear point, because there is one fact Dr. Browder did not

11  say that was clear to every one.  Everything he was

12  saying, every word was absolutely completely irrelevant

13  because if we know of a felony, there is no way you do any

14  of that.

15      If Dr. Browder never indicated in any way, shape --

16  the evidence is going to show, he is candid -- he never

17  told Mr. Covil in any manner or form that he had any

18  knowledge of a felony conviction.

19      Now, he did say, I can't talk to you about it because

20  of the, because it is a personnel matter.  We knew that.

21  But he was discussing the hiring practice.  He didn't make

22  the point that everything I am telling you, every single

23  word, it is totally completely, absolutely, irrelevant and

24  misleading if we know of a felony.  Because if you know of

25  the felony, as The Court has instructed you, you cannot --

1    and the law is perfectly plain -- you cannot hire a felon

2    in Virginia.  You have not been able to hire a felon in

3    Virginia since 1996.  And when Dr. Browder was talking to

4    Mr. Covil and saying it starts with the process, and when

5    he was saying, we narrow them down, he only narrowed them

6    down if you do not know of the felony.  We do a background

7    check.  You do not do a background check if you know of a

8    felony.  Background check, the evidence is going to show,

9    costs $400.  It is $400 down the rat hole to do a

10   background check if you already know about the felony.

11         When Mr. Covil left Dr. Browder's office he had the

12   tape of what he had heard, and he was absolutely convinced

13   that Dr. Browder did not know of the felony conviction at

14   the time.  He did not know the details.  But he -- but

15   there was no way he had any awareness based on what

16   Dr. Browder said that Dr. Browder knew of the felony at

17   the time.

18         Now, the evidence is going to show that WTVR is in

19   the business of broadcasting, and you want to do stories

20   that are important and significant.

21         And we stand by the fact that the evidence would show

22   that a story about a felon being hired was important, it

23   was significant.  But a story about the school

24   superintendent not being aware of the law that was in

25   effect since 1996, a story about a school superintendent

1    knowingly hiring a felon, knowing it, that is much more

2    newsworthy, much more interesting, and would have been the

3    feature story.  But Mr. Covil and everyone at WTVR is

4    going to say clearly and unambiguously they had no

5    knowledge of that.

6         Now, I want to show you two things from the

7    broadcast.  The picture will show you how much Dr. Browder

8    emphasized the law.  First let's look at the Virginia

9    school book, school law desk book.  Since -- this is the

10   2006 edition.  What the evidence is going to show is

11   Dr. Browder when he was talking to Mr. Covil referred him

12   to the desk book indicating this is my desk book.  I have

13   it right behind my desk.  And he was talking from the 2014

14   edition.  He then said, I have so many of these I will

15   give you the 2006 edition.  So Wayne brought back to the

16   station the 2006 edition of the desk book.  Then you will

17   look at, look on Dr. Browder's desk, what you will see is

18   he located the book, he had put it on his desk, and what

19   he and Mr. Covil will testify about is that they went over

20   every provision -- I won't say every provision since there

21   are two sentences in the statute.  I am making that longer

22   than it really is.  But they went over both of the

23   provisions.  Dr. Browder explained it to him.  Mr. Covil

24   at that point in time had no knowledge as to the law.  He

25   was surprised.  But Dr. Browder explained it to him,

1    showed it to him, and laid it out for him.

2        He then even gave him a copy of the desk book, and he

3    took it back to office with him.

4        Now, when Mr. Covil got back to his office he had

5    received the e-mail from SSSSmith.  That, by the way, is

6    not Wayne's first confidential source, that is the

7    anonymous source who apparently is the one who told the

8    school board about the felony conviction.  When he was

9    talking to Dr. Browder he could not figure out how the

10   school board learned about the felony conviction, but

11   SSSSmith sends an e-mail saying, I know this person is a

12   felon because I live in the community.  I am a citizen in

13   the community.  And I am the one who identified the felon

14   to the school board, which led to her being fired.

15       Again, indicating that until that e-mail, until

16   someone identified it, there was no way for anyone to

17   know.  Now, that e-mail also makes the point that

18   Mr. Covil thought was a very good point.  Who is

19   responsible for this?  Why didn't they find out earlier?

20   That was a good question.  He couldn't because Dr. Browder

21   wouldn't discuss the facts.  There was a question he could

22   not address, but plainly the purpose of the broadcast was

23   how can this happen when the law is this clear?

24       Now, the evidence is going to be that this

25   Dr. Browder is going to say he really didn't understand

1    the statute, and that is how he hired Ms Horne.  By the

2    way, the nub of the case is not about whether or not she

3    put a "yes" or "no" answer to that question.  This case is

4    about whether Mr. Covil had any awareness based upon what

5    he was being told by Dr. Browder at the time that

6    Dr. Browder knew of this.

7        The evidence in this case is going to establish

8    clearly, and I think unambiguously -- but it for you to

9    decide -- I can't argue that -- but here is what the

10   evidence is going to establish.  The evidence is going to

11   establish that this law has been in effect since 1996.

12   You have seen the law.  It is -- anybody can read the law

13   and understand what the law says.  The evidence will

14   establish that Ms Horne admits she did not provide the

15   certification.  She could not provide the certification.

16   She had been convicted of a felony.  There was no way that

17   she could be hired.

18       Mr. Covil was aware of Dr. Browder's experience.

19   More important, he was aware of the fact that school

20   boards in Virginia are well represented.  They have

21   lawyers.  They have a human relations department.  They

22   know how to hire people.  The evidence will establish that

23   they hire hundreds of people a year.  The notion that the

24   superintendent would not know the law and would have

25   knowingly hired a felon, Mr. Covil is going to say it

1    never crossed his mind that nothing that Dr. Browder said

2    gave him that impression and that it was totally

3    completely absolutely surprising to him.

4        And no one at any time up to that point criticized

5    Dr. Browder publicly, no one has suggested that he did

6    anything wrong as we prepared the broadcast based on that.

7        Now, we were from, the evidence will show, we thought

8    the felon was Angela Engle Horne.  And Mr. Covil tried to

9    get in touch with her.  And he obviously failed.  We did

10   not expect, and the evidence will show Ms Horne was going

11   to want to comment, especially since without her

12   commenting the station was not going to use her name, her

13   position, or her felony.

14       Obviously if she had commented, that would have been,

15   all of those would have been used.  We knew Ms Horne, we

16   knew it was a personnel matter, everything was

17   confidential.  And we had no expectation that she would

18   want to say anything about this broadcast based on what we

19   were told at the time.

20       And we think but based on that evidence, all of which

21   is going to be clear, and the primary evidence I want you

22   to focus on is to focus on what Dr. Browder specifically

23   told Mr. Covil in the context of what the inquiry was, and

24   to think about that because Mr. Covil, the evidence is

25   going to be, that he heard exactly what you are going to

1    hear.  He had Mr. Covil bring his camera with him.  The

2    evidence is going to show he sits down in the

3    superintendent's office.  He points the camera at him and

4    he asks questions.  And Dr. Browder just is sitting there,

5    responds to the questions.  There is no doubt when what he

6    said was he can't talk about the specific facts, I will

7    talk about the hiring process.  And then went down all of

8    these details.

9         Not once saying, of course, if we know of the felony

10   we don't do any of those things.  We can't do any of those

11   things.  And it never occurred to Mr. Covil that he was

12   being mislead in any way, shape, or form.  And that the

13   superintendent would have known about the felony.

14        It never occurred to Mr. Covil, the evidence will

15   show, in any way since this statute was so clear that

16   Dr. Browder would not have understood it.  And even today

17   it is surprising.

18        What the evidence will show is that at the time this

19   broadcast was prepared everyone believed absolutely and

20   completely that everything in the broadcast was accurate.

21   But the evidence will show, just as now, everyone is

22   absolutely completely amazed and astonished, let's use

23   these words, the evidence is going to go, they are amazed

24   and astonished that Dr. Browder knew about the felony

25   conviction.  Astonished.  It was surprising that a school

1   system could not understand this law.  This is, as simple

2   as this law is, and the evidence will show, that if we had

3   any knowledge that Dr. Browder's had known of the felony

4   conviction we would have immediately run another broadcast

5   and brought it out.  And that broadcast would have been

6   the school superintendent knowingly hired a felon.  School

7   superintendent does not know the law of Virginia.  This is

8   the law of Virginia.  It's as simple as it can be.  A

9   school superintendent for 40 years experience does not

10  know the law.  More importantly, the human relations

11  department didn't tell him.  The lawyers didn't tell him.

12  The school system needs to straighten itself up.  We did

13  not do that story.  But when you think about whether we

14  had any doubts I want you to think which story would we

15  have chosen if we had thought in any way, shape or form --

16       THE COURT:  All right.  We are getting argumentative.

17       MR. SHUMADINE:  I think I am.  I apologize, Your

18  Honor.

19       THE COURT:  All right.  I know.

20       MR. SHUMADINE:  I do.  I think I did argue.  I am

21  going to leave and let you make your conclusions as to the

22  evidence.

23       At the conclusion of the evidence I will respectfully

24  ask you to find that WTVR had no doubt, that there is no

25  clear and convincing evidence WTVR had any serious doubt

1   as to anything that was broadcast.

2          I look forward to working with you, and I will try to

3   be rapid so we can move this along.

4          Thank you.

5          THE COURT:  All right.

6          Let's get the podium turned around, Mr. Hawkins.

7          Have we ordered lunch yet?

8          THE CLERK:  Ordered, but not here yet.

9          THE COURT:  Okay.  Can we ask it to be here at noon?

10         THE CLERK:  Yes.

11         THE COURT:  All right.

12         And does the law require it to be here at noon?

13         THE CLERK:  Does not.

14         THE COURT:  All right.

15         Anything else you you want to break while you are at

16   it?

17         THE MARSHAL:  No, Your Honor.

18         THE COURT:  All right.  Okay.

19         All right.

20         Mr. Hawkins, will you help her with that, please.

21         Do you know how it works?  Okay.

22         All right.  Do you have -- who is the first witness?

23         MR. HAWKINS:  Ms Horne.

24         THE COURT:  How long will she take?

25         MR. HAWKINS:  From our side, probably 20 minutes.

```
 1        THE COURT:  Let's put her on and she can testify, and
 2   then we will take a break.
 3        And when we come back you can cross-examine.  All
 4   right?
 5        Go ahead.  Call her in and swear her in.
 6        MR. HAWKINS:  Your Honor, may it please The Court,
 7   the plaintiff calls Angela Engle Horne.
 8        THE COURT:  All right.
 9                       ANGELA ENGLE HORNE
10             WAS SWORN AND TESTIFIED AS FOLLOWS:
11                       DIRECT EXAMINATION
12        THE COURT:  Please speak directly into the
13   microphone.
14        THE WITNESS:  Okay.
15        THE COURT:  Loudly.
16        THE WITNESS:  Okay.
17        THE COURT:  Thank you.
18   BY MR. HAWKINS:
19   Q    All right.  Good morning.
20   A    Good morning.
21   Q    We are about 20 more minutes.
22        Would you please introduce yourself to the jury?
23   A    Yes.  My name is Angela Engle, formerly Horne.
24   Q    You say "formerly Horne."  You were previously
25   married?
```

1    A    Yes.

2    Q    From when to when?

3    A    From 2010 until November of 2015.

4    Q    Okay.  What was your formal name in February of 2015?

5    A    Angela Engle Horne.

6    Q    All right.

7         And you applied for a job, is that correct, at the at

8    the Prince George County school system?

9    A    Yes.

10   Q    When did do you that?

11   A    It was in July of 2014 is when I actually applied.

12   Q    Tell me about how that process happened for you.

13   A    I was told by a friend of mine that is one of the

14   principals in Prince George that the position may be

15   coming available.  And she thought I would be good for the

16   job, and to watch for the posting of the position.  So I

17   did.  I went on line and applied for the job.

18   Q    All right.  Did you complete an application?

19   A    I did.

20   Q    All right.

21        There we go.  Do you see what is on the page there in

22   front of you?

23   A    Yes, I do.

24   Q    All right.

25        Is this one of the pages of the application that you

1    completed?

2    A    Yes.

3    Q    Take a look -- I will do my best to focus you -- do

4    you see where it says question four there?

5    A    I do.

6    Q    That question asks if you have been convicted,

7    parenthesis, as guilty or not innocent, or a determination

8    of abuse or neglect?

9         THE COURT:  Are you able to blow that up?

10        MR. HAWKINS:  Probably not.

11        THE COURT:  Okay.

12        MR. HAWKINS:  Not at this moment.

13        THE COURT:  All right.

14   BY MR. HAWKINS:

15   Q    Well, do this.  Can you read that?

16   A    Yes.

17   Q    Okay.  All right.

18        Do you see there where it talks about a felony?

19   A    Yes.

20   Q    Circled?

21   A    Yes.

22   Q    Did you understand that question to be asking whether

23   or not you have previously been convicted of a felony?

24   A    Yes.

25   Q    What was your answer?

Horne - direct

1    A    Yes.

2    Q    All right.

3         Now, tell me in terms of the process, you complete

4    that application.  Then what happens?

5    A    In early August I received a call from Dr. Browder

6    asking me if I would come in and interview.

7    Q    All right.  Then you did?

8    A    I did.

9    Q    Did you have -- that interview took place on a

10   particular day?

11   A    Yes.

12   Q    After that interview did you have a conversation with

13   Dr. Browder about whether or not you previously had a

14   felony?

15   A    I did.  Early in September Dr. Browder called me and

16   said that they had narrowed it down to two applicants, and

17   that he wanted to know if the conviction I had marked on

18   the application was a felony.

19        And I explained to him that it was a felony.  From 15

20   years prior.

21   Q    Okay.

22        You say that happened 15 years prior.  What was his

23   response?

24   A    That he was going to follow up and he would let me

25   know.  He didn't think it was going to be an issue.  And I

1    said, well, please do, because I don't want to lose the

2    job I already have if it's an issue.

3    Q    Did you have a second conversation with Dr. Browder

4    about the conviction?

5    A    Yes.

6    Q    What was the that conversation?

7    A    He called me back and told me he had followed up and

8    that he didn't see any problem with it.  And he asked me

9    if I wanted to come in on a Saturday and work with the

10   previous finance director and just shadow her for a day,

11   because she wasn't going to be available any other time

12   after that.

13   Q    I take it then you started your employment.

14   A    I went in on that Saturday and I shadowed her.  And

15   then he followed up with a final phone call that I had

16   been the final candidate selected.

17   Q    All right.

18        So before you gave your two weeks notice from your

19   current job, did you confirm with Dr. Browder as to

20   whether or not your felony would be a problem?

21   A    Yes.  He called me and told me he cleared everything

22   through the board.  And when he explained the salary and

23   benefits and everything to me, and asked, you know, when

24   could I start.

25   Q    All right.

1        I take it you took the job.

2    A    I did.

3    Q    Have you worked there until when?

4    A    I worked there from September 29 until February 10,

5    2015.  So about four months.

6    Q    All right.

7        Now, tell me what happened February 10.  Was that a

8    Tuesday?

9    A    Yes.

10   Q    Tell me what happened on February 10.

11   A    On February 10, the morning of February 10, I went in

12   to work.  I was called into Dr. Browder's office.  He told

13   me that the board meeting was the night before.  And that

14   they determined that they would have to ask for my

15   resignation.

16   Q    All right.

17       Did he tell you why?

18   A    Because of the felony.

19   Q    All right.

20       What was your response?

21   A    I was pretty devastated.

22   Q    Why?

23   A    Because I really loved --

24       THE COURT:  Hold on.  Losing her job is really not

25   part of this case.

1       MR. HAWKINS:  It's not.

2       THE COURT:  Get to the story here.

3       MR. HAWKINS:  Indeed.

4       THE COURT:  I understand that nobody likes to be

5  terminated from a job.  We don't need to hear her

6  reaction.  I am sure it was devastating.  That is enough.

7       MR. HAWKINS:  There is a conversational point I would

8  like to emphasize.

9       THE COURT:  Get to the conversation.

10  BY MR. HAWKINS:

11  Q    What did you tell Dr. Browder about the felony

12  conviction at that point in time?  On Tuesday morning

13  February 10.

14  A    He asked for my resignation.  I told him I would not

15  resign, because I had not done anything wrong.

16  Q    That is because you disclosed the felony.

17  A    Because I had previously disclosed the felony on the

18  application, and in conversation.

19  Q    Now, did you speak with Dr. Browder, or, yes, Dr.

20  Browder on February -- or February 11th or the 12th or

21  13th, at any point in time prior to the CBS 6 broadcast?

22  A    No.

23  Q    Did you speak with anybody at WTVR?

24  A    No.

25  Q    All right.

1      Now, tell me about the 13th.  Did there come a point

2  in time when you watched a broadcast?

3  A    Yes.

4  Q    How is it that you came to watch that broadcast?

5  A    I was at home, and I was on my lap top.  I was

6  looking at my LinkedIn account trying to decide how, you

7  know, to revise my resume and prepare to start the job

8  hunt.  I noted that Wayne Covil had been, he had visited

9  my LinkedIn account.  I had an account where you can see

10  who looked at your account.

11  Q    All right.  You checked it?

12  A    Yes.

13  Q    What did that lead you to do?

14  A    It led me to turn the news on to channel 6.

15  Q    All right.

16      Who was with you at the time?

17  A    My husband at the time, Keith; and my son, Cody.

18  Q    That --

19      THE COURT:  Did you know who Wayne Covil was?

20      THE WITNESS:  I did.  I mean, I didn't know him, but,

21  I did know.

22      THE COURT:  He was a reporter on WTVR?

23      THE WITNESS:  Yes.

24      THE COURT:  Okay.

25      THE WITNESS:  And it said "WTVR."

1        THE COURT:  On the information you got from LinkedIn?

2        THE WITNESS:  Yes, sir.

3        THE COURT:  All right.  Sorry.

4   BY MR. HAWKINS:

5   Q    That is all right.  You watched CBS 6?

6   A    Yes.

7   Q    What did you see?

8   A    The story that you ran earlier.

9   Q    All right.

10       THE COURT:  That story is in evidence.  So it is part

11  of the things you can consider, even though -- were you

12  planning to play that again?

13       MR. HAWKINS:  I wasn't -- I think we watched it.

14       THE COURT:  We don't need to play it again.  You have

15  seen it, and it's part of the evidence in the case.

16       MR. HAWKINS:  Okay.

17       THE COURT:  Go ahead.

18  BY MR. HAWKINS:

19  Q    And you watched it.  Who else was there with you?

20  A    My husband at the time, Keith.  And my son, Cody.

21  Q    Now, did you believe that story was about you?

22  A    I knew it was about me.

23  Q    Why?

24  A    Well, I was the only felon that had been fired from

25  Prince George that week from the school board office.

Horne - direct

1    Q    Did Mr. Horne or your son say anything at the time?

2    A    Well, all mortified.  They were just in shock they --

3    Q    Okay.

4         Now, soon after that broadcast did you receive any

5    telephone calls or messages from Susan Wilson?

6    A    I did.

7    Q    Who is -- tell the jury who is Susan Wilson.

8    A    Susan is someone that I have known for many years.

9    We have worked together.  Our kids grew up together.  She

10   is a friend of mine.

11   Q    All right.

12        And she knew about your past.

13   A    Yes.

14   Q    All right.

15        What did she call you about?  What did she say?

16   A    Because she saw the story.  And she knew it was me.

17   And she called me and she was just horribly upset.  She

18   was calling to check on me.

19   Q    All right.

20        Now, did you receive a telephone call from a man

21   named Randy Bullock?

22   A    I did.

23   Q    Tell the jury, who is Randy Bullock?

24   A    Randy Bullock is also a friend of mine who actually

25   used to work in the Prince George school system.  Now

Horne - direct

1  works in the Dinwiddie school system.  And he saw the

2  story and he was very angry.

3  Q    Did he call you?

4  A    He did.

5  Q    All right.

6        What did he say?

7  A    He couldn't believe that I had been portrayed as a

8  liar in the story, that it looked as if I had lied on my

9  application.

10  Q    Okay.

11       Now, I want to be clear about this because this is a

12  case involving defamation, which involves falsity.  When

13  you saw that broadcast, what about this broadcast did you

14  think was false about you?

15  A    Specifically the last sentence where it says that you

16  have to -- it is class one misdemeanor, falsifying an

17  application.  I never falsified an application ever.

18  Q    All right.

19  A    I wouldn't do that.

20  Q    To be clear, you did not falsify your application to

21  the Prince George County school?

22  A    Absolutely not.

23  Q    You have disclosed your felony to all your employers?

24  A    Absolutely, yes.

25  Q    All right.

Horne - direct

```
1          Now, at any point in time prior to the broadcast -- I

2    think you answered this but I want to make sure I have it

3    right -- did you hear from anybody at WTVR?

4    A    No.  No one.

5    Q    No telephone messages, no internet messages?

6    A    No, not even -- I checked my phone records.  No.

7    Q    Now, at any point in time after the broadcast did you

8    hear from anybody at WTVR?

9    A    Never.

10   Q    Have you ever heard from anybody at WTVR about this

11   broadcast?

12   A    No.

13   Q    Your Honor, that is all we have.

14        THE COURT:  All right.

15        How long do you think your cross will take?  More

16   than 15 minutes?

17        MR. SHUMADINE:  I think it will be more than 15

18   minutes, Your Honor.

19        THE COURT:  Okay.

20        THE CLERK:  Lunch is not here.

21        THE COURT:  Lunch is not here.

22        Well, why don't we take a break, and they can eat

23   lunch when it gets here.  And we will come back at

24   1:00 o'clock.

25        And if it turns out that you haven't had a chance to
```

```
 1   eat lunch, we will address that then.  All right.

 2        Sorry to do that, but I don't want to interrupt.  I

 3   want you to get the full effect of the cross examination.

 4   So that is what we are going to do.

 5        Thank you very much for your time and attention.

 6   Remember, please, don't discuss this.  If you should go

 7   outside for a stroll, and go to your car or something like

 8   that, please don't look up anything about it on the

 9   internet or anything else.  All right?  Thank you all very

10   much.

11        I will see you all at 1:00 o'clock.

12                    (Jury withdrew)

13        THE COURT:  All right.  Anything else, counsel?

14        MR. HAWKINS:  No, Your Honor.  May the witness come

15   off the stand?

16        THE COURT:  Yes.  She can come off the stand.

17        Have a good lunch.  I will see you all at

18   1:00 o'clock.  Thank you.

19                    (A recess was taken)

20        THE COURT:  Okay.  Bring the jury back in.

21        You have been abandoned by your paralegal, if I can

22   say -- which capacity has she abandoned you?

23        MR. HAWKINS:  Just the paralegal capacity.

24        THE COURT:  All right.

25        Well, that may not be the wisest decision she ever
```

1   made.

2         Well, all right.

3         (Jury took its place in the jury box)

4         All right, ladies and gentlemen, thank you for coming

5   back.

6         And, we are now ready for cross examination by

7   Mr. Shumadine.

8         MR. SHUMADINE:  Thank you, Your Honor.

9                   CROSS EXAMINATION

10  BY MR. SHUMADINE:

11  Q    Good afternoon, Ms Horne.

12  A    Good afternoon.

13  Q    Let me begin.  You have were convicted of a felony;

14  is that correct?

15  A    Yes.

16  Q    And the fact that a felon was hired and then fired in

17  the Prince George school system was a hundred percent

18  correct; is that true?

19  A    That's correct.

20  Q    Okay.  And you have dealt with Dr. Browder; is that

21  correct?

22  A    Yes.

23  Q    When you came to the school system he was the one you

24  talked to; is that correct?

25  A    That's correct.

Horne - cross

1    Q    And Dr. Browder has a lot of experience in Virginia

2    education; is that correct?

3    A    I assume so, sir.  I can't speak to his background.

4    But I assume he does.

5    Q    You knew he had been superintendent in Prince George

6    County several years, didn't you?

7    A    Yes.

8    Q    And as the superintendent he is charged with knowing

9    the law as it relates to the school system; is that

10   correct?

11        MR. HAWKINS:  Objection, Your Honor.

12        THE COURT:  Overruled.

13        THE WITNESS:  Ask the question again.

14   BY MR. SHUMADINE:

15   Q    I will be glad to repeat.

16        As the superintendent of schools it is his

17   responsibility to know the law relating to the school

18   system?

19   A    Yes.

20   Q    Okay.

21        He is the official spokesperson for the school

22   system; is that correct?

23   A    Yes.  Unless he designates someone, yes.

24   Q    Okay.

25        So when Mr. Covil goes to talk to Dr. Browder would

1    you agree he is talking to the best person he can find to

2    get information relating to the Prince George school

3    system?

4    A    I would imagine that would be a good start.

5    Q    Okay.

6         And up to the time of this dispute have you ever

7    heard of any instance where Dr. Browder was anything but

8    candid?

9    A    You know, I can only speak for the four and a half

10   months I was there.  So, you know, I presume so.  That is

11   a difficult question for me to answer.

12   Q    But you are not aware of anything, sitting here

13   today, that would put anyone on notice that Dr. Browder

14   would be anything other than candid?

15   A    That would be correct.

16   Q    Okay.

17        Now, you have been shown the law that prevented your

18   being hired; is that correct?  Your being hired; is that

19   correct?

20   A    After I was fired, yes.

21   Q    Well, you were shown it by Dr. Browder; weren't you?

22   A    Upon my release, yes.

23   Q    Okay.  Let's look at the law together, if we could.

24   A    Okay.

25   Q    I think we are going to pull it up.  I apologize.

Horne - cross

1      THE COURT:  You are doing well.

2      MR. SHUMADINE:  I have got it.  Okay.

3      Now, would you agree with me that that law is

4  absolutely clear?

5      THE COURT:  Well, you know, let's not ask her for

6  legal conclusions.  In my experience laws that seem clear

7  aren't clear all the time.  But let's move it along here.

8  BY MR. SHUMADINE:

9  Q    Okay.

10      Well, may I ask this question?

11      Under that law there is no way you could be hired by

12  the Prince George school system; is that fair to say?

13  A    That is fair to say, yes.

14  Q    And if the law requires that the applicant certify

15  that the applicant has not been convicted of a felony; is

16  that right?

17  A    Please repeat the question.

18  Q    The law requires that the applicant certify that the

19  applicant has never been convicted of a felony; is that

20  correct?

21  A    That's correct.  That is what this statute states,

22  yes.

23  Q    So if you, if you know the law there is no way you

24  can be hired?

25  A    That's correct.

Horne - cross

1  Q    Okay.  And, now, does the Prince George school system

2  have a human relations department?

3  A    Yes.

4  Q    Does it have lawyers?

5  A    I don't know.  I just know there was HR clerks.

6  Q    And does the, does the school system hire hundreds of

7  people every year?

8  A    I wouldn't say hundreds.

9         MR. HAWKINS:  Objection.

10        THE COURT:  I don't think they hire hundreds a year,

11  but they hire some people.

12        MR. SHUMADINE:  I will rephrase the question.

13        THE COURT:  I will take judicial notice of the fact

14  that school division hires people every year.

15        MR. SHUMADINE:  Okay.  I won't ask that then.

16  BY MR. SHUMADINE:

17  Q    Now, let's -- we have a transcript of the broadcast

18  which I would like to bring up to you.  Let's start out

19  and look at some sections of the broadcast together.

20        Would you agree with me that the hiring process

21  starts with the statute?

22        THE COURT:  I am not sure what that question means.

23  Hiring process starts when there is an opening.

24        MR. SHUMADINE:  Okay.

25        Would you agree with me that whether you can be hired

1   is governed by the statute?

2       THE WITNESS:  Yes, I would say it is fair.

3   BY MR. SHUMADINE:

4   Q    So if the school superintendent knows of the felony

5   conviction there is no way you can be hired; do you agree

6   with that?

7       MR. HAWKINS:  Objection.

8       THE COURT:  Well, yes.  Let's not debate the law with

9   Mrs. Horne.  The law I think is clear, and if I haven't

10  already instructed the jury about it, I will right now.

11      That the school board should not have hired her -- it

12  is not her fault, because -- it's not.  And WTVR is not

13  responsible for her termination.

14      All right.

15      MR. SHUMADINE:  Well, yes, Your Honor.

16      But look with me at this language which I put up

17  there.  "While the school superintendent can not legally

18  talk about personnel matters, he did talk to me about the

19  hiring practice and it starts with this quote, 'Virginia

20  school law'" --

21      Do you see that?

22      THE WITNESS:  I do see that.

23  BY MR. SHUMADINE:

24  Q    Okay.

25      And do you have any problem with that statement?

Horne - cross

1    A    I do, because the broadcast did not start with that

2    book.  I never saw that book until I was released.

3    Q    But would you agree with me that when Dr. Browder

4    says it starts with that book he is saying that he knows

5    the law?

6         MR. HAWKINS:  Your Honor, that question --

7         THE COURT:  Well, the question -- that question

8    assumes Dr. Browder said that.

9         MR. HAWKINS:  Your Honor, the transcript --

10        THE COURT:  Sit down.

11        MR. HAWKINS:  Yes, sir.

12        THE COURT:  That -- the reporter is saying that, not

13   Dr. Browder.

14   BY MR. SHUMADINE:

15   Q    Let's go down to specifically quote Dr. Browder then.

16        It begins by saying, "Whether they have actually

17   committed any type of crime, if they say, yes, we will

18   inquire further regarding that particular information that

19   could be a prohibiting factor."

20        Do you see that?

21   A    I see that.

22   Q    And that means that they would inquire about the

23   crime; is that correct?

24   A    I presume that is what he meant.  You know, I wasn't

25   present, so --

1   Q    And if they find that it is a felony, it would be a

2   prohibiting factor; is that correct?

3   A    That is what he stated.

4   Q    That is all I am asking.  Yes?

5   A    Yes.

6   Q    So, now let's go -- and then -- and then we go on and

7   say, where he says a convicted felon or misdemeanor in

8   terms of child abuse, molestation charges towards

9   children, is a prohibiting factor for purpose of employing

10  individuals in the school district.  Do you see that?

11  A    I do.

12  Q    That makes it plain he is familiar with the statute;

13  is that fair to say?

14  A    I just don't know that I can speak to what his

15  familiarity is with the statute.  I can say that that is

16  the statement he made in this interview.  I would assume

17  that he is, yes.

18  Q    Okay.

19       Well, let's go back and talk about some of the other

20  statements Dr. Browder makes.  He then goes on to say,

21  "Applicants narrowed to 10 or 15."  That is the reporter.

22       Then Dr. Browder said, "Once we go through the

23  interview process we narrow it down to two or three

24  applicants."

25       Do you see that?

Horne - cross

1   A    I do.

2   Q    Well, you don't do that if you know of a felony

3   conviction; is that correct?

4   A    I don't know, Mr. Shumadine, you know, if this is the

5   process they use to where they narrow it down to two or

6   three applicants, you know.  At that point in time, you

7   know --

8   Q    Well, excuse me.  I am asking, a felon should not be

9   in those two or three applicants.  The felons --

10  A    I would agree with that.

11  Q    Okay.

12  A    Now, I would agree with that.  I didn't know at the

13  time.

14  Q    And it is totally unfair to the felon to go for any

15  further interviews because it is impossible to be hired?

16  A    With that I would agree.

17  Q    Okay.

18       Then he goes on and says -- then the reporter said,

19  "When the final applicant is selected" -- and Dr. Browder

20  said, "at that particular point, we make an offer, and

21  then at that point we start the finger printing, we start

22  the background check, et cetera."  Do you see that?

23  A    I do.

24  Q    Now, that, again, does not have any relevance, if you

25  know of a felony; is that correct?

Horne - cross

1   A     Yes, I would presume that is correct.

2   Q     And you are aware that a background check actually

3   costs some money, aren't you?

4   A     I performed background checks in the nature of my

5   role, yes, I'm quite aware.

6   Q     Okay.

7         And performing a background check if you already know

8   about a felony is just throwing money down the rat hole

9   here; is that fair?

10        MR. HAWKINS:  Objection.  Argument.

11        THE COURT:  That is not argument.

12        Go ahead.  Answer the question.

13        What he is trying to say is, do you agree with this?

14   That if you knew the applicant committed a felony, it

15   wouldn't make any sense to do a background check because

16   you know you couldn't hire them in the first place.

17        THE WITNESS:  In the school system.  In a school

18   system.

19   BY MR. SHUMADINE:

20   Q     I can't turn my cross over to, Your Honor, but thank

21   you.

22        And then Dr. Browder goes on to say, "The background

23   check, once we start that if you go anywhere from four,

24   six, eight weeks before the information comes in."

25        Do you see that?

1   A    I do.

2   Q    And, again, if you already know about the felony all

3   of that is irrelevant.  Doesn't make any difference,

4   right?

5   A    Probably.

6   Q    Okay.

7        And we have already gone over the fact that it is a

8   prohibiting factor.  Okay.

9        Now, in going back to the statute for just a second,

10  if you are going to talk about the fact that a felon has

11  been hired and fired as a result of the statute would you

12  agree to me that, with me, that it is appropriate to

13  describe the statute?

14  A    If that is what took place, yes, on paper.  But much

15  different in the video.

16  Q    Well, a felon was hired and fired; is that correct?

17  A    That's correct.

18  Q    And the reason the felon was hired and fired was

19  because it violated the statute; is that correct?

20  A    The applicant didn't falsify the application.

21  Q    I am not asking you that.  If my question is not

22  clear I apologize.  What I am asking you is that the

23  reason you were terminated was because of the statute.

24  A    Correct.

25  Q    And when Dr. Browder said that the statute was the

Horne - cross

```
 1    reason that could not be hired, he was correct; is that
 2    correct?
 3    A    Correct.
 4    Q    Okay.
 5         Now, let's look at the statute together.  We talked
 6    about it a minute ago, but let me pull it up if I might.
 7         Would you agree that there are only two sentences in
 8    the statute?
 9    A    Yes, although I have read the book and there is a
10    little more to it on the front and back end of it.
11    Q    For purposes of this there are only two provisions in
12    that statute that relate to you specifically; is that
13    correct?
14    A    That's correct.
15    Q    Okay.  And the first is that a felon cannot be hired
16    because a felon has to certify that there is no felony is
17    that correct?
18    A    That is what the statute says.
19    Q    And then the second section says that it as a class
20    one misdemeanor to falsely certify?
21    A    That is what it says.
22    Q    And if you describe accurately the statute, you
23    include both of those provisions; is that correct?
24    A    Perhaps.
25    Q    Okay.
```

Horne - cross

```
 1        Now, you were familiar with the fact that personnel

 2   records in the Prince George county school system were

 3   confidential, weren't you?

 4   A    I mean, that is really personnel records should be

 5   confidential wherever you work, but, yes.

 6   Q    And to the best of your knowledge that knowledge was

 7   in existence during the entire time that you worked for

 8   the Prince George school system?

 9   A    The policy was in existence, yes.

10   Q    And as far as you know the policy was followed; is

11   that correct?

12   A    I am not too sure about that.

13   Q    Well, do you know of any instance anyone violated

14   that the statute?

15   A    I know that the room was left un-secure.

16   Q    But except for knowing that the room was left

17   unsecured, are you aware of anyone who violated that

18   policy?

19   A    Actually, I do.

20   Q    Okay.

21        And would Mr. Covil have had any way to identify

22   anyone who would have violated the policy of the school

23   system?

24   A    I don't know that he would have any way unless

25   somebody told him, you know.
```

Horne - cross

1  Q    But when Dr. Browder said that it was the policy of

2  the school system that personnel records were

3  confidential, that was the policy?

4  A    That is a true statement.  That is the policy, yes.

5  Q    Okay.

6       When he told Mr. Covil, but no one in the school

7  system would talk to him, Mr. Covil had every right to

8  believe him on that, didn't he?

9  A    I don't know what conversation took place.  I was not

10 there.

11 Q    But you do know that he said personnel records are

12 confidential, because he said that?

13 A    He said that in the --

14 Q    Okay.

15 A    Yes.

16      MR. HAWKINS:  Your Honor, just to be clear, the

17 record says that he couldn't legally talk about personnel

18 matters.  I don't believe he used the word "confidential."

19      MR. SHUMADINE:  I apologize.

20      THE COURT:  Well, all right.  What the report says it

21 says.

22 BY MR. SHUMADINE:

23 Q    Okay.

24      He said he could not legally talk about personnel

25 matters.  You saw that.

Horne - cross

1   A    That is what he said in the interview.

2   Q    If what he was talking about that would apply to

3   everywhere in the Prince George school system?

4   A    I would presume he was speaking from policy.

5   Q    Okay.

6        So, he has established that there was no way for

7   Mr. Covil to obtain any other information about your, the

8   felon application from anyone in Prince George school

9   system?

10  A    I don't agree with that.

11  Q    Tell me how -- who would have -- who in the Prince

12  George school system would have violated the personnel

13  policy?

14  A    The HR clerk.

15       THE COURT:  Well, let me ask you.

16       If the HR clerk did that, it was a violation of the

17  rules, right?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  And you don't have any reason to think

20  that Dr. Browder knew that the HR clerk was leaking

21  personal records, do you?

22       THE WITNESS:  I know she had been written up for it.

23       THE COURT:  Well, she got in trouble for it.  So

24  she -- so everybody knew you weren't supposed to do that.

25       THE WITNESS:  That's correct, yes.

1   BY MR. SHUMADINE:

2   Q    That is all I am asking.

3   A    Okay.

4   Q    So there was no reason for Mr. Covil to talk to

5   anyone else at the school system unless he knew they

6   wanted to violate the policy?

7   A    Based on the policy, yes.

8   Q    Okay.

9        And the only way Mr. Covil could have found out

10  anything about your application was if you told him; is

11  that correct?

12  A    About my application?  He could have, yes.  He could

13  have.  He could have gotten that information from me.

14  Q    But only from you?

15  A    Presumptively so.  You know, I don't know who all had

16  access to my application in the school system.

17       THE COURT:  Well, unless somebody broke the rules and

18  revealed your application when they weren't supposed to,

19  the only way he could find it out about was from you;

20  isn't that right?

21       THE WITNESS:  That's correct.

22       THE COURT:  All right.

23       Let's not play word games here.  Answer the questions

24  that have been asked.

25  BY MR. SHUMADINE:

Horne - cross

```
 1   Q    Now, would you have answered Mr. Covil's questions if
 2   he had called you?
 3   A    I would have advised him to call my attorney, yes.
 4   Q    You had an attorney at that point in time?
 5   A    I had just gotten an attorney.  I was just in the
 6   process of meeting with him.
 7   Q    But you wouldn't have talked to him without him
 8   talking to your attorney; is that fair?
 9   A    Yes, that is fair.
10   Q    Okay.
11        And you recognize your name is not in there, in the
12   broadcast; is that correct.
13   A    Yes, sir.
14   Q    Your position is not in there?
15   A    Correct.
16   Q    And your felony is not mentioned?
17   A    Specifically, yes, you are correct.
18   Q    You are not identified in any way directly in the
19   broadcast?
20   A    Correct.
21   Q    And would you agree with me that every sentence in
22   the broadcast is true?
23   A    I presume so.
24   Q    Okay.  Well, you have read -- you have listened to
25   the broadcast many times.
```

1    A    Yes, sir.

2    Q    Based on your knowledge today every sentence in the

3    broadcast is true.

4    A    Yes, sir.

5    Q    And would you agree with me that the statute does

6    provide that it is a misdemeanor to make a false

7    certification?

8    A    It does say that, yes.

9    Q    Okay.

10        Would you agree with me that it was reasonable for

11   Mr. Covil to think the school superintendent would

12   understand and know the law?

13   A    I would imagine that he would think that, yes.

14   Q    Don't you agree with me that is absolutely reasonable

15   for him to think that?

16   A    Yes.

17   Q    Okay.

18        And if the school superintendent knows the law there

19   is no way a felon could be hired; is that correct?

20   A    That's correct.

21   Q    Let me talk to my colleague, if I may.

22        THE COURT:  All right.

23        MR. SHUMADINE:  No further questions, Your Honor.

24        THE COURT:  Any redirect?

25        MR. HAWKINS:  Yes, Your Honor.

```
 1                   REDIRECT EXAMINATION
 2        MR. HAWKINS:  Very briefly.
 3        THE COURT:  All right.
 4   BY MR. HAWKINS:
 5   Q    Ms Horne, you were asked about the statute in
 6   question and that there were two sentences.  You were
 7   asked whether both sentences applied to you.  I want to
 8   ask you specifically about the second sentence, which
 9   says, "That any person making a materially false statement
10   regarding any such offense shall be guilty of a class one
11   misdemeanor, and upon conviction, the fact of said
12   conviction shall be grounds for the Board of Education to
13   revoke such person's license to teach."
14        Does that apply to you?
15   A    No.
16   Q    Okay.
17        You were never asked to certify that you had not been
18   convicted of a felony, were you?
19   A    That's correct.  No, I was not.
20   Q    Not on your application?
21   A    No.
22   Q    Not from Dr. Browder or anybody else at the school
23   board, correct?
24   A    That is correct.
25   Q    All right.
```

1          That is all I have.

2     A    Thank you.

3          THE COURT:  Thank you very much, ma'am.  You may step

4     down.

5                    (The witness stood aside)

6          All right.  Who is the next witness?

7          MR. HAWKINS:  We would like to call Dr. Bobby

8     Browder.

9          THE COURT:  All right.  Dr. Browder.

10                        BOBBY BROWDER

11             WAS SWORN AND TESTIFIED AS FOLLOWS:

12                        DIRECT EXAMINATION

13         THE COURT:  All right.

14         Thank you very much for coming today, sir.

15         THE WITNESS:  Thank you.

16    BY MR. HAWKINS:

17    Q    Thank you, Your Honor.

18         Dr. Browder, would you please state your full name

19    for the record?

20    A    Sure.  Bobby Randall Browder.

21    Q    In 2014 what position did you hold?

22    A    Superintendent of Schools, Prince George.

23    Q    How long had you held that position?

24    A    From 2006.  Well, excuse me.  From 2009 to -- October

25    1 of 2015.

1    Q    All right.

2         Were you involved in the hiring and firing process?

3    A    Yes.

4    Q    All right.

5         Did you review applications for employment?

6    A    Yes.

7    Q    All right.

8         Did there come a point in time in 2015 where you

9    reviewed the application of Angela Horne?

10   A    Yes.

11   Q    Were you aware that she answered yes to the question

12   about having a felony conviction?

13   A    Later on in the process after we had gone through the

14   applications and recommend her as a candidate, yes.

15   Q    Did you speak with her about it?

16   A    Yes, once.

17   Q    Did she disclose the fact she had previously been

18   convicted of a felony?

19   A    I asked her was it a misdemeanor or felony?  He

20   indicated felony.  We had no further conversation.

21   Q    All right.

22        Did there come a point in time when Prince George

23   school system terminated Mrs. Horne?

24   A    Yes.

25   Q    When did that occur?

1    A    February.  Well, February 9 of 2015 is when the

2    school board met.  And the board at that particular time

3    reviewed all documentation, made a decision for purposes

4    of termination of Mrs. Horne.

5    Q    All right.

6         When did you communicate that to Mrs. Horne?

7    A    On February 10.

8    Q    All right.

9         That was in a morning meeting; is that correct?

10   A    That is correct.

11   Q    All right.

12        Now, did there come a point in time when you did an

13   interview with Wayne Covil about whether or not a felon

14   had been hired and then fired by the Prince George school

15   system?

16   A    Yes.

17   Q    How did that occur?

18   A    Mr. Covil called me, and he indicated that a call had

19   come into the studio indicating that a person, an employee

20   with the district, had a felony and he wished to

21   communicate with me in terms of the process.

22        At that particular time I indicated I could not talk

23   about any personnel period.

24   Q    All right.

25        Did you deny whether or not the Prince George school

1    system had hired a felon?

2    A    Yes.

3    Q    Okay.

4         So you told him they had not hired a felon?

5    A    I simply indicated I couldn't talk about the

6    personnel process period.

7    Q    Okay.

8         Well, did he ask you whether or not the school system

9    had in fact hired a felon?

10   A    He did -- he did ask me if it was the director of

11   finance?  And I indicated I could not validate yes or no.

12   I couldn't give any answer.

13   Q    So, it was your testimony that you responded by

14   saying, I am going to do neither of the above?

15   A    That is correct.

16   Q    Okay.

17        Did you say anything to the effect of, we absolutely

18   have not hired a felon?

19   A    Not that I am aware of.

20   Q    Okay.

21        Now, when did this telephone call come in from

22   Mr. Covil?

23   A    I can't be for sure if it was was on the tenth or

24   eleventh.  I'm not a hundred percent sure.  It was after

25   the school board meeting, and I am believing it was the

1   next day.

2   Q    All right.

3        When did you do your interview with him?

4   A    Again, once he arrived at the office.  And he

5   typically was in process of coming there.  He came in to

6   the office.  He asked could he see me, I could see him at

7   that particular point and do the interview.  I am thinking

8   again again it was probably on the tenth.

9   Q    Let me ask you this.  So you know the broadcast took

10  place on Friday the 13th.

11  A    Okay.

12  Q    Do you know whether or not you were interviewed on

13  the same day as that broadcast?

14  A    Well, I never saw the broadcast, so I don't know.

15  Q    Okay.

16       Where did the broadcast take place?  Where did the

17  interview take place?

18  A    In the superintendent's office where I work.

19  Q    Was that in the morning?

20  A    Again, I couldn't tell you whether morning or

21  afternoon.

22  Q    All right.

23       Now, other than what you have just testified about,

24  did Mr. Covil say anything, provide any more details about

25  the purpose of the interview?

Browder - direct

1   A   No.

2   Q   Okay.

3       Tell me then what happened when he did the interview.

4   A   He asked could we possibly go through in terms of the

5   hiring process.  And I said, yes, I can go over the hiring

6   process in terms of advertisement, personnel policy,

7   regulations, in terms of background check, et cetera.

8   Q   So he asked about the hiring process.

9   A   That is correct.

10  Q   And what did you tell him?

11  A   Just as I elaborated to you then.

12  Q   Okay.

13      Did he make any requests from FOIA or to the Virginia

14  Freedom of Information Act to you?

15  A   No.

16  Q   Did he ask you anything about whether or not there

17  had been any anonymous letters, that whether or not there

18  had been any communications to the school board about

19  whether or not a felon had been hired and then fired?

20  A   No.

21  Q   Okay.

22      Did anybody make any communication -- strike that.

23  Did anybody from WTVR other than Wayne Covil reach out to

24  you and make any kind of FOIA request?

25  A   No.

1    Q    Did anyone from WTVR other than Wayne Covil reach out

2    to you at all about this story?

3    A    No.

4    Q    I am going to show you -- you will see there in front

5    of you an e-mail.  Do you see that Dr. Browder?

6    A    Yes.

7    Q    This is an e-mail that is dated February 13th, 2015?

8         MR. SHUMADINE:  I don't think he has seen that

9    before, Your Honor.

10        THE COURT:  Well, we will find out, won't we?

11        MR. SHUMADINE:  Okay.

12   BY MR. HAWKINS:

13   Q    Well, Dr. Browder, take a look at this for just a

14   moment.  You will see it is dated February 13th of 2015 at

15   11:48:03 a.m.  Do you see that?

16   A    Yes.

17   Q    Ever seen this e-mail?

18   A    No, I have not.

19   Q    Okay.

20        I take it that Wayne Covil did not make any mention

21   of having received any such e-mail when he spoke to you?

22   A    Not that I recollect.

23   Q    Did anyone at WTVR indicate to you or communicate to

24   you prior to 5:30 at February 13th of 2015 that the

25   company, the station was in possession of this e-mail?

1    A    No.

2    Q    All right.

3         Now, in Prince George in February of 2015 were any

4    other persons who worked at the school board office fired?

5    Other than Mrs. Horne.

6    A    Going back in minutes, I don't recollect any through,

7    excuse me, as of February.  But some could have been prior

8    to February, yes.

9    Q    Okay.

10        Well, in the week of February 9 through February 13th

11   you had mentioned that there was a school board meeting on

12   February 9; is that correct?

13   A    That is right.

14   Q    Am I correct that the only person who was fired as a

15   result of that meeting was Ms Horne?

16   A    As far as termination recommended by the board, yes.

17   Q    Am I correct that the only director who worked at the

18   school board office of Prince George that was fired that

19   week was Ms Horne?

20   A    Correct.

21   Q    Okay.

22        And there is no secret about that, correct?

23   A    It would be within the board minutes if the board

24   took action.

25   Q    Okay.

Browder - direct

1        That is a public document, correct?

2   A    Well, it is a public document, but in terms of

3   personnel, the personnel would be labeled.  It wouldn't be

4   the name of an individual.  It would be P, whatever

5   number, and then the year, '14, '15.

6   Q    You could dig find out who that would be, right?

7   A    You would have to do a lot of digging to figure it

8   out.

9   Q    Okay.

10       But the code is not secret; correct?

11  A    That is correct.

12  Q    Okay.

13       Now, tell me about the interview with you and

14  Mr. Covil.  Did you show him a desk book?

15  A    Always I would have the Virginia school laws, and

16  typically in the past Wayne would ask me in terms of law,

17  et cetera.  I would also reference in terms of school

18  board policy and procedure.  Yes, I did have my copy on my

19  desk, and I had other copies to the right of me on a book

20  case from subsequent years.

21  Q    Okay.  You and Mr. Covil had talked before about

22  school procedures and legal procedures and that sort of

23  thing; correct?

24  A    Different times he would come to me, it would range

25  anywhere from inclement weather, could be a situation if

1    we had any accidents, student suspensions.  The list would

2    go on.

3    Q    Did you ever give him a copy of the school desk book?

4    A    Yes, I did allow him to use the desk copy that I had.

5    And it was, I think, around a 2006 issue.

6    Q    And he used that in his reporting; is that right?

7    A    I think he did.

8    Q    Okay.

9         You say you allowed him to use the 2006 desk book.

10   A    Well, it was a desk book copy, a copy that I had.  I

11   pulled it off the shelf.

12   Q    It wasn't the current desk book; is that right?

13   A    No.

14   Q    Okay.

15        And did you and he review the statute that provides

16   that felons or persons applying for the school system must

17   certify they haven't been convicted of a felony?

18   A    He was going through his procedure asking me

19   questions, et cetera.  I remember one of the questions he

20   asked me in terms of provision of information on the

21   application, was it a felony, or, excuse me, a

22   misdemeanor, if he provided false information.  I

23   indicated, yes.

24   Q    He asked that question.

25   A    Yes.

1   Q    Okay.

2        I want to show you what has previously been marked as

3   defense 3.  Do you see this document?  This is just, so

4   you understand what we are looking at, this is a page of

5   the internet version of the news story that ran by WTVR

6   about the felon hired and fired.  Do you see that?

7   A    Yes.

8   Q    There is a sentence there that says, "Additionally,

9   Browder said that providing false information on a school

10  application can lead to a class one misdemeanor charge".

11  Do you see that?

12  A    Yes.

13  Q    Did you say that?

14  A    Yes, I did.

15  Q    You did say that?

16  A    Yes, in collaboration he asked me the question.  I

17  responded.

18  Q    Okay.

19       Well, did you use those words to him, that it would

20  in fact be, false information on a school application can

21  lead to a class one misdemeanor charge?

22  A    I am going off of the best recall I can.  I am

23  thinking, yes.  I am not a hundred percent sure.

24  Q    I will tell you why I am asking.

25       Did you give a deposition in this case?

Browder - direct

1    A    Yes.

2    Q    All right.

3         You were asked questions under oath by both me and

4    Mr. Shumadine?

5    A    Yes.

6    Q    All right.

7         May I approach opposing counsel?

8         THE COURT:  What?

9         MR. HAWKINS:  I would like to approach opposing

10   counsel and show him.

11        THE COURT:  Tell him the page and line.

12        MR. HAWKINS:  Page 105.

13   BY MR. HAWKINS:

14   Q    Dr. Browder, the courtroom deputy is bringing you a

15   copy of a transcript of your prior deposition.  If you

16   look at the highlighted line there.  Do you see that?

17   A    Yes, I do.

18   Q    Now, do you see the question that precedes that where

19   I am asking -- this is a question that I am asking you --

20   I am asking you about this document and whether or not you

21   said those words.

22   A    Yes.

23   Q    What is the highlighted answer there?

24   A    The highlight is, "I don't believe I said that."

25        THE COURT:  So read the question, please.

1        THE WITNESS:  "There is a sentence here that I want

2   to read to you.  It is final closing sentence of the

3   on-line version.  It says, 'That additionally Browder says

4   that providing false information on a school application

5   can lead to a class one misdemeanor charge,' did you say

6   that?"

7        My response was, "I don't believe I said that."

8        THE COURT:  All right.  That was under oath?

9        THE WITNESS:  Yes.

10       THE COURT:  All right.  When was that?  The front

11  page of the deposition will tell you.

12       THE WITNESS:  September 28, 2016.

13       THE COURT:  So that was a lot closer to the event

14  than today?

15       MR. SHUMADINE:  Could I ask he read the next question

16  and answer?

17       THE COURT:  You can do that on cross examination.

18       MR. SHUMADINE:  I will do that.  Thank you, Your

19  Honor.

20       THE COURT:  Thank you.

21       MR. HAWKINS:  If I could get that back, please.

22  BY MR. HAWKINS:

23  Q    Do you believe that answer is correct?

24  A    It is what it is there.  I mean, I gave the answer at

25   that particular point.

1   Q    Okay.  You are not denying that is the answer you

2   gave?

3   A    That's correct.

4   Q    Okay.

5        My focus is, I know you provided the book to Dr. or

6   to Mr. Covil.  But my question is, did you actually say

7   the words that are attributed to you here on this exhibit

8   that is before you?

9   A    I can only go off of memory as best I can.

10  Q    Okay.

11       All right.

12       You were answering as truthfully as you could back in

13  your deposition; correct?

14  A    That is correct.

15  Q    All right.

16       Now, did Mr. Covil ask you any questions as to

17  whether or not the felon who had been hired and then fired

18  at Prince George school system made any misrepresentations

19  on their application?

20  A    No.

21  Q    Did he ask you any questions about the application

22  process for that particular person?

23  A    No.

24  Q    Did he ask you any specific questions about the

25  director of finance and budgets, other than was this the

1    felon?

2    A     No.

3    Q     Did he ask you any questions about whether or not

4    there had been any anonymous letters provided to the

5    school board?

6    A     No.

7    Q     Did he ask you whether or not you knew that there

8    were any information provided to the school board about

9    the fact that Ms Horne had been convicted of a felony?

10   A     No.

11   Q     Did he ask you whether or not the issue of

12   Mrs. Horns' termination had even been discussed in the

13   February 9 school board meeting?

14   A     No.

15   Q     Did he ask you any information about how to contact

16   Ms Horne?

17   A     No.

18   Q     Did he ask you any information about what, if

19   anything the school board knew about Ms Horne's felony

20   conviction and her hiring and firing?

21   A     No.

22   Q     That is all I have.

23         Thank you.

24         THE COURT:  All right.  Thank you.

25         Cross examination?

1    BY MR. SHUMADINE:

2    Q    Thank you, Your Honor.

3         May I have the courtroom deputy to give Dr. Browder a

4    copy of his deposition?

5         After the lines that Mr. Hawkins asked you to say on

6    page 105 where you said, "I don't believe I said that," is

7    there a further response to that question?

8    A    Yes.  It says it could have been --

9    Q    Okay.  Would you read those?

10   A    Yes.  First I said, "Okay."  And then it follows in

11   terms, "It could have been a reference to the school,

12   Virginia school law desk book information."

13   Q    Okay.

14        Would you go over with me to page 107.  And did you

15   sit down with Mr. Covil and go over the desk book with

16   him?

17   A    I had the 2014 copy in front of me.  And I don't know

18   exactly when he had the 2006 version in front of him.

19   Because he was asking questions and he was also filming

20   simultaneous.

21   Q    Did you go, did he ask did to go down the statute

22   together?

23   A    I know he was reviewing the book and asking

24   questions.  And one of the questions was, is it a

25   misdemeanor for purposes of providing false information

Browder - cross

1    regarding information on the application, et cetera.  And

2    I am reading it right there off the book in terms of, yes,

3    that is a class one misdemeanor.

4    Q    So your memory is you read it right off the book,

5    "yes, it as class one misdemeanor?"

6    A    That's correct.

7    Q    Okay.

8         Now, let's -- let me ask you some questions about

9    your history in Virginia education.

10        How long have you been involved in public education

11   in the Commonwealth?

12   A    Completed 39 years.

13   Q    Would you tell the members of the jury the various

14   positions you have held?

15   A    Three years as teacher.  I did 20 years as a

16   director.  I did basically 15 in terms of work as

17   assistant principal, principal.  And then I did three as

18   assistant superintendent.  The remainder as

19   superintendent.

20   Q    And is one of your responsibilities, or was one of

21   your responsibilities as superintendent of Prince George

22   school system to know the law?

23   A    Yes.

24   Q    Was one of your responsibilities to be the public

25   information officer of the school system?

1    A    Yes.

2    Q    Would you describe to the members of the jury what

3    that role would entail?

4    A    Some districts will have a public information

5    officer, like when I worked for Henrico they had one.

6    Prince George did not.  It was left up to the

7    superintendent or assistant superintendent.  Sometimes the

8    individual director, such as the transportation director

9    or director of special ED, they would be the ones that

10   would communicate directly with the public and provide

11   information, or the news press.  Typically I took the lead

12   in terms of the press if there were any questions that

13   were posed.

14   Q    So if anyone was coming to get information about the

15   Prince George school system, you were the best person they

16   could possibly talk to?

17   A    Yes.

18   Q    And now when Mr. Covil called you, what did he tell

19   you in the telephone call?

20   A    As stated previously, that there had been a report to

21   the station in terms of an employee, employee having a

22   felony charge that were employed.  He wished to do an

23   interview.  And, again, I responded I could not

24   communicate period regarding personnel.

25   Q    Okay.

1       So you made it plain that you would not provide any

2    details about that felony, the person who had that felony;

3    is that fair to say?

4    A    That is correct.

5    Q    And then he, did he tell you he wanted to run a story

6    on the hiring process to know how to prevent felons being

7    hired?

8    A    Well, his next statement was, we would wish to do

9    then a story on the hiring process.  In terms of what he

10   was going to do with that I didn't inquire.

11   Q    Okay.

12       But you knew the story was being generated by the

13   report that a felon had been hired --

14   A    Yes.

15   Q    -- and fired.

16       And you did not deny that a felon had been hired and

17   fired, did you?

18   A    No, I did not.

19   Q    Okay.

20       If a felon had not been hired and fired you would

21   have told him he was crazy, wouldn't you?

22   A    I would have probably responded, Mr. Shumadine, from

23   the standpoint I can provide information to you in terms

24   of the hiring process.  That is what you asked me.  And

25   that would have been the end of it.

1   Q     Thank you.

2         But he came to you and you met in his office, in your

3   office; is that correct?

4   A     That is correct.

5   Q     And did you identify the statute to him?

6   A     I can't be a hundred percent sure there.  Again, we

7   opened up the book.  And he was starting off in terms of

8   asking me questions, et cetera.  I was following through.

9   The first one posed was that of the application.  And I

10  went directly to the statute at that particular point and

11  had it there.  And then questions were asked.

12  Q     Okay.

13        So the -- so you went to the statute immediately

14  during the interview; is that fair to say?

15  A     It was opened up to that particular point, yes.

16  Somewhere in that process of us communicating, it was.

17  Q     Okay.

18        You had shown him the 2014 desk book; is that

19  correct?

20  A     That is correct.

21  Q     You had shown him that you had a copy of that desk

22  book at your desk; is that correct?

23  A     Correct.

24  Q     And that desk book contained the statute; is that

25  fair?

1    A    Correct.

2    Q    You also gave him a copy of the 2006 desk book?

3    A    That's correct.

4    Q    And that, too, had a copy of the statute.  Is that

5    correct?

6    A    Correct.

7    Q    And did you tell him the statute had been in effect

8    since 1996?

9    A    I don't recollect that.

10   Q    Okay.

11        Would that be shown in the desk book?

12   A    It should.

13   Q    Okay.

14        So the desk book you gave him showed that the statute

15   had been in effect since 1996; is that fair to say?

16   A    I would have to look at one to validate, but I would

17   think, yes.

18   Q    Okay.

19        And did you then discuss the hiring process with

20   Mr. Covil?

21   A    Yes.  Briefly.

22   Q    Okay.

23        Did you discuss the fact that the application

24   narrowed down?

25   A    Yes.

1    Q    Did you discuss the fact that interviews occur later

2    in the process?

3    A    Yes.  Briefly.

4    Q    Then did you discuss the fact that the background

5    check comes in later in the process?

6    A    Yes, it is after the fact.  After a person is

7    recommended for hire.

8    Q    Okay.

9         Well, is it a fact that if you know of the felony

10   conviction you don't do any of those things?

11   A    Correct.

12   Q    So, if you know of the felony conviction you would

13   never do anything further; is that fair to say?

14   A    Yes.

15   Q    Because background checks cost money, doesn't it.

16   A    Yes.

17   Q    So you just would be wasting money if you already

18   know of the felony conviction.

19   A    Yes.

20   Q    Okay.

21        So, now, was there any way -- let me first of all

22   ask.  Was everything done relating to Ms Horne's hiring

23   and firing privately?

24   A    Yes.

25   Q    Was it done in a closed session?

Browder - cross

1    A    Yes.

2         Board would always go into closed session for the

3    discussion of personnel.  They would review with either me

4    or superintendent, or could be with assistant

5    superintendents, and then there were times they would ask

6    that we be dismissed.  They would continue to have

7    discussions.  When we came back in they would make a

8    recommendation to me at that point, when I came back and

9    made the recommendation per the board's request.

10   Q    Because the jury may not understand what a closed

11   session is.  Would you explain what that means?

12   A    The school board would go into closed session for

13   purposes of discussing personnel, it would be student

14   matters, legal matters, could be acquisition of land, et

15   cetera.  At that particular point it is typically only the

16   school board, superintendent, assistant superintendent, or

17   it could be, once the information is presented by

18   superintendent or assistant superintendent, the school

19   board then is the only group that is discussing it.  We

20   would return at that point, they give us information, and

21   the board chair would ask us when we came into closed

22   session to please state if any action was taken within the

23   closed session as to what that action was.  And that is

24   where, hence "P" was for personnel, "L" was for legal, "S"

25   was for student and the number, and then school year, '14,

1   '15.

2   Q    But everything that was relating to Ms Horne was in a

3   closed session, was never made public; is that correct?

4   A    That is correct.

5   Q    Personal records including application were never

6   made public; is that correct?

7   A    As far as I know, that is correct.

8   Q    And then it was the policy of the Prince George

9   school system as long as you were with the school system,

10  for those personnel records would be private?

11  A    Correct.

12  Q    And it would be a violation of the policy for anyone

13  to have made that information available?

14  A    Correct.

15  Q    And did you in the interview do anything to tell

16  Mr. Covil you did not understand the law?

17  A    No.

18  Q    Gave him no indication that you had any

19  misunderstanding of the law; is that correct?

20  A    That is correct.

21  Q    And -- one moment, if I may.

22       Let me show pictures to you.  My colleague says I am

23  not being as clear as I should be.

24       If you recall, this -- is this being the way the

25  interview occurred?

1    A    It appears to be how the interview occurred, yes.

2    Q    Okay.

3         Is that your office and your desk?

4    A    Yes.

5    Q    And is that the 2014 desk book that is in front of

6    your desk?

7    A    It appears to be, yes.

8    Q    That is the one you identified and gave to Mr. Covil;

9    is that correct?

10   A    The one on the bottom.

11   Q    And then you look at this picture that shows the 2006

12   desk book, do you see that?

13   A    Yes.

14   Q    And that, too, is the one you gave to Mr. Covil?

15   A    Correct.

16   Q    Okay.

17        I have no further questions.

18        THE COURT:  All right.  Thank you very much.

19        Any redirect?

20        MR. HAWKINS:  Yes, Your Honor.

21                      REDIRECT EXAMINATION

22        THE COURT:  Go ahead.

23        MR. HAWKINS:  Waiting for the video.

24        THE COURT:  I am sorry.

25   BY MR. HAWKINS:

```
 1   Q    All right.

 2        Dr. Browder, I want to show you what has been

 3   previously been marked as defense exhibit 6.  Do you see

 4   the first page of that there --

 5   A    Yes.

 6   Q    -- in front of you?

 7        Is this the Prince George school board policy with

 8   respect to personnel records?

 9   A    Yes.

10   Q    You will see there that it has a date.  Do my best to

11   circle it there.

12        June 13, 2015.  Do you see that?

13   A    Yes.

14        THE COURT:  2005.

15        MR. HAWKINS:  2005, my mistake.

16        Do you see that?

17        THE WITNESS:  Yes.

18   BY MR. HAWKINS:

19   Q    And I take it the policy had been in place since at

20   least 2005 up to February of 2015; correct?

21   A    Yes.

22   Q    Now, look with me at the second paragraph.  Do you

23   see that?

24   A    Yes.

25   Q    It says that "the information relative to employment
```

1    is requested by banks or other establishments or

2    individuals.  "Written permission from the employee to

3    release such information is required, except to comply

4    with a judicial order, a lawfully issued subpoena, the

5    Virginia Freedom of Information Act, or other law or court

6    order."

7         Do you see that?

8    A    Yes.

9    Q    Would Mrs. Horne's application for employment been

10   covered by that?

11   A    Should have been.

12   Q    Okay.

13        Did Wayne Covil ever ask you to ask Mrs. Horne for

14   her written permission to release information about her

15   employment application?

16   A    Not that I am aware.

17   Q    Did he ever ask you pursuant to this policy for a

18   Freedom of Information Act request related to her

19   application?

20   A    No.

21   Q    All right.

22        Now, you testified about the interview you had with

23   Mr. Covil.  I want to make sure I have got this right.

24   You testified, am I right, that he is the one who focused

25   on the application itself?

Browder - redirect

```
1   A    Yes.

2   Q    Okay.

3        And that is how you ended up talking about the class

4   one misdemeanor provision of the statute; is that right?

5   A    Yes.

6   Q    All right.

7        Am I correct that he did not ask any details about

8   the application at issue for Ms Horne or the director of

9   budget and finance?

10  A    No.

11  Q    All right.

12       You gave this interview in that particular week of

13  2015; correct?

14  A    It would have been somewhere between February 9 and,

15  obviously, whenever it was shown.

16  Q    At any point after that interview did anyone from

17  WTVR contact you?

18  A    No.

19  Q    All right.

20       Now, were you aware of an anonymous letter sent to

21  the school board earlier that week, February 9 of 2015?

22  A    Two school board members, the first being

23  Mr. Stevenson, the second being Mr. Foster, referenced a

24  letter.

25  Q    All right.
```

Browder - redirect                           137

1      Did Mr. Covil ask anything about you, or ask anything

2   to you about that letter?

3   A   No.

4   Q   All right.

5      You testified that you were the primary media

6   spokesperson for Prince George schools; correct?

7   A   Yes.

8   Q   Did that position in any way prevent Wayne Covil from

9   reaching out directly to the school board members to ask

10   questions about hiring or firing?

11   A   No.

12   Q   All right.

13      To the best of your knowledge back when you were the

14   superintendent in 2015 of February, were the telephone

15   numbers for the school board members posted on the web

16   site for Prince George?

17   A   Yes.

18   Q   Nothing further.

19      MR. SHUMADINE:  Could I ask follow-up questions, if I

20   may?

21      THE COURT:  If you want to, you can call him back in

22   your case in chief.

23      Let's move on to whatever is next.  Do you have

24   another witness.

25      MR. HAWKINS:  I do.  We call Susan Wilson.

1      THE COURT:  All right.

2                 (Witness stood aside)

3      THE COURT:  May she be excused?

4      MR. SHUMADINE:  Let me think whether I want to call

5  him back.

6      THE COURT:  Okay.  But, would you think you will need

7  him any more today?

8      MR. SHUMADINE:  I do not need him any more today.  He

9  is released today.

10      THE COURT:  Dr. Browder, you can go home today, but

11  you need to come back tomorrow.

12      THE WITNESS:  Okay.  What time tomorrow, sir?

13      THE COURT:  Well, how long do you think your case is

14  going to take, Mr. Hawkins?

15      MR. HAWKINS:  We may be able to rest today.

16      THE COURT:  You better come back at 9:00.

17      Mr. Shumadine, do you know how to get in touch with

18  him?

19      MR. SHUMADINE:  With?

20      THE COURT:  With Dr. Browder.

21      MR. SHUMADINE:  What?

22      THE COURT:  Do you how to get in touch with him?  If

23  you decide not to call him up to testify any more, can you

24  call him tonight and let him go?

25      MR. SHUMADINE:  If he will give me your phone number.

1        THE COURT:  Who is next?

2        MR. HAWKINS:  Susan Wilson.

3        THE COURT:  Mr. Shumadine, if you decide you don't

4   want him to come back tomorrow, just call him and tell him

5   not to come, and that will be fine.

6        MR. SHUMADINE:  I promise.

7                         SUSAN W. WILSON

8             WAS SWORN AND TESTIFIED AS FOLLOWS:

9                       DIRECT EXAMINATION

10  BY MR. HAWKINS:

11  Q    Please introduce yourself to the jury.

12  A    I am Susan W. Wilson.

13  Q    Were you to live?

14  A    I live in Prince George, Virginia, in the town of

15  Disputanta.

16  Q    Do you known Angie Engle Horne?

17  A    Yes.

18  Q    How long have you known her?

19  A    Forty years.

20  Q    Okay.

21       Would you consider yourself a friend of hers?

22  A    Yes.

23  Q    Would you consider yourself someone who knows her

24  really well?

25  A    Yes.

1    Q    Now, did there come a point in time -- well, let me

2    ask you one more question.  Do you know that she has been

3    convicted of a felony in the past?

4    A    Yes.

5    Q    All right.

6         Did there come a point in time where you saw a news

7    story that was titled, "Felon Hired and Then Fired?"

8    A    I did.

9    Q    Tell me, did you watch that story.

10   A    I did.

11   Q    Did you watch it on the TV?

12   A    Been two years.  I want to say I saw it on social

13   media.

14   Q    Okay.  All right.

15        Had you spoken with Ms Horne prior to that?

16   A    No.

17   Q    Okay.

18        So the first time you see this is on social media?

19   A    Yes.

20   Q    Okay.

21        What was your reaction?

22        THE COURT:  Well, let's --

23        MR. HAWKINS:  I don't need to ask.

24        THE COURT:  Let's direct her -- is this dealing with

25   whether she knew it was about Ms Horne?

1          MR. HAWKINS:  Yes.

2          THE COURT:  Did you understand that that article was

3     about Ms Horne?

4          THE WITNESS:  Yes.

5          THE COURT:  How did you know that?

6          THE WITNESS:  Because I was with Angie when she

7     shared in the joy of getting the job, and also with Angie

8     almost 20 years ago when the felony happened.

9          THE COURT:  So you were able to put two and two

10    together and know it was her; is that right?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.

13    BY MR. HAWKINS:

14    Q    Did you reach out to Ms Horne?

15    A    I did.

16    Q    What did you ask her?  What did you say, if anything?

17    A    I'll put this in nice words.  I asked, what was going

18    on?

19    Q    Okay.  You did that because.

20         You thought it was her?

21    A    I knew it was her.

22    Q    That is all, I have, Your Honor.

23         THE COURT:  All right.

24         Cross examination?

25         MR. SPAIN:  No cross, Your Honor.

```
 1        THE COURT:  All right.
 2        May Ms Wilson -- will you need her?
 3        MR. HAWKINS:  I will need her tomorrow.
 4        THE COURT:  All right, Ms Wilson, you will need to
 5   come back tomorrow again to testify.  So why don't you
 6   come in at around -- why not come around 1:00.  Okay?
 7   Thank you.
 8        And do you have -- you have a phone number to reach
 9   her?
10        MR. HAWKINS:  I do.  I can find her.
11        THE COURT:  Thank you.
12        MR. HAWKINS:  The plaintiff calls Randy Bullock.
13        THE COURT:  Randy Bullock.
14                    (Witness stood aside)
15                    RANDY BULLOCK
16        WAS SWORN AND TESTIFIED AS FOLLOWS:
17                    DIRECT EXAMINATION
18   BY MR. HAWKINS:
19   Q    Good afternoon, Randy.  Would you please state your
20   full name for the jury?
21   A    Randy Dean Bullock.
22   Q    Were you do you live?
23   A    I have two addresses, but I teach at Dinwiddie High
24   School, and I currently reside at -- on Creekstone Drive
25   in Chesterfield.
```

1    Q    All right.

2         Do you know Angie Horne?

3    A    I do.

4    Q    How long have you known her?

5    A    Since 2009.

6    Q    All right.

7         Did there come a point in time when you saw a news

8    story called "Felon Hired Then Fired?"

9    A    Yes.

10   Q    How did you first see that story?

11   A    On TV.  I get home usually pretty early.  I always

12   check out the news.

13   Q    All right.

14        What do you do?

15   A    I teach at Dinwiddie High School.  I teach

16   engineering and architecture.

17   Q    You watched this news story?

18   A    I did.

19   Q    All right.

20        Prior to watching that news story did you have any

21   conversations with Angie Horne or Angie Engle Horne about

22   the news story?

23   A    Yes.

24   Q    Okay.

25        What did you have?

1   A    Prior to it?

2   Q    Yes, sir.

3   A    That I just knew there were some things going on --

4   Q    Okay.

5   A    -- at Prince George because I worked there for almost

6   10 years.

7   Q    All right.

8        Am I correct that Mrs. Horne did not tell you

9   anything about the story before it aired?

10       Before you watched it.

11  A    Before I watched it?  No, she didn't.

12  Q    Okay.

13       What did you see when you saw the story?

14  A    Well, that they didn't say exactly, but they said

15  that, you know, someone -- they had hired a felon and

16  that -- and then they fired her.  And, you know, I knew

17  the story.  I knew, you know, people to get hired and

18  fired there.  I mean, I know everybody there, basically.

19  So I knew that it was about her.

20  Q    Okay.

21       Did she tell you it was with her before you saw the

22  story?

23  A    May have.  I am not sure.

24  Q    Well, what I am trying to figure out, did you have

25  any advance warning about this particular TV story?

1   A      No.

2   Q      Okay.

3          So the first time you see it you haven't heard from

4   Ms Horne that she is the person in the story?

5   A      No, no, I had not, but I just knew that it was about

6   her.

7   Q      How did you know that?

8   A      Well, I just know because of things that were going

9   on.  I was the one of the reasons she applied for the job,

10  you know, because we knew that they needed somebody.  And,

11  you know, I have contacts in there.  I thought of Angie

12  would be good for the job.

13  Q      You knew she worked at the Prince George County

14  schools?

15  A      Absolutely.

16  Q      And you knew she worked in the school board office?

17  A      Yes.

18  Q      Okay.

19  A      That is how I put two and two together.

20  Q      All right.

21  A      I mean, how many people were up there at the school

22  board office?  It's not that many.

23  Q      Did you reach out to Ms Horne?

24  A      I did.

25  Q      By telephone?

Bullock - cross

1    A    I did.

2    Q    What did you say to her?

3    A    Well, I just, I told her I said, you know, this is

4    crazy.  And, of course, she was hysterical and crying.  I

5    tried to console her.  I said, you know, this is wrong.

6    Should, you know --

7         MR. SPAIN:  Your Honor.

8         MR. HAWKINS:  I'm not --

9         THE COURT:  Yes.

10        How did you know the story was about her, and did you

11   reach out to her?  And the answer is, yes.

12        THE WITNESS:  Yes, I did.

13        THE COURT:  Let's just move on.

14   BY MR. HAWKINS:

15   Q    Did you reach out to her because you believed she was

16   the subject of the story?

17   A    I did.

18   Q    Thank you.

19        That is all we have.

20        THE COURT:  All right.

21        Thank you, sir.

22        Sorry.  There is cross examination?

23        Mr. Spain?

24                    CROSS EXAMINATION

25   BY MR. SPAIN:

Bullock - cross

1    Q    Just briefly, Your Honor.

2         Mr. Bullock, you said you worked in the school system

3    for 10 yeas.

4    A    Almost 10, I can't --

5    Q    All right.

6         So you are familiar with what was going on in the

7    Prince George school system based on prior contacts there?

8    A    Yes, I know a lot of people there.

9    Q    That is the reason why you were able to put two and

10   two together is that you understood what was going on, who

11   had been recently hired and fired?

12   A    Right.

13        I knew they needed somebody that, you know, had her

14   experience, because, you know --

15        THE COURT:  Did you know she had been fired before

16   you saw the story?

17        THE WITNESS:  No.  I didn't know she had been fired.

18   BY MR. SPAIN:

19   Q    You said you knew things were going on, that was your

20   testimony.  What did you mean by that?

21   A    Well, you know, you just hear things from people.

22        THE COURT:  We don't know what that means, sir.

23        THE WITNESS:  Well, I mean, you hear rumors.  You

24   don't know if they are true or not.

25   BY MR. SPAIN:

Bullock - cross

1    Q    Did you hear a rumor she had been fired, or was going

2    to be fired?

3    A    No.

4    Q    What did you hear?

5    A    That, you know, that they were trying to get the

6    budget and all that stuff straight.  And I had heard some

7    rumblings of some employees there, you know, about things

8    going on.

9         THE COURT:  We weren't there, so we don't know.

10        THE WITNESS:  Yes.

11        THE COURT:  When you say you heard about things going

12   on, I think things probably go on all the time everywhere.

13   One of the things going on is a trial.  We are trying to

14   figure out what happened.  When you say, I heard rumblings

15   about things going on, it doesn't tell us much of

16   anything.

17        So what did you hear?

18        THE WITNESS:  Well, I heard some of the girls in the

19   office, I think were mad because Angie had expected them

20   to do their jobs.

21        THE COURT:  All right.

22        So there was dissatisfaction.  Office politics.

23        THE WITNESS:  Right.  Grumblings, what I call them.

24   BY MR. SPAIN:

25   Q    Okay.

Bullock - cross

1       The broadcast itself doesn't give Ms Horne's name;

2  correct?

3  A    Correct.

4  Q    Doesn't give her position?

5  A    No.

6  Q    Doesn't give the details of her felony conviction?

7  A    Right.

8  Q    So, you knew it was her because you know her, you

9  worked in the school system, et cetera?

10 A    Um hum.

11 Q    Correct?

12 A    Correct.

13 Q    But if, unless you know her work in the school system

14 or have some or connection you would know these facts, you

15 wouldn't be able to tell it was about her, is that

16 correct?

17 A    Well, I mean, I knew it was about her because of her

18 position.

19 Q    I understand your position.  But you know because you

20 know her.  You have contacts in the school system.  You

21 keep -- you generally know what's going on; is that fair?

22 A    You hear stuff.  I mean, I have got a lot of friends

23 everywhere.

24      MR. SPAIN:  No further questions, Your Honor?

25      THE COURT:  All right.

1        MR. HAWKINS:  No redirect.

2        THE COURT:  All right.

3        Thank you.

4        Do you need him to come back?

5        MR. HAWKINS:  I do not.

6        THE COURT:  All right.

7        Thank you very much for coming, Mr. Bullock.

8        THE WITNESS:  Thank you.

9        THE COURT:  You are excused, and don't need to come

10   back.  You are welcome to stay and watch the rest of the

11   trial if you want.

12       THE WITNESS:  No.

13       THE COURT:  Okay.

14       THE WITNESS:  Thank you, sir.

15       THE COURT:  Do you have another witness?

16       MR. HAWKINS:  I do.

17       I would like to call Wayne Covil.

18       THE COURT:  All right.

19                   (Witness stood aside)

20       THE COURT:  How long will this take?

21       MR. HAWKINS:  He is going to take a long time.

22       THE COURT:  How long is a long time?

23       MR. HAWKINS:  Forty-five minutes probably.

24       THE COURT:  All right.

25       Well, let's take -- we have been going an hour and a

Covil - direct

1  quarter.  Let's take a 15-minute break, and then come back

2  with Mr. Covil.  All right.

3      Mr. Covil, we are going to take a break right now and

4  come back in 15 minutes.

5      Let's come back at 2:30.

6      Go ahead, ladies and gentlemen.  Out you go.

7                      (Jury withdrew)

8      All right.  See you back at 2:30.

9                      (A recess was taken)

10     THE COURT:  All right.

11     Anything to take up before the jury comes back?

12     All right.  Bring the jury back and get this show on

13  the road.

14             (Jury took its place in the jury box)

15     You are not required to sit in the same seat all the

16  time.  This is like a seventh grade dance.  All the boys

17  on one side and the girls on the other.  Except

18  Mrs. Cauthorne down there.  She goes over to the boys

19  side.

20     Call your next witness.

21     MR. HAWKINS:  The plaintiff calls Wayne Covil.

22     THE WITNESS:  All right.  Call Mr. Covil.

23                  GARRY WAYNE COVIL

24         WAS SWORN AND TESTIFIED AS FOLLOWS:

25                  DIRECT EXAMINATION

```
 1        THE COURT:  Thank you for coming today.

 2        Good afternoon.

 3        THE WITNESS:  Good afternoon.

 4   BY MR. HAWKINS:

 5   Q    Thank you, Your Honor.

 6        Good afternoon, Mr. Covil.

 7   A    Good afternoon.

 8   Q    Would you please state your full name for the record?

 9   A    My name is Garry, with two R's, Wayne Covil.

10   Q    Where do you work?

11   A    I work for WTVR CBS 6 in Richmond, Virginia.

12   Q    What capacity?

13   A    I am their senior reporter.

14   Q    How long have you been that?

15   A    The senior reporter?

16   Q    Yes, sir.

17   A    Probably like 12 years.  Something like that.  I have

18   been with the station since 1992.

19   Q    All right.

20        Were you a senior reporter, or were you the senior

21   reporter in February of 2015?

22   A    Yes.  Yes, sir.

23   Q    Okay.  You are the person who authored and broadcast

24   the story "Felon Hired Then Fired"; is that correct?

25   A    Correct.
```

Covil - direct

1   Q    You currently still work for the TV station; is that

2   right?

3   A    Yes, sir.

4   Q    Your Honor, permission to treat the witness as

5   hostile, adverse.

6        Mr. Covil, you were the one who broadcast this video

7   on February 13 of 2015; correct?

8   A    Correct.

9   Q    All right.

10       Prior to that time had you ever met Ms Horne?

11  A    Not that I know of.

12  Q    Okay.

13       It's true, is it not, that prior to that video, and

14  prior to that broadcast you had no idea who she was?

15  A    Not that I know of, no.

16  Q    Okay.

17       Am I correct that at that point in time, at the time

18  of that video, you had no idea about her past, did you?

19  A    No, sir.

20  Q    You had no idea whether she had ever been convicted

21  of a felony; is that correct?

22  A    No, sir.

23  Q    You had no idea whether she had ever disclosed her

24  prior conviction to the Prince George County school

25  system; is that correct?

1    A    That's correct.

2    Q    You had never seen her employment application prior

3    to your broadcast?

4    A    No.  That would not have been available to me.

5    Correct.

6    Q    Well, you had never asked for it, had you?

7    A    Correct.

8    Q    All right.

9         You had never had any discussions with anybody at the

10   Prince George County school system, or anyone else, about

11   Ms Horne prior to the broadcast; am I correct?

12   A    About her specifically, correct.  But, I mean, asking

13   questions about what had happened, yes.

14   Q    I understand.  What I am focused on is the person who

15   is Angela Engle Horne.

16   A    Okay.

17   Q    You had never talked to her, spoken to her, had any

18   communication with her prior to the broadcast; am I

19   correct?

20   A    Not that I am aware of.

21   Q    All right.

22        You didn't know how to get in touch with her; is that

23   correct.

24   A    Correct.

25   Q    And you hadn't tried to get in touch with her.

Covil - direct

1    A    I did try to reach out to her, and left a message on

2    a phone number that we believed was her phone number.

3    Q    Right.  But you couldn't confirm that was her phone

4    number; correct?

5    A    We did not get a call back, so, no, sir.

6    Q    You didn't reach out to her with an e-mail or text

7    message or any other kind of communication?

8    A    Didn't have an e-mail, and didn't have a cell phone

9    number, so I couldn't send a text; no, sir.

10   Q    Did you look for one?

11   A    I personally did not.  No.

12   Q    And you didn't look for an e-mail or a cell phone

13   number; correct?

14   A    I personally did not.  No.

15   Q    That's right.

16        THE COURT:  Well, did somebody at the station try to

17   do that?

18        THE WITNESS:  Correct, yes, sir.

19        THE COURT:  Okay.

20        MR. HAWKINS:  We will talk about that later.

21   BY MR. HAWKINS:

22   Q    But, nobody gave you a cell phone number; correct?

23   A    Yes.

24        I was given a number that was either a cell phone or

25   a home number.  That was the number that I used to try to

Covil - direct

1    reach out to her.  I left a message.

2    Q    With a telephone call?

3    A    With, yes, with a telephone call.

4    Q    You did not use that number to send a text; correct?

5    A    No, I did not.

6    Q    Okay.

7         You say that you didn't personally look up her e-mail

8    address, or personally look up any other identifying

9    information.  Did anybody give you any kind of a

10   identifying information for Ms Horne, how to reach out to

11   her?

12   A    Yes.  I talked to one of our executive producers.

13   And he gave me some information.  And that was the number

14   that I used.

15   Q    Okay.

16        I want to make sure that we have got this clear.

17   When you say information, and you have gotten this contact

18   information, all we are talking about is the one cell

19   phone number where you didn't get a return message; is

20   that correct?

21   A    A phone number, yes.

22   Q    You don't even know if what this was a cell phone

23   number, do you?

24   A    Correct.

25   Q    Okay.

Covil - direct

1          Now, just so I am absolutely clear about this.  Prior

2     to the interview, or prior to the broadcast of the story

3     on February 13 of 2015, you had no knowledge about what Ms

4     Horne and what Dr. Browder, or anyone else at Prince

5     George County school system talked about as to her prior

6     felony conviction; is that correct?

7     A    Correct.

8     Q    All right.

9          Tell me, if you would, how did the story get started?

10    A    I received a phone call from someone that I consider

11    a source that has provided me with information concerning

12    Prince George County for many, many years.  And it was

13    basically a short, brief, phone call, as they usually are.

14    Basically saying they were were under the belief that a

15    felon had been hired and fired from the school board

16    office.  And may have given me a partial name.  That was

17    about the extent of the conversation.

18    Q    Okay.

19         This person reached out to you; correct?

20    A    Yes, sir.

21    Q    This person didn't you tell why they were reaching

22    out to you; correct?

23    A    No.

24         Just provided the information like they have -- I

25    mean, they are a source, and they provided me information

Covil - direct

1    about Prince George.

2    Q    You have no idea whether or not this person had a

3    bias against Mrs. Horne or whether or not this person

4    disliked or liked Ms Horne; is that correct?

5    A    I was not under the belief when I got the phone call

6    from this person, no.

7    Q    Nothing about this person's information to you

8    communicated one way or the other whether there was a pro

9    or a con bias; correct?

10   A    Correct.

11   Q    Okay.

12        Am I correct that this is a confidential source; is

13   that right?

14   A    Correct.

15   Q    That's not somebody you are going to reveal today; is

16   that true?

17   A    Correct.

18   Q    Now, in terms of this conversation it was short, was

19   it not?

20   A    Yes.

21   Q    Under five minutes; correct?

22   A    Yes.

23        I would believe so.  Best I recall, yes.  Short.

24   Q    Okay.

25        This call came in from the source to you; correct?

Covil - direct

```
 1   A     Correct.

 2   Q     Only once?

 3   A     Correct.

 4   Q     You know the source's phone number; correct?

 5   A     Correct.

 6   Q     And you have reached out to that person before;

 7   correct?

 8   A     Correct.

 9   Q     You have followed up with that source when you felt

10   you needed to; correct?

11   A     Well, we have talked on numerous occasions, so, yes.

12   Q     Okay.

13         So it wouldn't be unusual for you to call this person

14   as opposed to just a one-way communication; is that

15   correct?

16   A     Correct.

17   Q     All right.

18         Now, your source didn't tell you anything about

19   whether or not Mrs. Horne had completed an application

20   where she had disclosed her felony conviction; correct?

21   A     No, there was no discussion about an application.

22   Q     All right.

23         So you had no idea whether or not she had been

24   truthful or whether or not she had been honest about her

25   application at the time she completed it; correct?
```

1   A      At the time of the phone call; correct.

2   Q      Okay.

3          Well, and at the time of the broadcast story you had

4   no idea whether or not she had been truthful on her

5   application; correct?

6   A      From interviewing the superintendent after going over

7   the hiring process it was our belief since we have

8   interviewed Bobby Browder before, and he has always been

9   truthful, we believe the information that he was providing

10  us about what had happened was truthful.  And so, we

11  believed the way Dr. Browder described that hiring

12  process, and the state law on the statute, we believed

13  going in to the story that everything he had said was

14  truthful.  That the only way that you could not -- that a

15  felon could not be hired into a school system in the State

16  of Virginia, if they were a convicted felon.  That was the

17  first thing they had to talk about.  If that came up,

18  there would be no other discussion.  So in the

19  interviewing Dr. Browder it was our belief that the person

20  had not been truthful.

21  Q      That was your belief that --

22  A      That was.

23  Q      -- what you understood; correct?

24  A      Correct.  From Dr. Browder, who we have interviewed

25  dozens of times for many years, and he had never led us

1    astray, and until now we never knew he had mislead us;

2    correct.

3    Q    So that was the message you were communicating,

4    wasn't it, in your story?

5    A    The story was concerning the hiring process, and also

6    the state law of the statute, and he went over that with

7    us.  Had the book in his hand.

8    Q    Understood.  But you just talked about the process

9    and the way that the narrative went.  And the way that the

10   story was put together, and you and Dr. Browder discussed

11   the statute; correct?

12   A    Correct.

13   Q    What I heard you say is that you believe that the

14   person had not been truthful, otherwise there would have

15   been no need to go through this entire process; correct?

16   A    Correct.

17   Q    And isn't it true then that is exactly the message

18   that you conveyed when you broadcast your story?

19   A    Yes.  The story was about the hiring process and how

20   you go about it.

21        THE COURT:  Mr. Covil, I know that you are extremely

22   articulate.  If you could just try to answer the question.

23   That would be very helpful and move things along here.

24        Ask the question again.

25   BY MR. HAWKINS:

1    Q    Mr. Covil, am I correct that exactly the message that

2    you conveyed in your story was that the only way a felon

3    got hired after this process gets complete is because that

4    person lied on their initial application?

5    A    Correct.

6    Q    Am I also correct that you didn't ask Mr. or

7    Dr. Browder any specific questions about the application

8    process as to the director of finance and budget?

9    A    Going into the interview process?

10   Q    Yes, sir.

11   A    He said he could not discuss personnel matters, that

12   was a personnel matter that he could not discuss, so he

13   did agree to talk about the hiring process and the state

14   law.  So that is where we discussed.

15   Q    I understand that.

16        But, am I correct that your whole purpose of going

17   into there was to find out how the felon got hired; is

18   that correct?

19   A    Correct.

20   Q    All right.

21        Am I correct that when you didn't get a direct answer

22   to that question you steered it to the hiring process to

23   basically answer the same question; is that right?

24   A    Well, when I called him and said, we are looking to

25   see if a felon had been hired or fired, he said that is a

Covil - direct

1    personnel matter.  We can't talk about that.  But, he
2    said, we can talk about the hiring process and the state
3    law.
4         I said, fine.
5    Q    Is it your testimony that he steered you to the
6    hiring process or you steered him to the hiring process?
7    A    He suggested that to me.  Again, he cannot legally
8    talk about a personnel matter against state code.  So he
9    said, I can talk about the hiring process.  I said, fine.
10   Q    All right.
11        Well, there is couple of things we need to unpack
12   with that.
13        Did you ask Dr. Browder whether or not the director
14   of finance and budget had been fired because of a felony
15   conviction?
16   A    No.
17   Q    Did you identify the position to Dr. Browder and say,
18   did this person get fired?
19   A    No.
20   Q    All right.
21        You understood that a felon had -- you believe that a
22   felon had been hired and fired; is that correct?
23   A    Correct.
24   Q    Did Dr. Browder confirm one way or the other whether
25   or not a felon had in fact been hired and fired?

1   A    When I called him and said, I would like to talk

2   about a felon being hired and fired, when he said, we can

3   not discuss a personnel matter, at that point that is

4   basically in our line of work is a confirmation.  I had a

5   source telling me that.  Then he said, I can't discuss

6   that, but I can discuss the hiring process.  That to me

7   was moving forward again with another confirmation.

8   Q    You took his non response or his not a forceful

9   denial as a confirmation; is that correct?

10   A    Correct.  Because if he had said, Wayne, you are

11   totally off base, you are crazy, noting like that would

12   ever happen.  That would have been the end of the story.

13   Especially dealing with him because, again, dealt with him

14   for many years, dozens of interviews, always been

15   truthful.  If he said that, that would have stopped.  But

16   when he said, we can't talk about a hiring, we can't talk

17   about a personnel matter, that was, there is something

18   there.  We already had the first source.  Now we had that.

19   Q    All right.  So there is something there, but you

20   didn't use that same logic, that same denial, non-denial

21   confirmation logic, to ask whether or not the application

22   had been falsified; isn't that true?

23   A    Well, when Dr. Browder was going over the process and

24   said the process starts with this book, the statute, and

25   he is going down the statute, the first thing he says,

1    have you ever been convicted, have you ever been convicted

2    of a felony?  And if that answer is yes, then that -- the

3    process stops.  There is no moving forward, there is no

4    background check, there is nothing else.  So at that point

5    the process should stop.  So they could not be hired

6    because that had been brought up.  We now know we were

7    mislead.  In that, because at the time, no, he is going

8    over the process.  He is the superintendent.  The law has

9    been in effect for almost 20 years.  I was under the

10   belief everything he was saying was absolutely a hundred

11   percent truthful.

12   Q    And I understand that, but you are an investigative

13   reporter, correct?

14   A    Correct.

15   Q    Well -- and I say that because the lead into this

16   particular story on WTVR had a big headline that said,

17   important investigation.  Do you recall that?

18   A    Correct.

19   Q    All right.

20        So this was designed to be an investigation; correct?

21   I mean --

22   A    It is more of a newsworthy piece.  You could call it

23   an investigation.  More of a newsworthy piece than a felon

24   had been hired.

25   Q    That was the focus; correct?

Covil - direct

1   A      Pardon?

2   Q      That was the focus, that the felon had been hired?

3   A      Correct.  Hired and fired.

4   Q      Hired and fired.

5          Now, take me again, because I want to make sure I

6   have got this question right.  You said that Dr. Browder's

7   non forceful non denial was the same thing as

8   confirmation, at least your your purposes; correct?

9   A      Correct.

10  Q      You did not use that same logic, that same process,

11  to ask Dr. Browder whether or not the felon had in fact

12  lied on their application.  Am I correct?

13  A      Correct.

14         Again, when he went -- when he went through the whole

15  process, and so, as we are going through the process he

16  has also been truthful.  So I was going along with

17  everything he was saying.  He was quoting the statute as

18  it went down.  It is a short statute.

19  Q      But you didn't break him down, did you?  You didn't

20  go through each process and say, well, did you know that

21  there was a -- that the felon -- that the person at issue

22  had lied on their application?  Did you know that the

23  person had disclosed their felony?  Did you know of the

24  felony at all?  You didn't ask that question, did you?

25  A      No.

Covil - direct

1      I was definitely under the impression that it had not

2   happened, because, again, he was sitting there quoting me.

3   He is the superintendent saying, you know, if you are a

4   felon it stops.  So what he is saying is, if I had known,

5   it would have stopped.

6   Q    So you took his word as gospel?

7   A    Correct.  He has always been truthful.

8   Q    All right.

9        Well, let's talk about that.  So I know the context

10  of the interview.  This is something you set up with him?

11  Is that right?

12  A    Yes, I called.  Yes, and set it up, a time to meet

13  him, yes.

14  Q    You did the interview on the same day as the story,

15  is that right?

16  A    Correct.  That morning.

17  Q    You did that morning.

18  A    Correct.

19  Q    Before 11:00?

20  A    Yes, sir.

21  Q    All right.

22       So before 11:00 February 13 of 2015 you interviewed

23  Dr. Browder.  How long did it take?

24  A    The whole process probably 30 minutes.

25  Q    Okay.

Covil - direct                                    168

1        Did you speak with Dr. Browder at any point in time

2    after that interview concluded?

3    A    Not that I recall, no.

4    Q    Did you reach out to him in any way after that

5    interview concluded, but before the story ran?

6    A    No, sir.

7    Q    All right.

8    A    Not that I recall.  I wouldn't think so.

9    Q    All right.  All right.

10       I want to turn your attention to this document.  Do

11   you see there document?

12   A    Yes.

13   Q    This is a document that has been, previously been

14   marked as, or previously admitted as plaintiff's exhibit

15   8.  Do you recognize it?

16   A    Yes.

17   Q    This is an e-mail sent to you, correct?

18   A    Yes, sir.

19   Q    And sent to you at 11:48 in the morning on

20   February 13 of 2015; correct?

21   A    Correct.

22   Q    And to the best of your knowledge, with the exception

23   of the highlighting, is the text of this e-mail identical

24   to what you saw at that time?

25   A    Yes, it looks identical.

Covil - direct

1    Q    Okay.  Did you read it?

2    A    Yes.

3    Q    The e-mail on February 13?

4    A    Yes, sir.

5    A    I don't know what time, but yes, I read it.

6    Q    Do you believe you read it at or around February 13

7    at 11:48, soon thereafter?

8    A    Probably soon thereafter, yes.

9    Q    Okay.

10         THE COURT:  Wait a second.

11         Mr. Covil, what does it mean up at the top where it

12   says, "sent via iPhone six."

13         THE WITNESS:  So, this looks like this is a copy of

14   the -- I got an e-mail on my phone, and so if I forward an

15   e-mail on my iPhone to the TV station that, I guess they

16   call that like a signature.  So whoever printed this off

17   for this purpose, I think has -- that wasn't on the e-mail

18   when I got it.

19         THE COURT:  What you got was the part that started

20   from SSS?

21         THE WITNESS:  Yes, forward message, yes, sir.

22         THE COURT:  Thank you.

23         THE WITNESS:  Yes, sir.

24   BY MR. HAWKINS:

25   Q    All right.

Covil - direct

1      Do you know who SSSSmith is?

2   A   No.

3   Q   All right.

4      Do you recognize the e-mail address SSSSmith869 at

5  Yahoo dot com?

6   A   No.

7   Q   Is that anybody you ever dealt with?

8   A   Not that I am aware of.

9   Q   Okay.

10     So you have read this e-mail at or around the time it

11  was received by you.  And you see it.  It says, "I am a

12  Prince George County resident.  On Monday I anonymously

13  sent letters to each of the school board members informing

14  them that a convicted felon was hired by the school board

15  office."  Do you see that?

16   A   Yes, sir.

17   Q   And did you in response to this e-mail call any of

18  the members of the school board to ask them about an

19  anonymous letter?

20   A   No, sir.

21   Q   Why not?

22   A   Because the superintendent is the one who handles the

23  media.  And in dealing with this, we knew that it as

24  personnel matters, so they are not going to respond to

25  that.

Covil - direct

1   Q    You didn't ask him, did you?

2   A    No, sir.

3   Q    Then you don't know what they would have said, do

4   you?

5   A    No, sir.

6   Q    Okay.

7        And it says that I anonymously sent letters.  Do you

8   see that?

9   A    Yes, sir.

10  Q    Did you do anything to try to find out what that

11  letter said or what those anonymous letters said?

12  A    No.  I mean, it says that a convicted felon, that is

13  what she said, or he was convicted felon was hired by the

14  school board office.

15  Q    Correct.

16       It doesn't say whether it was a detailed letter,

17  whether it was a short letter, anything about it other

18  than it was a letter that contained at least that

19  information; correct?

20  A    Correct.

21  Q    I am correct that you did not follow up with Dr.

22  Browder to ask him about the anonymous letter; correct?

23  A    No.

24  Q    All right.

25       It then says, I know this because the person also

Covil - direct

1   lives in Prince George, "and I know they are a felon.  I

2   also know they work as a director at the Prince George

3   school board office."  Do you see that?

4   A   Yes.

5   Q   It was your belief at that particular time that it

6   was a director who was at the school board office who had

7   been hired and fired; correct?

8   A   A director or like department head, something like

9   that.

10  Q   Okay.

11      So that appeared to be accurate, correct?

12  A   Correct.

13  Q   All right.

14      So, then it says, "My concern is how did this

15  happen." Do you see that?

16  A   Yes.

17  Q   And then it says, "Any state employee has a

18  background check when hired, so how was this overlooked?

19  Who allowed this to happen?"

20      Do you see that?

21  A   Correct.

22  Q   Did do you any investigation to find out who allowed

23  this to happen?

24  A   Well, when I -- I got this after I interviewed

25  Dr. Browder.  This came in, I don't know, a short time

1    later, within an hour of interviewing Dr. Browder, maybe a

2    little later when I saw it on my phone.  He had already

3    gone over the entire process about how you hire someone,

4    and the first part of it being if you are a convicted

5    felon up can't get hired.  Then he went down point by

6    point on the statute.  Talking about, you know, it's a

7    class one misdemeanor, if you don't.  He went over that we

8    do background checks, and they will take two, four, six,

9    eight weeks sometimes to come back.

10        I had his information.  He is someone that I have

11   dealt with in the past.  Always been truthful for years.

12   So I was going with what he had told me.

13   Q    Understood.

14        But the next question is, "Who allowed this to

15   happen?  Shouldn't someone take responsibility."  Do you

16   see that?

17   A    Yes.

18   Q    The next sentence says, "Who at the school board gave

19   the okay to hire a felon?"

20        Do you see that?

21   A    Correct.

22   Q    Did you do anything to determine whether or not

23   somebody at the school board gave the okay to hire a

24   felon?

25   A    Well, we knew that a felon had been hired and fired.

1   We didn't know who had done that.  After interviewing

2   Dr. Browder we were left with, that it had to come back on

3   the background check.  But we knew from doing the

4   interview that sometimes, or often, they are hired before

5   the background check comes back.

6   Q    Okay.

7        And let me make sure I have got this right.

8        You didn't ask anybody at the school board who at the

9   school board gave the okay to hire a felon, correct?

10  A    No, not at the time.

11  Q    Ever.  Correct?

12  A    Sorry.  What?

13  Q    Ever.  You said not at the time.  The answer is you

14  have never done that, have you?

15  A    Correct.

16       We now know what happened, I guess is what I mean.

17  Okay.

18  Q    Okay.

19       And then it says, "Virginia law states that a school

20  division can not hire convicted felon."  And then it says,

21  "This also happens at the same time the superintendent

22  gets a 10 thousand dollar raise.  Is he really doing his

23  job?"

24       Do you see that?

25  A    Yes.

1    Q    Does that not raise some concerns about the

2    credibility of Dr. Browder?

3    A    No.

4    Q    That doesn't suggest to you that you need to double

5    check about what he has been telling you?

6    A    Not at all.  I have known Dr. Browder for years.  I

7    don't know who this anonymous source is.  They are giving

8    me some information.  This would be the third confirmation

9    that a felon had been hired and fired.  But it also says,

10   there is -- they are critical of the superintendent.  The

11   e-mail is not really placing -- they don't know who is at

12   fault, they just want somebody to take responsibility.

13   And there is a difference between responsibility and

14   fault.  But that didn't give me pause about Dr. Browder.

15   I mean, again, that is someone that I have dealt with for

16   I guess he had been superintendent seven years, dozens of

17   interviews, never an instance of any type of misleading or

18   misinformation from him at all in all those times.

19   Q    Well, this e-mail points fingers at the school board

20   and the superintendent; correct?

21   A    Yes, sir.

22   Q    Yet you didn't follow up with either of those two

23   parties after you got this; correct?

24   A    Correct.

25        THE COURT:  Well, now, wait a second.  I think that

1    question is a little bit unfair.

2         Under the law of Virginia everybody who works at one

3    of our public schools is technically employed by the

4    school board.  So to say that he didn't call up the school

5    board really sort of misstates things.  The operative

6    people to call are at the school board office.  They are

7    not the school board.  You call them school board members,

8    but to say someone gets hired by the school board, anyone

9    who knows anything about the schools means that somebody

10   at the school -- at the superintendent's office or

11   somebody recommended somebody for hiring or firing.  And

12   then the school board takes formal action.

13        MR. HAWKINS:  Okay.

14   BY MR. HAWKINS:

15   Q    That helps me clarify what I wanted to ask.

16        Did you ask after serving this e-mail any members of

17   the Prince George county school board about this document

18   or about the hiring and firing of Angela Horne?

19   A    No.  And, again, simply because the superintendent is

20   the -- in Prince George he is spokesperson.  So he is the

21   one that deals with the media.  We knew we were dealing

22   with a personnel matter, so they couldn't legally, under

23   state law, talk about a personnel matter.

24   Q    You said that before.  I must ask.  What do you mean

25   by they cannot legally talk about it?

Covil - direct

1    A    They can't reveal information concerning the

2    personnel hiring or firing.

3    Q    Upon what do you base that statement?

4    A    Years of experience dealing with different school

5    boards.  I mean, they usually don't talk about personnel

6    records, things like that, to the media.

7    Q    Well, my focus is your use of the word "legally."

8    Are you aware of any particular statute or code that

9    prevents school boards from releasing information about

10   individuals if it is properly requested?

11   A    No.  I am not a lawyer, so I would say, no.

12   Q    In fact, you have never seen the statute that you

13   referenced in the news story prior to February 13 of 2015;

14   correct?

15   A    The felon statute?

16   Q    Yes.

17   A    No, sir, no.

18   Q    You had no prior experience with that whatsoever?

19   A    No, sir.

20   Q    You didn't ask anybody about it other than

21   Dr. Browder; correct?

22   A    Correct.

23   Q    All right.

24        That is not something you did any research on, or did

25   any kind of examination at WTVR after you finished your

1    interview?

2    A    No.  When I called Dr. Browder to talk to him, when I

3    got to his office he had the state law book in his hand

4    and said, the hiring process starts with this, open it up

5    to the correct page, and then we went step by step with

6    the process.  Him describing the law.  I mean, he was the

7    authority on it.  When he was describing it I had no doubt

8    that he knew what he was talking about.  I mean, it is --

9    I mean I am not lawyer, but it says if you are a felon,

10   you can't be hired.  So I could read that part.

11   Q    All right.

12        Am I correct that you did not respond to this e-mail

13   at all, did you?

14   A    I believe I sent a reply to that address.  I don't

15   think anything came back.

16   Q    Okay.  That is your belief now; is that correct?

17   A    Yes.

18   Q    Okay.

19        Now, tell me, if you would, you said nobody replied

20   back; is that correct --

21   A    Yes.

22   Q    -- to this?

23   A    Correct.

24   Q    All right.

25        Did you take this e-mail and submit it around WTVR?

1    A    Well, I forwarded it to -- we have an e-mail address.

2    If you send it to one e-mail address, it goes to a litany

3    of people, like 50 different people.  So that was

4    forwarded to the entire staff.

5    Q    All right.

6         Mr. Covil, look with me at the document in front of

7    you right now.  Do you see that?

8    A    Yes.

9    Q    And you will see that it is, the bottom is actually

10   the top of what we were looking at?

11   A    I see what you are saying.

12   Q    You forwarded the e-mail that came in 11:48 at 11:55.

13   Do you see that?

14   A    Yes.  Down at the bottom.  I see that.  Sorry.  I was

15   looking at the top.  Yes.  11:55.

16   Q    Two minutes later you get a response from a woman

17   named Sheryl Barnhouse; correct?

18   A    Yes.  That is my boss.

19   Q    All right.  What is she title wise.

20   A    She is the news director.

21   Q    All right.

22        Do you listen to her when she tells you things to do?

23   A    Yes.

24   Q    All right.

25        It says there, "we need to pursue.  Wayne, are you

1    reaching out for additional information?  Name for

2    starters.  Thanks.  S. B."

3           Do you see that?

4    A     Yes.

5    Q     Did you reach out for any additional information?

6    A     I believe at this point we were shifting our focus to

7    the hiring process, not about any particular person.  So I

8    believe at that point we were not a hundred percent on who

9    it was, so we were going with the interview we had with

10   Dr. Browder.  And then with what we call M O S.  I had

11   gotten a man on the street interview.  We were going with

12   that.

13   Q     Okay.

14          THE COURT:  Wait a second.

15          THE WITNESS:  Okay.

16          THE COURT:  Didn't you say earlier that your

17   confidential source gave you a part of a name?

18          THE WITNESS:  A partial name.  Like -- I don't

19   remember -- I don't recall whether a first name or last

20   name.

21          THE COURT:  What was the partial name given to you?

22          THE WITNESS:  I don't recall.

23          THE COURT:  Something that allowed you to identify

24   someone like Angela or Angie or Horne?

25          THE WITNESS:  Correct.  That is what we believe, yes.

1       THE COURT:  So then based on that you were able to

2   put together that there was someone named Angela Horne who

3   worked at the school board office.

4       THE WITNESS:  It was -- yes, one of the executive

5   producers thought that is who it might be.

6       THE COURT:  And then somebody you got a, what might

7   have been a phone number for her, and tried to call her.

8       THE WITNESS:  Yes, sir.

9       THE COURT:  So, was that before or after this

10  reaching out for additional information e-mail?

11      THE WITNESS:  I think the phone call probably would

12  have come after this.

13      THE COURT:  Okay.  All right.

14      Sorry, Mr. Hawkins.  Go ahead.

15  BY MR. HAWKINS:

16  Q    Thank you.  I'm sorry, but the phone call from whom?

17  A    The phone call he was referring to when I tried to

18  call what we thought was Ms Horne probably came after

19  this.

20  Q    Okay.  But in terms of the phone call from your

21  source, that came in days before; correct?

22  A    Either came in the night before or that morning.

23      I am not a hundred percent certain when it came in.

24  Q    Okay.

25      So I am correct, then, that you did not reach out for

1    any additional information.

2    A    No, sir.

3    Q    All right.

4         Now, there is anther e-mail I want to show you.  Do

5    you see this?

6    A    Yes.

7    Q    All right.  This is an e-mail, again, it is a forward

8    and it's a conversation.  It relates to a screen shot.  I

9    will show you, this is the screen shot.  That was the

10   attachment to this e-mail.

11        Do you see that?

12   A    Yes.

13   Q    You are identified as a recipient specific on this

14   e-mail; correct?

15   A    Yes, all the producers and then, me, myself, yes.

16   Q    All this is occurring on February 13th between noon

17   and 1:00 o'clock.  Do you see that?

18   A    Correct.

19   Q    Go back here.

20        This e-mail has been forwarded.  To Wayne Covil.  I'm

21   sorry.  At the bottom, going to the top.  All right.  Do

22   you see it?  Goes to you.  Goes to all WTVR producers;

23   correct?

24   A    Correct.

25   Q    At 12:33 p.m.  Again all this on February 13th.  Do

Covil - direct

1    you see that?

2    A    Yes.  Yes.

3    Q    Who is Mike Bergazzi?

4    A    He is one of our executive producers, and he does a

5    lot of research for us.

6    Q    Okay.

7         Says, "Wayne, ask your source if she may have been

8    convicted of a crime in Tennessee."  Did you do that?

9    A    Yes.

10   Q    Did you do that?

11   A    No.

12   Q    After you got this e-mail did you do anything to

13   investigate anything further about a felon hired and then

14   fired?

15   A    No, because at this point we were moving in the

16   direction of just doing the hiring process, the state

17   statute, and not going with the single person.

18   Q    Am I correct that you basically stopped working on

19   this story once it had been video packaged?

20   A    Can you rephrase?

21   Q    After your interview with Dr. Browder did you stop

22   investigating the story?

23   A    No.  I went to the gas station and did the man on the

24   street interview.

25        THE COURT:  All right.

Covil - direct

1        What about the underlying facts of what happened at

2    the school?  That is what he is asking.

3        THE WITNESS:  No.  Because at that point he couldn't

4    talk about personnel matters, we already had the interview

5    with Dr. Browder specifically going over everything

6    concerning the law, the statute, the hiring process, the

7    fact that you can't hire a felon.  That negates

8    everything.  And so from him, that was what we needed,

9    because we weren't going to name anyone specifically or a

10   job description or title.

11   BY MR. HAWKINS:

12   Q    Okay.

13        But you will see here this specifically says Angela

14   Horne screen shot.  Do you see that?  The subject line.

15   A    Yes.

16   Q    Am I correct that by 12:33 p.m. on February 13, 2015

17   you believed Angela Horne was in fact the felon who had

18   been hired and fired?

19   A    We thought she might be, but weren't a hundred

20   percent sure.

21   Q    You weren't considering anybody else, were you?

22   A    No, not at that point.

23   Q    This is the only person that you have zeroed in on;

24   am I correct?

25   A    Correct.

Covil - direct

1    Q    All right.

2         Take a look.  This is defendant's exhibit 3.  Do you

3    see this?

4    A    Yes, sir.

5    Q    This is the first page.  Just to show you, there are

6    several pages to it.  Am I correct that you were more

7    likely than not the author of all copy of this that begins

8    after the words "Prince George County?"

9    A    Probably.  I mean this is the web script.  So we have

10   a web editor.  They may have changed something, but I

11   probably did most of it.  They may have changed a word or

12   something.

13   Q    Am I correct you believe that you were more likely

14   than not the author of the text of this article?

15   A    Yes, yes.

16   Q    Okay.

17        Now, it says here you talked about the hiring

18   process.  I want to make sure I understand this.  The

19   hiring process focused on the convicted felon; correct?

20   A    Well, that was the impetus for the story; correct?

21   Q    Okay.

22        Am I correct you draft your own stories for the most

23   part; correct?

24   A    You mean like the TV script, web script?  Yes, I

25   wright my own stories, yes.

Covil - direct

```
 1   Q     Okay.

 2         You have authored thousands of stories?

 3   A     Yes.

 4   Q     Okay.

 5         And when you do that you put in your opening sentence

 6   or your topic sentence, something that gets the reader to

 7   continue to reading; correct?

 8   A     Well, on the TV script I am doing the reading, but

 9   for web script it is kind of -- my web script tries to

10   follow my story, the TV story.

11   Q     Then take the TV story.  When you are doing a TV

12   story you want n opening line to capture the reader's

13   attention and continue to continue watching; correct?

14   A     That or the video, yeah.  Yes, sir.

15   Q     You do the same at the end.  You want to have a kind

16   of punch line that summarizes what you are saying; is that

17   correct?

18   A     I wouldn't call it a punch line.  I mean, you are

19   trying to wrap up the story is what you are trying to do

20   at the end.

21   Q     Okay.  Something you can put a period on.  Would that

22   be fair?

23   A     Yes.

24   Q     All right.

25         And you did that with this story, too, in both the
```

Covil - direct

1  beginning and end, am I correct?

2  A    Correct.

3  Q    So the first line here says that you were contacted,

4  CBS News, after learning that a convicted felon had been

5  hired by a central Virginia school system.  Do you see

6  that?

7  A    Yes.

8  Q    That was designed to get the reader's focus and

9  continue to keep reading; correct?

10  A    Correct.

11  Q    And the first words when you talked on video were --

12  and this is when the video gets turned over to you from

13  Candace Burns -- "and sources tell us that the person who

14  was hired to work in the school board office is no longer

15  employed."  Do you recall that?

16  A    Yes.

17  Q    Okay.

18       And that is designed to get the viewer to keep

19  watching; correct?

20  A    I mean, I don't know if I would phrase it like that.

21  That is the start of the story to explain to viewers this

22  is what our story is going to be about.

23  Q    And it was about the felon; wasn't it?

24  A    Well, about the hiring process, but the impetus for

25  the story was a felon hired and fired.

Covil - direct

1   Q    That is a message you went through with the whole

2   story; isn't it.

3   A    Correct.

4   Q    Felon hired and then fired; correct?

5   A    Well, the story is about -- well, that is the impetus

6   for the story, but the story I would say obviously is

7   about Browder talking about hiring process and the law and

8   showing the book.

9   Q    Right.  He is doing so in the context of a felon has

10  been fired and hired by his school system; correct?

11  A    Correct.

12  Q    All right.

13       Now, just so I have got this clear.  You are the one

14  who at the very end of the story on the video says,

15  "Virginia State law is also specific when it comes to

16  filling out an application for a school system.  It is a

17  class one misdemeanor to make false representations when

18  it comes to revealing criminal conviction."

19       Do you recall saying that?

20  A    Yes, that was part of the statute which was part of

21  the story, yes.  That was like the back end of the

22  statute; correct.

23  Q    Those were your words?

24  A    Yes.  Quoting the law, yes.

25  Q    Okay.  And you chose to put that in there; correct?

Covil - direct

1    A    Correct.

2    Q    You chose to do that to give the impression that the

3    felon had lied on their application; correct?

4    A    No.  I mean, no.  Because the story is about the

5    statute.  I am going down the first part about if you are

6    felon you can't get hired.  Browder talked, Dr. Browder

7    talked about the hiring process.  And then that is part of

8    the statute.  If you are doing a story about the statute,

9    you have to include that.

10   Q    Okay.

11        Did anyone tell you to include that?

12   A    No, it is my story about the statute and the law so I

13   included it.

14   Q    All right.

15        Am I correct that at the time that you had broadcast

16   this story you had no information that indicated that

17   Angela Engle Horne had lied on her application for

18   employment?

19   A    The information I had was during the interview with

20   Dr. Browder.  He went down, these are the steps for the

21   hiring process.  Starts with the book.  If you are a

22   felon, a convicted felon, you can't get hired.  So, right

23   off the bat he is implying that this is what happened.

24   That there was nothing there.

25   Q    You had no direct information from anybody that

1    Angela Horne had lied on her application; correct?

2    A    We didn't --

3         THE COURT:  This is a yes or no question.  So let's

4    try to answer the question.  You can say "yes, but," so,

5    you had no -- did you have direct information that she had

6    lied?  Yes or no.

7         THE WITNESS:  No.

8         THE COURT:  All right.  Now give us the "but."

9         THE WITNESS:  Because when Dr. Browder was talking

10   about the process it said that if you say you are a

11   convicted felon the process stops.

12        THE COURT:  So you -- the "no" is you reached an

13   inference from what Dr. Browder said that she must have

14   lied, otherwise Browder would not have gone forward with

15   the application.

16        THE WITNESS:  Correct.

17        THE COURT:  Okay.

18        MR. HAWKINS:  Okay.

19   BY MR. HAWKINS:

20   Q    And yet you ran the story without ever talking to

21   her; correct.  To Ms Horne.

22   A    We reached out to her.  But again, the story was not

23   about her.  She is not named.

24        THE COURT:  You know that is a very -- that is not

25   responsive to his question.

1        THE WITNESS:    I am sorry.

2    BY MR. HAWKINS:

3    Q    Mr. Covil, I just want to ask one other follow-up

4    question to make sure I am right.  You talked about how

5    Dr. Browder gave you this impression that whoever had been

6    the felon had lied on their application; correct?

7    A    Correct.

8    Q    Now, it is your testimony that after you have this

9    impression, and after you received this anonymous e-mail,

10   you didn't have reason to believe he might not be telling

11   you the truth?

12   A    No.

13   Q    Would you tell me if you did?

14   A    Yes.

15   Q    Okay.

16   A    I am under oath, so yes.

17   Q    Okay.

18   A    I had no doubts about the interview with him.  He had

19   never led me astray ever before.  Had no doubts what he

20   was telling me and explaining to me wasn't the truth.

21   It's not until now that a year later that we realize we

22   were mislead.

23       THE COURT:  Mr. Covil --

24       THE WITNESS:  Yes, sir.

25       THE COURT:  -- I things would go considerably more

Covil - cross                           192

```
 1    quickly if you would simply answer the questions that are
 2    asked of you, and not try to articulate your entire
 3    defense in every answer.
 4         All right?
 5         THE WITNESS:  Yes, sir.  I apologize.
 6         THE COURT:  That is okay.
 7    BY MR. HAWKINS:
 8    Q    And just so I have this correct, you took Dr. Browder
 9    at his word; correct?
10    A    Correct, yes, sir.
11    Q    And you did absolutely nothing to investigate whether
12    or not he he might not be telling you truth; correct?
13    A    Correct.
14    Q    That is all the questions I have, Your Honor.
15         THE COURT:  All right.  Thank you very much.
16         Cross examination?
17                       CROSS EXAMINATION
18    BY MR. SHUMADINE:
19    Q    Good afternoon, Mr. Covil.
20    A    Good day.
21    Q    Let me start it off with you.  How long have you
22    known Dr. Browder?
23    A    Probably about seven years.  The entire time he was
24    superintendent.
25    Q    And how many times had you talked to him?
```

1   A    Dozens.  I mean dozens.

2   Q    Would you describe to the members of the jury the

3   relationship you had, and your evaluation of his

4   responses?

5   A    Dr. Browder was the spokesperson for the school

6   system, so he is who you called.  Always would get back to

7   you very quickly.  Was always willing to do interviews

8   with all the media.  Never had any reason to doubt.  He

9   was very articulate, but he also was willing to talk with

10  the media when they called.  He was always, you know,

11  cordial about getting back to you, doing an interview,

12  giving you information.  There was never any indication

13  that he had ever mislead me or anyone in any way.  He knew

14  his job very well was the impression we had.

15  Q    And were you aware whether his responsibilities

16  included being responsible for complying with the law?

17  A    Yes.

18  Q    Did they include that?

19  A    Yes.

20  Q    Okay.

21       When he, when you went to his office and he showed

22  you the law, what was your reaction in terms of whether he

23  understood the law?

24  A    I had no doubt.  When I walked in he was prepared for

25  us.  He had the book in his hand.  He said, hiring process

Covil - cross

1    starts with this.  He said, let me open it up and show it
2    to you.  And then he went straight down.  And it is a very
3    short statute.  Very short law.  And he read it off and
4    said, you know, this is the way it works, and here in
5    Prince George, this is what we do.
6         Basically I had no doubt, no doubt whatsoever, that
7    he knew exactly what he talking about, and that he knew a
8    law that had been on the book for twenty years, almost
9    twenty years.
10   Q    Okay.
11        Let's put the statute up there again.  I hope I am
12   not boring everyone.  But let's look at it.
13        Let's blow it up so you can see it, Mr. Covil.
14   A    Thank you.
15   Q    And did he read you the specific language in the
16   statute?
17   A    Yes.
18   Q    Did he read the language that every applicant has to
19   certify that the applicant has not been convicted of a
20   felony?
21   A    Correct.
22   Q    Okay.
23        Did he explain to you that if an applicant were
24   convicted of a felony the process would stop at that point
25   in time?

1    A    Absolutely.

2         That was one of the first things he talked about was

3    the whole process stops, there is no need to move forward

4    because, I think he called it a prohibiting factor.  It

5    just stops.  If you are convicted of a felony you can't

6    work in a school system in any capacity in the State of

7    Virginia.

8    Q    Okay.

9         Did he give you any indication of any kind that he

10   would hire someone knowing of a felony?

11   A    No.  None whatsoever.

12   Q    Okay.

13        Was it Dr. Browder who called your attention to the

14   second provision in the statute?

15   A    Correct.  That the class one misdemeanor?

16   Q    Yes.

17   A    Correct, yes.

18   Q    Did you have any knowledge of the statute prior to

19   the time you went into Dr. Browder?

20   A    No, sir.  None whatsoever.

21   Q    Okay.

22        But, based upon what you heard from Dr. Browder, what

23   was your impression of his knowledge about the statute?

24   A    I had no doubt leaving his office that he knew the

25   law.  I mean, he was superintendent.  He had been in

1   education, higher education for forty years.  I had no

2   doubt he knew this law.  I mean, he read it off and

3   explained it to me.  And really had no doubt that he knew

4   what he was talking about, and that he had known the law

5   and knew it well.

6   Q    If you know the law, is there any way that anything

7   happens if you know of a felony conviction?

8   A    No.  It stops the process.  I mean, it is simple.  If

9   you are a felon, you can't get hired by a school system.

10  Q    Okay.

11       Did you have any reason to doubt in any way that

12  Dr. Browder was fully familiar with the law at all times?

13  A    No reason whatsoever to doubt that.

14  Q    At the time you prepared this broadcast did you

15  believe it was true?

16  A    Absolutely.

17       If we had had any doubt we would have pulled the

18  story.  But I was absolutely believed everything that he

19  had told to me was the truth as it had been for dozens of

20  stories over seven years, five or six, or seven years.

21  Q    Well, Mr. Hawkins asked you to look a good deal of

22  time at the e-mail from SSSSmith.  Did anything in the

23  SSSSmith e-mail suggest to you that Dr. Browder had not

24  been candid?

25  A    No.  The SSSSmith e-mail is looking for somebody to

1    take responsibility, but it didn't lay any fault.  But it

2    was critical of Dr. Browder.  But it didn't say whether he

3    knew it or not.

4    Q    Okay.

5         And if you had known that Dr. Browder had knowingly

6    hired a felon in violation of law would that have changed

7    your broadcast?

8    A    Absolutely.  I mean, it is in the public interest

9    that a superintendent or school system doesn't know a law

10   that has been on the books for almost twenty years.

11   Q    Did you have any indication that that might be

12   possible?

13   A    None whatsoever.

14   Q    All right.

15        Let me ask co-counsel.

16        I have no further questions.

17        THE COURT:  Any redirect?

18        MR. HAWKINS:  Yes, Your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. HAWKINS:

21   Q    Mr. Covil, do you recall giving a deposition in this

22   case?

23   A    Yes.

24   Q    In that deposition you swore to tell the truth, the

25   whole truth, nothing but the truth?

1   A    Yes, sir.

2   Q    All right.

3        I would like to show you pages 71 and 72 of your

4   deposition.

5        All right, I will ask it be presented.

6        Well telling that for the record.  I want to ask you

7   to start with line 23 on page 71 and then continue reading

8   through line 16 on page 72.

9   A    Start with 22?

10  Q    Twenty-two or 23 on 71.  And then flip over to line

11  16.

12  Q    Take just a moment.  Go ahead.

13  A    You want me to read it?

14  Q    Nos, sir, I actually want you to actually read it in

15  your head.

16  A    Sorry.

17       I am sorry.

18  Q    Have you finished reading it?

19  A    Yes.

20  Q    It's true, is it not, that I asked you in your

21  deposition whether or not you had ever followed up with

22  the SSSSmith e-mail; correct?

23  A    Correct.

24  Q    What was your response?

25  A    Do you know who the person is --  no.  I said, "No."

1    Q    Okay.  Was that your correct testimony?

2    A    At the time, yes.

3    Q    Okay.

4         So, is that testimony that was closer in time to the

5    actual events; correct?

6    A    Yes.

7    Q    Okay.

8         Am I correct that you did not follow up with the

9    SSSSmith e-mail?

10   A    I believe that I sent a reply text.  I believe I sent

11   a reply e-mail, but never got anything back.  That is what

12   I believe now.

13   Q    But that is not what you said in your deposition; is

14   it?

15   A    No.

16   Q    And you are under oath both times; correct?

17   A    Correct.

18   Q    All right.

19        You can hand that back.

20        Now, Mr. Covil, you testified that you believe that

21   Dr. Browder knew the law; correct?

22   A    Correct.

23   Q    You never asked him if he knew the law, did you?

24   A    No.

25   Q    You never asked what kind of experience he had with

Covil - redirect

1    that particular law, did you?

2    A    No.

3    Q    All right.

4        And you testified that the story that you would have

5    given if you had known that he had not been telling you

6    the truth if -- if he had knowingly hired a felon in

7    violation of Virginia law, would have been a much better

8    story; correct?

9    A    Correct.

10   Q    And isn't that the kind of thing that would have

11   made, would be more newsworthy than the story you aired?

12   A    Correct.

13   Q    Why didn't you wait and find that information out or

14   try to find that information out?

15   A    We reached out to a phone number that we thought was

16   Ms Horne.  We did not the get a call back.  We weren't

17   expecting really that a convicted felon would call us

18   back.  The story we did was concerning the hiring process,

19   the state statute, did not mention anyone by name or a

20   job.  So if she had called us back that day or the day

21   after, we would gladly have done the story.  We didn't

22   know we were mislead until a year later.

23   Q    You didn't know you were mislead until after you

24   published the story; correct?

25   A    We didn't know we were mislead until the law suit was

1   filed.

2   Q    All right.  After?

3   A    A year after.

4   Q    After the story gets out there in the public, after

5   it is available to be seen by viewers; correct?

6   A    We learned about it from the law suit.  Not, I mean,

7   not from anyone else.

8   Q    Understood.

9   A    Right.

10  Q    My point is that this story that occurred, this felon

11  hired and then fired, was not hot news; correct?

12  A    It was a newsworthy story.

13  Q    Wasn't like a snow storm closing; correct?

14       Wasn't the kind of thing the public needed to know in

15  order to get home from their community drive or their work

16  drive; correct?

17  A    No.

18  Q    Nothing that prevented the story from waiting until

19  the following week or even the following week; correct?

20  A    If we had had any doubts, we would have pulled the

21  story.  When that story aired we had no doubt that what we

22  had been told was the truth.

23  Q    So the e-mail that says, is he really doing his job,

24  reference to Dr. Browder, doesn't give you reason to look

25  a little bit more and wait a day or a week or two days or

1   anything?

2   A    The e-mail is not saying that he knew.  It is just

3   saying somebody needs to take responsibility.

4   Q    You said that that -- in your testimony with

5   Mr. Shumadine you said that that e-mail was critical of

6   Dr. Browder.  You did nothing to follow up with him or

7   whoever that e-mail person was to find out whether or not

8   you could have been able to give the real news story, the

9   one you said is the most newsworthy of the two; correct?

10  A    Correct.  At the time I --

11  Q    That is all I have.

12  A    Okay.

13       THE COURT:  Thank you.

14       All right.

15       May he be excused?

16       MR. SHUMADINE:  No.  We may recall him.

17       THE COURT:  All right.

18       So you will need to come back tomorrow, probably

19  around 9:00 o'clock.

20       THE WITNESS:  Thank you, Your Honor.

21                    (Witness stood aside)

22       THE COURT:  Thank you.

23       All right.  Do you have more witnesses?

24       MR. HAWKINS:  I do.

25       Plaintiff calls Michael Bergazzi.

 1        THE COURT:  All right.  Come up here, please.

 2                      BENCH CONFERENCE

 3        THE COURT:  Have you been fully heard on the issue of

 4   actual malice in this?  Do you have more actual malice

 5   evidence?

 6        MR. HAWKINS:  I do.  I have Ms Barnhouse and I have

 7   anther --

 8        THE COURT:  Okay.  All right.

 9        MR. HAWKINS:  Yes, sir, I do.

10                      IN OPEN COURT

11                 MICHAEL ALLEN BERGAZZI

12          WAS SWORN AND TESTIFIED AS FOLLOWS:

13                   DIRECT EXAMINATION

14        THE COURT:  All right.  You may lead the witness.

15   BY MR. HAWKINS:

16   Q    Good afternoon, Mr. Bergazzi.

17        Please state your name?

18   A    Michael Allen Bergazzi.

19   Q    What is your current position at WTVR?

20   A    I am executive producer.

21   Q    All right.

22        How long have you held that position?

23   A    About five or six years.

24   Q    All right.

25        Did you hold that position on February 13 of 2015?

Bergazzi - direct

1    A    I did.

2    Q    All right.

3         Did there come a point in time on that date that you

4    assisted in trying to find out the identity of the felon

5    who had been hired and then fired at the Prince George

6    County school system?

7    A    Yes.

8    Q    Prior to that day did you have any knowledge about

9    who the felon was, or whether or not they had been hired

10   or fired improperly or properly?

11   A    I did not.

12   Q    Okay.

13        Did you personally do anything to investigate whether

14   or not the application for the felon had properly

15   disclosed, or had disclosed the felony to the school

16   system?

17   A    I did not.

18   Q    Have you ever done that?

19   A    I have not.

20   Q    Okay.

21        I want to show you a couple of things.  I want to

22   start with this anonymous e-mail.  Do you see this e-mail?

23   A    Yes.

24   Q    Ever seen it before?

25   A    Yes.

Bergazzi - direct

1   Q    Did you see it on or around February 13 of 2015?

2   A    Yes.

3   Q    All right.

4        I want to skip a page, or skip up a little bit.

5        You will see there that the e-mail gets forwarded to

6   Mrs. Barnhouse.  And it's to, there is a to Wayne Covil

7   and a to all WTVR producers.  Do you see that?

8   A    Yes.

9   Q    Are you included in that group?

10  A    Yes.

11  Q    Okay.

12       What, if anything, did you do in response to serving

13  that e-mail?

14       The anonymous e-mail.

15  A    I don't remember if I started researching after I

16  received this e-mail, or after Wayne called me to ask me

17  to start.  I might have been working on something else at

18  the time this was sent out.

19  Q    Did Mr. Covil give you a name of Angie Horne?

20  A    He gave me a name.  I don't believe -- I don't know

21  it was the first name or the last name.

22  Q    I want to show you something that says Angela Horne

23  screen shot.  Do you see this document?

24  A    Yes.

25  Q    All right.

Bergazzi - direct

1      This is an e-mail from you to all WTVR broadcasting

2   producers and Wayne Covil.

3      Do you see that?

4   A   Yes.

5   Q   Okay.  And I take it that you sent this e-mail on or

6   about February 13 at 12:33 p. m.

7   A   I did.

8   Q   Okay.

9      Now, this was this screen shot that was attached to

10  it?

11  A   Yes.

12  Q   And was the purpose of your sending this particular

13  screen shot to identify Angela Horne?

14  A   Yes.

15  Q   All right.

16     And I take it that is because it says "Angela Horne

17  screen shot" on the subject line.

18  A   Yes.

19  Q   What, if any, response did you receive from

20  forwarding that screen shot?

21  A   I don't recall if I received a response at all.

22  Q   Okay.

23     Look with me at this particular e-mail set of

24  exchanges.  Do you see that.

25  A   Yes.

Bergazzi - direct

1   Q    All right.

2        Now, it says, "Wayne, ask yourself if she may have

3   been convicted of a crime in Tennessee."  Do you see that?

4   A    I do.

5   Q    And that is an e-mail from you to Wayne Covil and to

6   all WTVR broadcasting producers; correct?

7   A    Correct.

8   Q    Why did you ask that question?

9   A    I think I had started searching her name on line on

10  various people search sites to try to learn more about

11  her.  And I had come across what I believed was an

12  obituary for a Mr. Hodge, and listed one of the daughters

13  as Angela Hodge Horne.  So I was searching for Angela

14  Horne and Angela Hodge.  And I found Angela Hodge, who had

15  a criminal history in the State of Tennessee.  At that

16  point I sent it to Wayne saying, that this could be a path

17  worth looking into.

18  Q    You will see there up above it says from Mike

19  Bergazzi.  Well, says from Misty Davidson.  Who is that?

20  A    Assistant news director.

21  Q    Was she helping you search?

22  A    She was doing it independently of me.  I don't

23  remember working with her on this.

24  Q    Okay.

25       Well, it says, "Looks like Hodge is her middle slash

Bergazzi - direct

1    maiden name.  You probably already know that.  But I am

2    practicing my research skills."  Do you see that?

3    A    Yes.

4    Q    Did she tell you what she meant by that?

5    A    I assumed, like I said, doing the same thing as I

6    was, trying to learn more about Angela Horne once we had

7    that name, and she probably found that on line.

8    Q    Did you or Misty Davidson ever discover anything

9    about Angela Horne being convicted of a felony?

10   A    I don't believe that I did.

11   Q    In Virginia or anywhere?

12   A    I don't believe that I did.

13   Q    All right.

14        Did you find any identification information for Ms

15   Horne?

16   A    Can you define identification information?

17   Q    That was not a very good question.  You are correct.

18        Contact information.

19   A    I believe I found a phone number for -- that I

20   believed might have been for Angela Horne, and passed it

21   on to Wayne at some point.

22   Q    You weren't a hundred percent sure that number worked

23   for her, were you?

24   A    I was not a hundred percent, sure, no.

25   Q    You weren't sure at all, were you?

Bergazzi - direct

1   A    I don't know if I was sure at all.  I found a number

2   connected to that name, or I wouldn't have sent it to him.

3   Q    Was it connected to the Hodge Horne name or to the

4   Horne name?

5   A    I think it was likely Angela Horne.

6   Q    All right.

7        You didn't call that number, correct?

8   A    I did not.

9   Q    All right.

10       Did you call anybody at the school board office -- or

11  strike that -- did you call anybody at the

12  superintendent's office to find out Angie Horne's phone

13  number?

14  A    I did not.

15  Q    Do you know if anyone did?

16  A    I know Wayne reached out to Dr. Browder, who was the

17  spokesperson for the school system.  But other than that,

18  I don't know of anyone else.

19  Q    All right.

20       Are you aware of anybody at WTVR reaching out to

21  anyone to find out contact information for Angie Horne

22  other than what you have just testified about?

23  A    No.

24  Q    That is all I have.

25       Thank you.

```
 1        THE COURT:  All right.

 2        Cross examination?

 3        MR. SHUMADINE:  Just one moment, Your Honor.

 4        THE COURT:  Sure.

 5        MR. SHUMADINE:  No cross.

 6        THE COURT:  Well, that was quick.  All right.

 7        Does Mr. Bergazzi need to come back tomorrow?

 8        Let's have him come back and then.

 9        MR. HAWKINS:  Not from plaintiff.

10        THE COURT:  Apparently all we can do tomorrow on WTVR

11   is have advertisements.  The whole news staff is here.

12        MR. SHUMADINE:  I will contact him if he needs to

13   come back, and take responsibility.

14        THE COURT:  Thank you very much, Mr. Bergazzi.

15        THE WITNESS:  Thank you, Your Honor.

16                  (Witness stood aside)

17        THE COURT:  Who is next?

18        MR. HAWKINS:  Mrs. Barnhouse.

19        THE COURT:  All right.

20                    SHERYL BARNHOUSE

21           WAS SWORN AND TESTIFIED AS FOLLOWS:

22                    DIRECT EXAMINATION

23        THE COURT:  Thank you.

24        Good afternoon.

25        THE WITNESS:  Good afternoon.
```

Barnhouse - direct

1        THE COURT:  All right.

2    BY MR. HAWKINS:

3    Q    Mrs. Barnhouse, please state your full name for the

4    jury.

5    A    Sheryl Ann Barnhouse.

6    Q    What is your current position?

7    A    News director.

8    Q    For WTVR?

9    A    Yes, sir.

10   Q    All right.

11        For how long have you held that position?

12   A    I have held that position, it will be four years in

13   July.

14   Q    So you have that position back in February of 2015;

15   is that correct?

16   A    Yes, sir, I did.

17   Q    Permission to treat the witness as adverse.

18        THE COURT:  Yes.

19   Q    Mrs. Barnhouse, it's true, is it not, that prior to

20   February 13th of 2015 you had no idea who Angela Horne

21   was; is that correct?

22   A    That's correct.

23   Q    You never spoken with her?

24   A    No, sir.

25   Q    Never looked her up?

Barnhouse - direct                          212

1    A    No, sir.

2    Q    Never tried to find any identification information or

3    contact information about her?

4    A    No, sir.

5    Q    You had no idea whether or not she had been truthful

6    about disclosing a felony conviction when she got hired at

7    Prince George County school system?

8    A    No, sir.

9    Q    Never spoke with Dr. Browder?

10   A    Did not speak to Dr. Browder on my own; no, sir.

11   Q    All right.

12        Did there come a point in time when you learned that

13   Wayne Covil was looking to do a story about a felon hired

14   and then fired at Prince George County school system?

15   A    There came a point in time, quite honestly I think it

16   was at the point when I sent out that e-mail.

17   Q    Okay.

18        You have been sitting here, so you witnessed all the

19   testimony.  So you were copied, or you were forwarded the

20   e-mail that we have been talking about from SSSSmith869.

21   Do you see that?

22   A    Yes.

23   Q    You are Mr. Covil's supervisor; correct?

24   A    I am.

25   Q    You give him instructions and he is supposed to

1   follow them; correct?

2   A     Yes.  There is also other mangers that are

3   responsible for that as well.

4   Q     Okay.  Am I correct that in terms of the hierarchy

5   you are second in the food chain, chain of command?

6   A     We have my general manager, who is obviously in

7   charge of the entire station and other departments.  In

8   terms of the news department; yes, sir.

9   Q     That person is Steven Hayes; is that correct?

10  A     Yes, sir.

11  Q     Then it's you, correct?

12  A     Correct.

13  Q     All right.

14        Now, in terms of this particular e-mail, did you read

15  it?  And I will direct your attention to the e-mail.  This

16  is the stream, but the top half of that e-mail that says

17  that it was sent to you on or about 11:55 on February 13

18  of 2015.  Do you see that?

19  A     Yes, it was sent to all WTVR producers, which is all

20  of newscast producers and managers and assignment editors.

21  Q     That includes you?

22  A     Yes, sir.

23  Q     All right.

24        THE COURT:  How many people is that?

25        THE WITNESS:  Twenty-ish.

Barnhouse - direct

1        THE COURT:  Okay.

2    BY MR. HAWKINS:

3    Q    You responded; correct?

4    A    I did.

5    Q    All right.

6        There is an e-mail that says, "We need to pursue.

7    Wayne, are you reaching out for additional information,

8    name for starters.  Thanks.  S. B."  Is that you?

9    A    That is me.

10   Q    All right.

11        And you sent that e-mail at or around 11:57 on

12   February 13th, 2015; correct?

13   A    Correct.

14   Q    Did you ever have follow up with Mr. Covil about this

15   e-mail?

16   A    No.  Often times, this particular instance we were in

17   middle of a snow storm and I will see tips in my office or

18   see things like this and I will reach out and say, hey,

19   are we working on this?  And another follow manager will

20   come in and say, hey, actually Wayne has been on it the

21   last couple of hours if I can't attend an editorial

22   meeting.

23   Q    The snow storm was more important than a felon hired

24   and fired?

25   A    I guess it is subjective.

Barnhouse - direct

1    Q    Well --

2    A    I mean, yes, from a coverage standpoint we were very

3    busy with what was going on with the snow storm.

4    Q    That is more newsworthy to you than whether or not a

5    director at a local stool system got hired and fired;

6    correct?

7    A    I am not going to say definitively that it was more

8    newsworthy.  I think they are both important stories.

9    Q    Did the snow storm have a higher urgency?

10   A    In that particular instance, yes.  It was in the

11   morning, though.  It had been overnight.  So, throughout

12   the course of the late morning and afternoon it obviously

13   wasn't as significant.

14   Q    Am I correct that the reason that this story, this

15   hired and fired story -- strike that.

16        This story only aired at one time; correct?

17   A    It did.

18   Q    Aired at 5:30 on February 13?

19   A    Yes.

20   Q    And am I correct the reason that it didn't air

21   multiple times that same day, that same news cycle, was

22   because of the snow storm?

23   A    I would say there are many different reasons.  But

24   obviously I would say a snow storm could overshadow a

25   story like this.

Barnhouse - direct

1   Q    Okay.

2        Based on your recollection do you believe that the

3   news focus on the evening of February 13th was more on the

4   snow storm than it was on whether or not a local school

5   employee had been hired and fired?

6   A    I think that is fair to say, yes.

7   Q    Okay.

8        And to your knowledge Wayne never responded to you

9   with respect to this e-mail; correct?

10  A    Not to my knowledge.  Like I said, he is likely

11  driving around in the midst of interviewing, and someone

12  else notified me.

13  Q    Do you know if -- well, did anyone ever notify you

14  whether or not he reached out for additional information?

15  A    Whether or not he reached out regarding this e-mail?

16  Q    Yes.

17  A    I was under the impression that he -- I did not, but

18  at some point he had.  But I wasn't definitive about that.

19  Q    That he had reached out for more information?

20  A    Yes, or he would have responded to this.

21  Q    Okay.

22       And from what do you form that impression?

23  A    Just in conversations that we have had that I felt

24  like someone along the way said Wayne responded.  To try

25  to get more information.

Barnhouse - direct

1    Q    Okay.

2         But you don't know that.

3    A    I don't.

4    Q    Okay.

5         And you didn't follow up with him after this e-mail

6    to see if he did do any additional information?

7    A    No, sir, but we have a lot of reporters, and I don't

8    follow up with each one individually every single day.

9    So, no, sir.

10   Q    All right.

11        Well, you did see this -- sorry -- this e-mail;

12   correct?

13   A    Yes, sir.

14   Q    And it did raise enough of awareness to you to

15   specifically ask Mr. Covil to pursue further; correct?

16   A    Well, I would say that anyone with a school board --

17   or, sorry -- convicted felon possibly being hired by a

18   school system would raise a red flag and say we should

19   look into the story.

20        Like I said, he was in the midst of already looking

21   into the story, which I was unaware of.

22   Q    Well, but you took this e-mail and you said, pursue

23   this; correct?

24   A    Yes.

25   Q    Okay.

Barnhouse - direct

1    And you said that this e-mail raised red flags for

2    you that need to be further investigated; correct?

3    A    The red flags being that a convicted felon was hired

4    by the school system, which, of course, is newsworthy.

5    Q    Right.  It is also newsworthy how that person got

6    hired; correct?

7    A    Well, of course.

8    But you would also think a school system with all the

9    checks and balances in place, that -- I mean, what would

10   we think other than, you know, we did our due diligence in

11   making sure we questioned the superintendent, the person

12   responsible.

13   Q    Even though this e-mail says, is he really doing his

14   job?  Correct?

15   A    The responsibility, it doesn't justify fault.  They

16   are a government entity.  Of course you are going to

17   question the government entity in terms of -- this person,

18   obviously, they are the ones that did the hiring.

19   And we did.  We went and asked Browder.  Dr. Browder.

20   Q    But you put fault on Ms Horne, and on no one else.

21   A    Sir, we did not put fault on Ms Horne.  The statute

22   was -- may have inferred that -- but we did not put fault

23   on Ms Horne.  We read from the statute.

24   THE COURT:  Ma'am, we don't need any speech.

25   THE WITNESS:  Sorry.  Yes, Your Honor.

1      THE COURT:  Thank you.

2      Redirect or cross?

3      MR. SHUMADINE:  Just a moment, Your Honor.  I will

4   try to be brief.

5                    CROSS EXAMINATION

6   BY MR. SHUMADINE:

7   Q    Ms Barnhouse, at the time you got the -- thank for

8   leaving the e-mail up there, the SSSSmith e-mail -- were

9   you aware of anything Mr. Covil was doing in regard to

10   this story?

11   A    I wasn't.  That is -- I wouldn't have sent an e-mail

12   like that saying we need to pursue if I knew he was

13   already pursuing.

14   Q    What in the e-mail did you feel really needed to be

15   pursued?

16   A    That a convicted felon had been hired and fired.

17   Q    All right.

18      Let me ask you this.  Would you describe to the jury

19   WTVR's policy in regard to accuracy?

20   A    Well, we are committed to be accurate.  I think that

21   is what we stand for.  You know, if we don't have accuracy

22   then what do we have?  I think we felt very confident in

23   the interview that we had obtained, and the process that

24   had been explained to us, that I think any reasonable

25   person would take a look at the school system and how

1    something like this would be missed and not understand how

2    it would happen based on what Dr. Browder had told us.

3    Q    You have reviewed what Dr. Browder told you; is that

4    correct?

5    A    Yes, sir.

6    Q    Does that review give you any indication that

7    Dr. Browder knew at the time of the felony conviction?

8    A    None whatsoever.  I didn't even approve the script

9    myself.  Others did.  But in watching the broadcast I had

10   no doubt whatsoever, and in fact, Wayne had suggested if

11   Ms Horne or her attorney had called us after the fact and

12   said, wait a minute, or even five minutes before, wait a

13   minute, this is what has happened, the story would be

14   pulled.  We pull stories all the time right before the

15   news cast because we may have one iota of doubt.  And if

16   we have one iota of doubt that story does not air.

17   Q    Okay.

18        I have no further questions.

19        THE COURT:  All right --

20        MR. HAWKINS:  Your Honor, just briefly.

21                      REDIRECT EXAMINATION

22   BY MR. HAWKINS:

23   Q    Ms Barnhouse, what good does it do to call up the

24   news story after it has been aired, after the toothpaste

25   is out of the tube?

1    A    What good does it do?

2    Q    Yes.

3    A    I think it is setting the record straight.  If that

4    is what happened, if we were mislead by a superintendent

5    of schools, and Ms Horne wants to come and talk to us

6    whether releasing her identity or not, I think that

7    obviously is -- that is a follow up story.  That is the

8    public deserves to know if a school system violated the

9    law.  It is kind of a hard thing to believe.  And that is

10   a follow up story.

11   Q    Isn't that the kind of thing that should have been

12   the lead story?

13   A    Should have been the lead story?

14   Q    Wouldn't it have been the better newsworthy lead

15   story to say that the school system didn't hire a felon

16   properly, and got the law wrong?

17   A    Of course if we had known that; yes, sir.

18   Q    And you didn't pursue that issue, did you?

19   A    We -- there was no indication that Dr. Browder was

20   misleading us.

21        THE COURT:  Ma'am, really, ma'am, I understand how

22   strongly you feel about this.  He asked you a yes or no

23   question.  Please answer it.

24        THE WITNESS:  Yes, sir.

25        Would you please repeat?

1    BY MR. HAWKINS:

2    Q    You didn't pursue the story about whether or not the

3    school system had mislead WTVR or anybody else about

4    hiring a felon; correct?

5    A    Correct.

6    Q    And you said, I heard you in your testimony talk

7    about how you pride yourself on your accuracy; correct?

8    A    Correct.

9    Q    It is not accurate based on what you know now to say

10   that Ms Horne committed a class one misdemeanor by falsely

11   making a misrepresentation on her application for

12   employment at the Prince George County school system; is

13   it?

14   A    We didn't report that.

15        We simply reported --

16        THE COURT:  Ma'am -- ma'am.

17        THE WITNESS:  I am confused.

18        THE COURT:  Please answer the question.  Don't make a

19   speech.  Okay?

20        His question was, was she convicted, did she make a

21   false statement on her application.  Yes or no?

22        THE WITNESS:  No, she did not.

23        THE COURT:  Thank you.

24        THE WITNESS:  Sorry.  I misunderstood the question.

25        THE COURT:  You didn't misunderstand it.

1          All right.  Next witness.

2          MR. HAWKINS:  We rest.

3          THE COURT:  All right.

4          MR. HAWKINS:  Well, let me we move for the admission

5    of all exhibits.

6          THE COURT:  They are all admitted.

7                     (Witness stood aside)

8          Okay.

9          You had a motion?

10         MR. SHUMADINE:  Yes, sir.

11         THE COURT:  All right.

12         Ladies and gentlemen, can you step outside for a

13   minute.  I have some business to take up with the lawyers.

14   All right.

15                     (Jury withdrew)

16         THE COURT:  All right.

17         So you have got a rule 50 motion for judgment?

18         MR. SHUMADINE:  Sorry?

19         THE WITNESS:  You have a rule 50 motion?

20         MR. SHUMADINE:  There is a rule 50 motion.

21         Your Honor, we move for judgment as a matter of law

22   on the basis that the evidence even considered in the

23   light most favorable to the plaintiff can not establish

24   constitutional or actual malice.  The constitutional

25   actual malice requirement is that there must be serious

1    doubt as to the truth at the time the broadcast is made.

2    And the requirement is that the plaintiff produce clear

3    and convincing evidence of constitutional or actual

4    malice.

5        There is no evidence, I would respectfully suggest,

6    in this case indicating that anyone involved in the

7    broadcast had any doubt at the time, and whether they were

8    negligent, I am not -- I don't believe there is evidence

9    of negligence, but I am not going to argue that.  There

10   are a lot of things that -- I think that wishing you had

11   done more is different from negligence.  There are a lot

12   of things here that we wish we had done more.  We wish we

13   had seen more.  But, plainly the evidence is clear, and I

14   think convincing, that no one at the station had any

15   awareness or any suggestion that the school system knew or

16   could have known at the time of the broadcast.  If you

17   say, as Dr. Browder admits, he said -- and Mr. Covil says

18   he heard him say that the process stops if you know there

19   is a felony -- then there is no way that Ms Horne can be

20   hired.  That is the end of it.  Once he has said that,

21   unless you disbelieve Dr. Browder, or you believe that

22   Dr. Browder did not know the law, that ends it, I would

23   respectfully suggest.  I think The Court understands that.

24   We briefed it.  And I am -- I will certainly answer any

25   questions.  But I think that it is plain there is no

 1   actual malice.

 2        THE COURT:  Thank you.

 3        So, Mr. Hawkins, I guess, to me the question is --

 4   clearly they did not know it was false.  The question is

 5   whether they had serious doubt about the truth.

 6        MR. HAWKINS:  Well, and I looked at your jury

 7   instructions, and you have identified serious doubt.

 8   There is a corollary to that.

 9        THE COURT:  What is the corollary?

10        MR. HAWKINS:  The high degree of awareness of

11   falsity.  And in this case it can be proven as we

12   indicated in our bench brief through purposeful avoidance.

13        And the evidence we believe in this case clearly and

14   convincingly shows that there was a high degree of

15   awareness of falsity.  They closed the books on the story

16   after Mr. Covil did his interview of Dr. Browder.  And

17   they had reason to go further.  Not just negligent reason

18   or reasonable care, they had, they had fingers pointed and

19   they had reason to believe that there was more to this

20   story that they needed to go to, and they needed to

21   investigate.  And the case law talks about the failure to

22   look for obvious information.  The failure to look for

23   obvious sources.  The failure to pursue that which is

24   right in front of you.  And they had that which was right

25   in front of them.

1        And they chose, and they undeniably chose not to go

2    forward.

3        THE COURT:  Let me ask you this:  Suppose Dr. Browder

4    had said to them, Angela Horne lied on her application.

5    At that point would they have an obligation to go forward

6    and investigate more?

7        MR. HAWKINS:  I think they would have, yes.  I think

8    that is no question about that.

9        THE COURT:  Why would they have an obligation if he

10   told them that, to seek more information?

11       MR. HAWKINS:  Well, if he says this, they need to

12   find out if in fact -- that is a serious charge.

13       THE COURT:  Yes.

14       MR. HAWKINS:  That is a serious charge that be puts

15   out there.  I think a news station has an obligation to

16   find out whether or not that kind of direct accusation,

17   which of course they did here, without using those words,

18   was true.  And, let's put it this way.  If that were all

19   the case was about, and with your hypothetical if

20   Dr. Browder had said that, and then they had not gotten

21   this anonymous e-mail, and it may sound like I am harping

22   on this quite a bit -- and I am -- and the reason for that

23   is there is your false, your awareness of falsity.

24       THE COURT:  Talking about the SSSSmith?

25       MR. HAWKINS:  That is exactly what I am talking

1    about.

2         THE COURT:  But SSSSmith e-mail says, reading between

3    the lines, that Browder knew she was a convicted felon.

4         MR. HAWKINS:  That is not how I read it.

5         THE WITNESS:  And they hired her anyhow.

6         MR. HAWKINS:  And if that is true -- well, actually,

7    that interpretation is exactly the point.  That is the

8    story they say they wished they had done.  That they

9    should have done.  That is the more newsworthy story.

10   That is my point.  That e-mail places fingers, points

11   fingers, raises doubts about the veracity of Dr. Browder

12   and raises fingers and points fingers at the school board

13   and says they probably knew this, and yet they allowed her

14   to continue on.

15        Now, it didn't say enough directly, but they didn't

16   ask.  They didn't follow up.  Mr. Covil says he did, but

17   he didn't.  But he did, but he didn't.  And the truth of

18   the matter is he didn't follow up.  Nobody followed up.

19   And with that e-mail, they should have followed up and

20   their failure to do so is purposeful avoidance, it is the

21   proverbial ostrich burying their head in the sand.  We

22   think -- we recognize without any hesitation it must be

23   clear and convincing.  We recognize it is a high standard

24   and should be, but we submit that we have met it here, and

25   we ask the motion be denied.

1    THE COURT:  We will take a break here and I'll be

2    back.

3                      (A recess was taken)

4    THE COURT:  All right.

5    I have gone through the evidence that we have and

6    looked at some cases.  I conclude that the motion for

7    judgment as a matter of law must be granted at this time.

8    Essentially what we have here is evidence that Wayne Covil

9    had information that somebody had been hired and fired.

10   That Dr. Browder told him that you can't hire a felon.

11   That Browder further told him that the job application has

12   to say whether there is a felony conviction.  And that

13   from that Covil inferred that she lied on the application;

14   otherwise it would not have gone forward.  Yes, he could

15   have investigated more.  Yes, it is probably not first

16   class reporting.  But -- and it would have been a better

17   story if they had nailed Browder.  But they didn't.

18   I am very sorry, Ms Horne, but this is a tough case

19   in the way the law works in our country.  It is designed

20   to protect the press so they than can feel -- that they

21   can bring to us the truth no matter how popular or

22   unpopular it is.  And you have heard our current president

23   talk about how he doesn't think the liable laws are fair

24   to people in his shoes, and and you may join him in that

25   sentiment after this.  But I am very sorry.  I am going to

```
1    grant the motion.

2        Let me congratulate both sides on a job well done.

3        Mr. Hawkins, you took a tough uphill battle, and I

4    appreciate your work on this.  I will come down and shake

5    hands with everybody.  And then we will adjourn court for

6    the day.  Or adjourn court for the day, and then I will

7    come down and shake hands.

8

9                    HEARING ADJOURNED.

10

11       THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

12

13

14                GILBERT FRANK HALASZ, RMR

15                 OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25
```